# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

|  |  |  |
|---|---|---|
| FIDEL BRETO d/b/a FAMILY FOODS, On Behalf of Himself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:07-cv-188 |
| | ) | JUDGE GREER |
| v. | ) | MAGISTRATE JUDGE INMAN |
| | ) | |
| DEAN FOODS COMPANY, *et al.,* | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |
|  | ) | |

**DEFENDANTS SOUTHERN MARKETING AGENCY, INC.'S AND JAMES BAIRD'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR 12(B)(6) MOTION TO DISMISS
PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM**

i

# TABLE OF CONTENTS

OVERVIEW ........................................................................................................... 1

PROCEDURAL AND FACTUAL BACKGROUND ............................................... 2

PLEADING STANDARD UNDER FED. R. CIV. P. 12(B)(6) ............................... 5

ARGUMENT ....................................................................................................... 6

I.    The Capper-Volstead Act Immunizes SMA's and Baird's Actions From Antitrust Challenges .................................................................. 6

     A.    SMA Qualifies as a Capper-Volstead Cooperative ................................ 6

     B.    In Light of the Broad Immunity Afforded SMA and Baird by Capper-Volstead, Plaintiff Has Failed to State a Claim for Federal Antitrust Violations Upon Which Relief Can Be Granted .................... 7

II.   The Filed Rate Doctrine Bars Plaintiff's Allegations That SMA Is "Flooding" the Southeastern Market ................................................. 10

     A.    Governmental Regulation of Milk Prices ............................................ 11

     B.    The Filed Rate Doctrine ...................................................................... 13

     C.    The Filed Rate Doctrine Bars Plaintiff's Causes of Action Against SMA ................ 13

III.  Plaintiff Has Not Stated a Plausible Claim that Baird and SMA Are Part of an Illegal Conspiracy ................................................................. 15

     A.    Plaintiff's Specific Allegations Against Baird and SMA are Insubstantial .............. 16

     B.    *Twombly* Sets the Standard for Pleading in This Case ............................. 19

     C.    Plaintiff Fails to Plausibly Allege that Baird or SMA Ever Joined an Illegal Conspiracy ............................................................... 21

     D.    Plaintiff Has, at Most, Alleged Independent Conduct by Baird and SMA .............. 22

     E.    Plaintiff Has Not Met the Burden of Pleading Required by the Capper-Volstead Act ............................................................................. 24

     F.    Plaintiff's Generalized Allegations About "Defendants" are Not Sufficient to State a Claim Against Baird or SMA .............................. 25

     G.    Baird May Not be Sued as an Individual Because Plaintiff Has Failed to Allege Specifically That He Actively and Knowingly Engaged in Wrongdoing .......................................... 26

IV.  Plaintiff Has Not Alleged that Baird or SMA Possess Unlawful Monopsony or Monopoly Power ................................................................. 28

V.   Plaintiff Has Failed to Sufficiently Plead a Cause of Action for Unjust Enrichment Against SMA and Baird ..................................................... 29

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&D Supermarkets. Inc., # 2 v. United Food and Commercial Workers Local Union,*
732 F. Supp. 770 (N.D. Ohio 1989) ............................................................................. 27-28

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.,*
914 F. Supp. 814 (N.D.N.Y. 1996) ................................................................................ 7, 11

*Bell Atlantic Corp. v. Twombly,*
127 S. Ct. 1955 (2007) ....................................................................................*passim*

*Bell v. Fur Breeders Agricultural Cooperative,*
348 F.3d 1224 (10th Cir. 2003) ........................................................................... 10

*Brown v. Donco Enterprises, Inc.,*
783 F.2d 644 (6th Cir. 1986) ........................................................................... 27-29

*Dodd v. Woods Mem'l Hosp.,*
2007 WL 2463275 (E. D. Tenn. Aug. 28, 2007) .................................................. 5

*Estate Constr. Co. v. Miller & Smith Holding Co.,*
14 F.3d 213 (4th Cir. 1994) ........................................................................... 22

*Ezzo's Investments, Inc. v. Aveda Corp.,*
2000 WL 1888677 (6th Cir. Dec. 19, 2000) ......................................................... 22

*Fairdale Farms, Inc. v. Yankee Milk, Inc.,*
625 F.2d 1037 (2d Cir. 1980) ........................................................................... 8-10

*Farmers Union Milk Marketing Cooperative v. Yeutter,*
930 F.2d 466 (6th Cir. 1991) ........................................................................... 12

*Freeman Indus. LLC v. Eastman Chem. Co.,*
172 S.W.3d 512 (Tenn. 2005) ........................................................................... 29

*Green v. Associated Milk Producers, Inc.,*
692 F.2d 1153 (8th Cir. 1982) ........................................................................... 8, 10

*Keogh v. Chicago & Northwestern Railway,*
260 U.S. 156 (1922) ....................................................................................*passim*

*Jung v. Ass'n of Am. Med. Colleges,*
300 F. Supp. 2d 119 (D.D.C. 2004) ..................................................................... 26

*L. & L. Howell, Inc. v. Cincinnati Co-op. Milk Sales Ass'n,*
1983 WL 162169 (6th Cir. Jul. 20, 1983) ........................................................... 9-10

*Maryland & Virginia Milk Producers Ass'n, Inc. v. U. S.*,
    362 U.S. 458 (1960)................................................................................ 11

*Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*,
    341 U.S. 246 (1951)................................................................................ 14

*Murphy Tugboat v. Shipowners & Merchants Tugboat Co.*,
    467 F. Supp. 841 (N.D. Cal. 1979)....................................................... 27

*Nat'l Farmers Org. v. Associated Milk Producers, Inc.*,
    687 F.2d 1173 (8th Cir.1982)............................................................ 6, 8

*Scheid v. Fanny Farmer Candy Shops, Inc.*,
    859 F.2d 434 (6th Cir. 1988)................................................................... 5

*Servais v. Kraft Foods, Inc.*,
    631 N.W.2d 629 (Wis. App. 2001)................................................... 15-16

*Stark v. Wickard*,
    321 U.S. 288 (1944)......................................................................... 14-15

*Treasure Valley Potato Bargaining Assoc. v. Ore-Ida Foods, Inc.*,
    497 F.2d 203 (9th Cir. 1974)................................................................... 9

*U.S. v. Dairymen*,
    660 F.2d 192 (6th Cir. 1982)........................................................... 6, 8, 9

*United States v. United States Gypsum Co.*,
    438 U.S. 422 (1978)....................................................................... 27, 29

*Vermilion Foam Products Co. v. General Electric Co.*,
    386 F. Supp. 255 (E.D. Mich. 1974) .................................................... 26

### STATUTES

Agricultural Marketing Agreement Act of 1937 ("AMAA"), 7 U.S.C. § 601, *et seq* ................. 12

Capper-Volstead Act, 7 U.S.C. § 291 ...........................................................*passim*

### OTHER AUTHORITIES

7 C.F.R. §§ 1005.7 ................................................................................ 12-13

7 C.F.R. §§ 1005.13................................................................................ 12-13

7 C.F.R. §§ 1007.7 ................................................................................ 12-13

7 C.F.R. §§ 1007.13................................................................................ 12-13

Fed. R. Civ. P. 12(b)(6) ................................................................................*passim*

Fed. R. Civ. P. 8 ...................................................................................................... 9

Restatement (First) of Restitution § 1 ..................................................................... 29

# OVERVIEW

Plaintiff alleges a wide-ranging anti-trust conspiracy among various corporations, associations, and individual defendants, including relatively small players like Defendants Southern Marketing Agency, Inc. ("SMA") and James Baird ("Baird"), to monopolize the purchase of Grade A milk with the purpose and effect of unlawfully depressing and stabilizing prices paid to dairy farmers and cooperatives for their raw Grade A milk. Plaintiff further alleges that this conspiracy has the added effect of artificially inflating the retail price for processed Grade A milk purchased by Plaintiff and other direct milk purchasers. Plaintiff's Complaint fails at the most fundamental level and must be dismissed.

First, grievously omitted from the Complaint is any mention of the Capper-Volstead Act, 7.U.S.C. § 291, which immunizes and protects the conduct of SMA and Baird to the extent they were involved in meeting, discussing, and acting upon issues relating to the sale, handling, and marketing of raw Grade A milk to dairy processors and bottlers.

Second, the filed rate doctrine enunciated in *Keogh v. Chicago & Northwestern Railway*, 260 U.S. 156 (1922), bars Plaintiff's claims of "flooding" against SMA. The Federal Milk Marketing Order ("FMMO") program established by the United States Department of Agriculture ("USDA") dictates what and how much milk is eligible to be "pooled" in each geographic federal marketing order ("Order") and establishes therefrom the minimum blend prices paid to dairy farmers for their raw Grade A milk. Plaintiff's claims of flooding, in essence, challenge the decisions made by the federal government with regard to the amount of milk to be "pooled" by Defendants in Orders 5 and 7 and the minimum blend prices related thereto. Plaintiff's Complaint, thus, flies in the face of the filed rate doctrine.

Third, Plaintiff's Complaint does not set forth specific facts, as required by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), plausibly alleging who, what, when, where, or how SMA or Baird joined or participated in any of the alleged wrongful agreements beyond purportedly being involved in monitoring the prices paid to dairy cooperative members and marketing, transporting, and pooling its members' milk—all of which are legally protected activities under federal law.

Further, Counts Three and Four of Plaintiff's Complaint, asserting causes of action for unlawful monopolization and monopsony, do not allege that SMA or Baird possess unlawful monopoly or monopsony power and, therefore, fail to state a claim against SMA and Baird. Moreover, Count Six of Plaintiff's Complaint, asserting a cause of action for unjust enrichment, fails to allege that Plaintiff directly or indirectly conferred any benefit upon SMA or Baird and, thus, fails to state a claim against SMA and Baird.

For these reasons,[1] Plaintiff's Complaint fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and should, therefore, be dismissed in its entirety.

## PROCEDURAL AND FACTUAL BACKGROUND

On August 6, 2007, Plaintiff, a direct purchaser of processed Grade A milk, filed a class action complaint on behalf of all similarly situated direct milk purchasers against several dairy cooperatives, bottlers, marketing agencies, and individuals, including Dean Foods Company ("Dean"), National Dairy Holdings, L.P. ("NDH"), Dairy Farmers of America, Inc. ("DFA"), Dairy Marketing Services, LLC ("DMS"), Gary Hanman ("Hanman"), Gerald Bos ("Bos"), SMA, and Baird (collectively "Defendants"). (Compl. at 2.) Specifically, Plaintiff alleges

---

[1] In addition to the grounds stated herein, SMA and Baird adopt and incorporate by reference the grounds and arguments made in the Motion to Dismiss and Joint Memorandum of Law filed by Defendants Dean Foods Company, National Dairy Holdings, L.P., Dairy Farmers of America, Inc., Dairy Marketing Services, LLC, Gary Hanman, and Gerald Bos.

2

conspiracy-related causes of action under Sections 1 and 2 of the Sherman Act and a common law cause of action for unjust enrichment against all Defendants. (Compl. ¶¶ 84-101, 118-31.) Further, Plaintiff alleges causes of action for monopoly against DFA and for monopsony against DFA, Dean, and NDH. (Compl. ¶¶ 102-17.) Plaintiff does not name or seek damages from SMA or Baird for these latter two causes of action. (Compl. ¶¶ 102-17.) Defendants SMA and Baird now move to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

SMA is a milk marketing agency in common comprised of dairy cooperatives, each of which is comprised of numerous dairy farmers. (*See, e.g.*, Compl. ¶¶ 16, 41, 43.) Baird is the manager of SMA and the officer, director, and general manager of Lone Star Milk Producers, Inc., a dairy cooperative based in Texas and a cooperative member of SMA. (Compl. ¶ 17.) SMA, and Baird as SMA's manager, like the dairy cooperatives of which it is comprised, handles and markets the collective milk produced by SMA's dairy cooperative members and, in turn, their member farmers. (*See, e.g.*, Compl. ¶ 41.) SMA's responsibilities, like those of its dairy cooperative members, include locating buyers, negotiating sales prices, coordinating hauling, performing testing, recording and reporting data to the local federal milk market administrator ("Market Administrator"), and paying member cooperatives for their raw Grade A milk. (*See, e.g.*, Compl. ¶ 41.) Similar to its dairy cooperative members, SMA only sells, markets, and transports its members' raw Grade A milk to dairy processors and bottlers and does not, itself, process the raw Grade A milk for resale to direct milk purchasers, like Plaintiff. (*See, e.g.*, Compl. ¶ 41.)

SMA markets raw Grade A milk through the comprehensive regulatory framework of the FMMO program, which was established by the USDA and is administered by the Secretary of

Agriculture (the "Secretary") and the local Market Administrator. (*See* Compl. ¶¶ 30-31.) As the Complaint alleges, the USDA via the FMMO establishes the minimum prices paid for each Class of Grade A milk, as well as the minimum blend prices paid for milk pooled within a specific marketing Order, including Orders 5 and 7 which are at issue in this action. (Compl. ¶¶ 30-35.) Pursuant to the FMMO, the USDA and Market Administrator also broadly oversee and monitor the sale and marketing of raw Grade A milk produced by dairy farmers, cooperatives, and their marketing agencies within each relevant Order. (Compl. ¶¶ 30-35.)

Despite recognizing that SMA, Baird, and the other Defendants operate within this comprehensive and complex regulatory framework (*see, e.g.*, Compl. ¶¶ 22-40), Plaintiff nonetheless alleges, in a conclusory fashion, that Defendants engaged in a broad conspiracy to monopolize the market for raw Grade A milk with the purpose and effect of depressing and stabilizing prices paid to dairy farmers and cooperatives for Grade A milk produced in the Southeast. (*See* Compl. ¶¶ 1, 2e, 45, 47, 63, 65-66.) Plaintiff further alleges, without specificity or support, that Defendants' conspiracy to depress prices paid to dairy farmers and cooperatives has had the added effect of artificially inflating the retail prices paid by Plaintiff for the processed Grade A milk it purchases from Defendants. (*See* Compl. ¶¶ 1, 4, 45, 47, 70.)

In support of these broad antitrust allegations, Plaintiff alleges that Dean, DFA, and NDH entered into several long-term, exclusive full-supply agreements to limit the access to fluid Grade A milk bottling plants by dairy farmer and cooperative members of DFA, SMA, and DMS, and to thereby depress the over-order premiums paid by processors and bottlers to these dairy farmers for their raw Grade A milk. (*See* Compl. ¶¶ 2a, 46, 53, 57-59, 62-63.) Plaintiff alleges that, by means of these full-supply agreements, threats, boycotting, or punishment, DFA and Dean have forced and coerced dairy farmers and cooperatives into marketing their raw

Grade A milk through DMS and/or SMA in order to gain access to fluid Grade A milk bottling plants. (*See* Compl. ¶¶ 2b-h, 45, 57-59, 62-64.)

Plaintiff does not allege that SMA or Baird entered into any long-term, exclusive full-supply agreements. Plaintiff does not allege that SMA or Baird engaged in coercion, boycotting, or punishment. Plaintiff does not allege that SMA or Baird processed raw Grade A milk. Finally, Plaintiff does not allege that SMA or Baird sold Grade A milk to Plaintiff or any other direct milk purchaser. At most, Plaintiff's Complaint alleges only that SMA and Baird monitored the prices paid to its dairy cooperative members for their raw Grade A milk, that SMA charged its cooperative members purportedly inappropriate fees and transportation costs, and that SMA "flooded" the Southeast market with milk from the Southwest. (*See, e.g.*, Compl. ¶¶ 2g, 59-60, 63.)

## PLEADING STANDARD UNDER FED. R. CIV. P. 12(B)(6)

Federal Rule of Civil Procedure 12(b)(6) provides a court with the authority to dismiss a complaint if it fails to state a claim upon which relief can be granted. *Dodd v. Woods Mem'l Hosp.*, No. 06 CV 56, 2007 WL 2463275, at *2 (E. D. Tenn. Aug. 28, 2007). In other words, Rule 12(b)(6) "tests whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Accordingly, to survive dismissal, a "pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007) (*citing* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216 at 235-36 (3d ed. 2004)).

**ARGUMENT**

**I.    The Capper-Volstead Act Immunizes SMA's and Baird's Actions From Antitrust Challenges**

The Capper-Volstead Act, 7 U.S.C. § 291, enables dairy farmers and cooperatives, among others, to band together to collectively market and sell their milk without fear of violating the federal antitrust laws.  *See U.S. v. Dairymen*, 660 F.2d 192, 194 (6th Cir. 1982); *Nat'l Farmers Org. v. Associated Milk Producers, Inc.*, 687 F.2d 1173, 1184-85 (8th Cir.1982). Specifically, Capper-Volstead provides:

> [p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, *in collectively processing, preparing for market, handling, and marketing* in interstate and foreign commerce, such products of persons so engaged.  *Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes.*

7 U.S.C. § 291 (emphasis added).  In light of this permissive language, it becomes clear that the Plaintiff is challenging the very milk marketing and handling efforts that SMA and Baird are legally entitled to carry out pursuant to the protections afforded by Capper-Volstead.

**A.    SMA Qualifies as a Capper-Volstead Cooperative**

In order to qualify for Capper-Volstead immunity, an agricultural cooperative must satisfy two requirements:  "First, the organization claiming to be immunized from liability must be composed of 'members' that are 'producers of agricultural products' or *cooperatives composed of such producers*.  Second, such an organization must be involved in the 'processing, preparing for market, handling, or marketing' of the agricultural products of its members." *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 823 (N.D.N.Y. 1996) (emphasis added); *see also* 7 U.S.C. § 291.  SMA satisfies both of these requirements.

6

First, SMA is a "marketing agency in common" comprised of dairy cooperatives, including Lone Star Milk Producers, Inc. and Dairy Farmers of America, Inc., each of which in turn is comprised of numerous dairy farmers/producers. *See* 7 U.S.C. § 291 (associations of dairymen "may have marketing agencies in common"). Second, SMA operates for the sole benefit of its member-cooperatives in marketing their raw milk throughout the Southeastern marketing region. This activity goes to the heart of the reason why dairy cooperatives join SMA—to take full competitive advantage of the collective marketing of the raw milk produced by their dairy farmer members. Moreover, SMA arranges for the transportation and hauling of milk for the collective benefit of its member cooperatives, activities that bring SMA, and Baird as its manager, within the protection afforded by Capper-Volstead. *See Green v. Associated Milk Producers, Inc.*, 692 F.2d 1153, 1157 (8th Cir. 1982).

**B.     In Light of the Broad Immunity Afforded SMA and Baird by Capper-Volstead, Plaintiff Has Failed to State a Claim for Federal Antitrust Violations Upon Which Relief Can Be Granted**

First, to the extent Plaintiff challenges SMA's and Baird's activities in connection with the sale and marketing of their cooperative members' raw Grade A milk and the fees and costs they charge to SMA's cooperative members (*see, e.g.*, Compl. ¶¶ 59, 63), such activity is immunized by the Capper-Volstead Act. Courts have consistently interpreted the Capper-Volstead Act to permit "[t]wo or more cooperatives [to] voluntarily join together solely for the purpose of setting uniform prices for their members." *Dairymen*, 660 F.2d at 194; *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 625 F.2d 1037, 1039 (2d Cir. 1980). This means that, under Capper-Volstead, marketing agencies in common, like SMA, are authorized to enter into milk marketing arrangements to establish prices paid to their member cooperatives. *See Nat'l*

*Farmers Org.*, 687 F.2d at 1184 ("the milk marketing contracts and programs promoted by NFO . . . do not constitute actionable price fixing in light of the Capper-Volstead exemption.").

Second, to the extent Plaintiff alleges anticompetitive behavior based upon the fact that SMA (and DMS) market nearly all of the Grade A milk produced in the Southeast (Compl. ¶ 63), such an allegation is precluded by Capper-Volstead, which sanctions the acquisition of monopoly power by dairy cooperatives and/or marketing agencies in common. "Capper-Volstead gives farmers the right to combine into cooperative monopolies." *Fairdale Farms*, 635 F.2d at 1040; *see also Dairymen*, 660 F.2d at 194 ("[A]n agricultural cooperative can willfully attain a monopoly through the voluntary enrollment of its members, or through a voluntary combination with other cooperatives. The mere accretion of monopoly power through voluntary combination is immunized by the Capper-Volstead Act."). Plaintiff has not alleged that SMA and Baird increased SMA's membership by anything but voluntary means.

Third, to the extent Plaintiff alleges anticompetitive behavior against SMA and Baird in connection with SMA's "monitoring" of the prices paid to its dairy cooperative and farmer members (*see, e.g.*, Compl. ¶¶ 2g, 63, 69), such an allegation is likewise precluded by Capper-Volstead. Courts have broadly interpreted "marketing" under the Capper-Volstead Act to include "[t]he aggregate of functions involved in transferring title and in moving goods from producer to consumer, including among others buying, selling, storing, transporting, standardizing, financing, risk bearing, *and supplying market information.*" *Treasure Valley Potato Bargaining Assoc. v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir. 1974) (emphasis added); *see also Fairdale Farms*, 625 F.2d at 1040. Clearly, then, any actions taken by SMA and Baird to "monitor" the prices paid to dairy farmers are protected under the broad umbrella of "marketing" protection afforded by Capper-Volstead.

Plaintiff also alleges antitrust violations based upon the fact that SMA and DFA share common employees "who enable Defendants to monitor and enforce compliance with their conspiracy." (Compl. ¶ 68.) Putting aside the fact that DFA is a member of SMA and that any allegation of conspiracy between SMA and DFA would necessarily amount to an allegation that SMA was conspiring with itself, Capper-Volstead expressly authorizes marketing agencies in common and/or cooperatives to "conspire" with other marketing agencies in common and/or other cooperatives to handle and market raw Grade A milk. *See L. & L. Howell, Inc. v. Cincinnati Co-op. Milk Sales Ass'n*, 716 F.2d 903 (Table), Nos. 81-3491 & 81-3492, 1983 WL 162169, at *4 (6th Cir. Jul. 20, 1983) (two dairy cooperatives can "conspire" together under the auspices of Capper-Volstead to effectuate the hauling of raw milk for their Order).

Finally, Plaintiff complains that SMA has intentionally "flooded" the Southeast market with Grade A milk from the Southwest to reduce the prices received by dairy farmers. (Compl. ¶ 60.) Plaintiff further complains that SMA has engaged in anticompetitive behavior in connection with SMA's transportation of milk into the Southeast market. (Compl. ¶¶ 60.) In essence, these allegations challenge SMA's "handling" and "hauling" of raw Grade A milk, activities that are expressly protected and immunized by Capper-Volstead.[2] *See Green*, 692 F.2d at 1157 ("'Handling' encompasses milk hauling. The nature of milk as a product is such that it must be transported quickly and under controlled conditions to the processing plant so that its freshness and purity are maintained. It is therefore central to the functions of a milk co-op to insure that this transportation takes place properly.").

---

[2] Moreover, to the extent Plaintiff challenges SMA's decision to utilize a Baird-owned trucking company for the transportation of its cooperative members' Grade A milk in the Southeast marketing region (Compl. ¶ 69), such a challenge is also precluded. Capper-Volstead authorizes cooperatives and marketing agencies in common to enter into "the necessary contracts and agreements to effect the "handling" of milk. *See L. & L. Howell, Inc. v. Cincinnati Co-op. Milk Sales Ass'n*, 716 F.2d 903 (Table), Nos. 81-3491 & 81-3492, 1983 WL 162169, at *4 (6th Cir. Jul. 20, 1983); *see also* 7 U.S.C. § 291.

Admittedly, "a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment, boycotts, coerced membership, and discriminatory pricing." *Fairdale Farms*, 635 F.2d at 1044 (citations omitted); *see also Bell v. Fur Breeders Agricultural Cooperative*, 348 F.3d 1224, 1232 (10th Cir. 2003). However, the facts pleaded by Plaintiff against SMA and Baird fail to place SMA's and Baird's activities beyond the sanctuary of the Capper-Volstead Act. Nowhere in the Complaint does Plaintiff specifically allege that either SMA or Baird boycotted, threatened, harassed, or coerced any dairy cooperatives into joining SMA. *Compare Maryland & Virginia Milk Producers Ass'n, Inc. v. U. S.*, 362 U.S. 458, 468 (1960) (plaintiffs specifically alleged that defendant dairy cooperative interfered with truck shipments of non-members' milk, attempted to induce dairy bottling to stop using non-member producers, and engaged in boycott of feed and farm supply owners who owned competitive dairy); *Agritronics*, 914 F. Supp. at 826 (plaintiffs specifically alleged that defendant dairy cooperative itself coerced plaintiffs' membership, barred access to essential facilities, and forbade private testers from competing with defendants). At best, Plaintiff has merely recited conclusory allegations of predatory behavior against "Defendants" as a whole, allegations of which are insufficient to plead SMA and Baird beyond the protection of Capper-Volstead.

## II. The Filed Rate Doctrine Bars Plaintiff's Allegations That SMA Is "Flooding" the Southeastern Market

Plaintiff contends that SMA is intentionally "flooding" the Southeastern market with outside milk (*e.g.*, milk produced in another marketing order) in order to depress the prices paid to Southeast dairy farmers for their raw Grade A milk. (Compl. ¶ 60.) Plaintiff, however, fails to mention that the Market Administrator absolutely determines and controls what and how much milk can be pooled in each respective Order and, in turn, establishes the

minimum blend prices therefrom. In light of the Market Administrator's strict control over the volume of milk pooled in an Order and the corresponding minimum blend prices, the unilateral "flooding" of the market alleged by Plaintiff becomes a practical impossibility.

Plaintiff's claims of "flooding" against SMA amount to nothing more than an attack on the Market Administrator's determination of the volume of milk to be pooled in Orders 5 and 7 *and* his establishment of the minimum blend prices for raw Grade A milk derived therefrom. Plaintiff's claims against SMA are, therefore, barred by the filed rate doctrine to the extent they seek to attack the federally-dictated volume of milk eligible to be pooled on Orders 5 and 7 and the corresponding federally-mandated minimum blend prices.[3]

### A.       Governmental Regulation of Milk Prices

Congress enacted the Agricultural Marketing Agreement Act of 1937 ("AMAA") in order to establish and maintain orderly marketing conditions and fair prices for agricultural commodities, including milk and dairy products. 7 U.S.C. § 601, *et seq.* "Congress eschewed reliance on market forces to price milk and has substituted a complex regulatory scheme to control the prices paid to producers." *Farmers Union Milk Marketing Cooperative v. Yeutter*, 930 F.2d 466 (6th Cir. 1991). Acting pursuant to the authority of the AMAA, therefore, the Market Administrator monitors, regulates, and sets the prices paid for raw Grade A milk for each Order. Inherent in this authority is the Market Administrator's power to determine what and how much milk is eligible to be pooled in each respective Order. *See* 7 C.F.R. §§ 1005.7, 1005.13, 1007.7, 1007.13. Based on his determination of the volume of milk to be pooled, the Market Administrator then establishes the minimum blend prices for the raw Grade A milk participating in the pool for each respective Order. *See* 7 C.F.R. §§ 1005.7, 1005.13, 1007.7, 1007.13.

---

[3]       Plaintiff does not allege that Baird was involved in any "flooding" of the Southeast market. Even if Plaintiff did so allege, Baird would be protected by the filed rate doctrine for the same reasons SMA is protected.

Milk is pooled in a Federal Order under two processes. Under the default process, Grade A milk is delivered from a farm to a "pool plant," whereby that milk is automatically pooled at the plant where the milk is received and, thus, "pooled" in the Order under which the plant is regulated. In addition, milk can be pooled by a process called "diversion," which means the milk is delivered from the farm directly to a "nonpool plant," but is nevertheless included in the monthly Order pool. *See* 7 C.F.R. §§ 1007.13(c), 1007.13(d), 1005.13(c), 1005.13(d). The amount of milk eligible to be pooled by diversion is determined by the Market Administrator.[4]

The limits on milk pooled by diversion in an Order during a month are absolute and inviolable.[5] The Market Administrator will reject and exclude from the Order pool any milk that exceeds the diversion limitations that have been established. *See* 7 C.F.R. §§ 1007.13(5), 1005.13(5). In other words, the Market Administrator renders ineligible for pooling any such excessive milk, thereby preventing that milk from taking advantage of and affecting the minimum blended price. Based upon this comprehensive regulatory framework, it is therefore impossible for a dairy farmer, cooperative, or marketing agency in common to "flood" a pool or "flood" a market with excessive amounts of milk.

---

[4]    In determining the amount of milk to be pooled by diversion on a specific Order, the Market Administrator considers: (1) the producer delivery-day requirements (also known as the "touch base" requirements), and (2) the diversion percentage limitations. *See generally* 7 C.F.R. §§ 1007.13(c), 1007.13(d), 1005.13(c), 1005.13(d).
    The producer delivery-day requirements define which farms have met the Order's requirement for service to the Class I marketplace by virtue of their delivery of Grade A milk to pool plants *not less* than the federally mandated requisite number of days each month—this is called "touching base." A dairy farmer who during the month meets the delivery-day requirements or "touches base" the requisite number of days for the Order may have his milk diverted the remaining days of the month. *See generally id.*
    The diversion percentage limitations establish the confines within which cooperative associations, marketing agencies in common, or pool plant operators, collectively referred to as "handlers," must function with regard to the volume of milk the handler may pool by diversion for all the handler's producer-farms collectively. The diversion percentage limitations are stated as a maximum percentage of the handler's monthly volume of Grade A milk deliveries to pool plants directly from the farms. *See generally id.*
    In light of these considerations, the volume of monthly production which may be diverted to nonpool plants is directly related to the serving of the Class I marketplace by those farms as a group.
[5]    In all instances, Order provisions codify the Order's initial diversion provisions. However, the producer delivery-day requirements and diversion limitation percentage provisions may be altered by the Market Administrator based on current market conditions. 7 C.F.R. §§ 1007.7, 1005.7. The Market Administrator may also adjust the pooling qualification criteria for pool supply plants. *Id.*

Noteworthy is the fact that in the Orders there are no distinctions made between the location of the farms and their ability to participate in an Order pool. A distant farm which delivers to an Order pool plant is entitled to the Order minimum blended price in the same way and at the same rate as a nearby farm delivering to the same Order pool plant. Farms located outside an Order area are treated the same as farms located within the Order area. The Orders are consequently impartial, thereby establishing and applying provisions that "insure a sufficient quantity of pure and wholesome milk" is delivered to the Orders' marketing areas, as required by the AMAA, while at the same time absolutely eliminating the possibility of "flooding" the Order pool with excessive quantities of outside milk.

### B. The Filed Rate Doctrine

The filed rate doctrine originated in *Keogh v. Chicago & Northwestern Railway*, 260 U.S. 156 (1922). In *Keogh*, the U.S. Supreme Court held that a private shipper could not pursue price fixing allegations against railway companies for rates that were filed with and approved by a regulatory agency. Specifically, the Court reasoned that the "filed rate" as established by the regulatory agency was the legal rate and, therefore, could not be discriminatory. *Id.* at 164. The Court concluded that claims which in essence challenge the legally established "filed rate" are barred as a matter of law. *Id.* at 164-65; *see also Montana-Dakota Utilities Co. v. Northwestern Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951); *Stark v. Wickard*, 321 U.S. 288 (1944).

### C. The Filed Rate Doctrine Bars Plaintiff's Causes of Action Against SMA

First, Plaintiff contends that SMA is intentionally "flooding" the market in Orders 5 and 7 with outside milk to depress the prices paid to dairy farmers in the Southeast. (Compl. ¶¶ 2g, 60.) As noted above, however, the Market Administrator strictly controls and dictates what and how much milk can be pooled in an Order; any milk that exceeds the pooling limitations is

"rejected" by the Market Administrator. Accordingly, the "flooding" of which Plaintiff complains is a practical impossibility on the part of SMA and, therefore, any outside milk pooled by SMA in Orders 5 and 7 is expressly authorized and regulated by the Market Administrator. To the extent Plaintiff complains of SMA's efforts in "flooding" the pools in Orders 5 and 7 with outside milk, Plaintiff has failed to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

Second, Plaintiff's allegations of flooding the market are inherently related to the issue of what volume of milk is allowed to be pooled in an order. As discussed above, the volume of milk eligible to be pooled in an Order directly impacts the minimum blend price established by the Market Administrator. Therefore, by leveling allegations of "flooding" against SMA, Plaintiff's Complaint is, in essence, challenging the Market Administrator's determination of the volume of milk to be pooled in an Order and the minimum blend prices he thereby establishes. To the extent Plaintiff challenges the Market Administrator's determination of the volume of milk eligible to be pooled on Orders 5 and 7 and the resulting minimum blend prices, Plaintiff's claim is precluded by the filed rate doctrine established by *Keogh* and its progeny. *See Keogh*, 260 U.S. 156; *Stark*, 321 U.S. 288.

To allow Plaintiff's claims regarding "flooding" to proceed as pleaded in the Complaint, the Court would have to conclude that the federally-established volume of milk eligible to be pooled on a monthly basis on Orders 5 and 7 was not reasonable. In turn, the Court would have to speculate as to what amount of Grade A milk the Market Administrator should have deemed eligible to be pooled. The Court would then have to surmise as to what percentage milk eligible to be pooled would have been used in each respective class of milk, which in turn would require the Court to guess as to what the utilization percentage should

have been for the various classes of milk depending upon the ultimate end use of the raw milk. In the end, the Court would have to speculate what "reasonable" minimum blend price the Market Administrator would have set based on the foregoing factors, but for the alleged "flooding" of the market by SMA. This, in turn, would require the Court to speculate as to and recalculate the appropriate over-order premiums (which are based upon the minimum blend price) and, ultimately, speculate as to the reasonable retail prices Plaintiff should have paid for processed Grade A milk. As noted in *Servais v. Kraft Foods, Inc.*, this Court should not substitute its own judgment for that of the Market Administrator and USDA and, therefore, should conclude that any claims for damages by the Plaintiff tracing back to its allegations of "flooding" are barred by the filed rate doctrine. *See Servais v. Kraft Foods, Inc.*, 631 N.W.2d 629, 630-31 (Wis. App. 2001), *aff'd*, 643 N.W.2d 92 (Wis. 2002).[6] On this ground, Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

## III. Plaintiff Has Not Stated a Plausible Claim that Baird and SMA Are Part of an Illegal Conspiracy

Plaintiff's Complaint should be dismissed as to SMA and Baird because it fails to plead facts indicating that SMA and Baird entered into an unlawful conspiracy. Plaintiff's allegations regarding Baird and SMA are insubstantial and omit even an explicit allegation that Baird or SMA agreed to join the alleged conspiracy. Thus, under the pleading standard laid out in a recent Supreme Court case, *Bell Atlantic Corp. v. Twombly*, Plaintiff has failed to state a claim against Baird or SMA. *See Twombly*, 127 S. Ct. 1955, 1964-65 (2007). Plaintiff fails to satisfy the *Twombly* standard for several reasons: (1) Plaintiff does not adequately allege that Baird or SMA ever joined the alleged conspiracy; (2) Plaintiff's allegations against Baird and SMA

---

[6] "Because the federal milk marketing orders at issue here were established by a federal agency through formal rulemaking designed to implement a congressional scheme, they determine lawful rates. And because the filed rate doctrine precludes suits for damages developed through attacks on such lawful rates . . . we conclude that the filed rate doctrine bars the appellants' action herein." *Servais*, 631 N.W.2d at 634-35.

amount, at most, to allegations of lawful independent conduct; (3) Plaintiff does not allege why Baird and SMA are unprotected by the Capper-Volstead Act, which legalizes agreements among entities such as SMA, DFA, and Baird; and (4) Plaintiff's vague allegations regarding "Defendants" in general do not state a claim against Baird or SMA. Accordingly, Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### A. Plaintiff's Specific Allegations Against Baird and SMA are Insubstantial

Plaintiff has alleged only insubstantial details about SMA's involvement in the alleged illegal conspiracy, and even less with regard to Baird. Throughout the Complaint, Plaintiff vaguely alleges that "Defendants" generally conspired to commit various wrongdoing, but rarely specifies whether SMA or Baird is alleged to have been involved in the specified conduct. (*See e.g.*, Compl. ¶¶ 4, 61, 64, 55, 70-74, 129.)

As to SMA, the crux of Plaintiff's specific allegations is as follows:

- "Defendants' conspiracy forced previously independent cooperatives to join SMA (a DFA-controlled marketing agency) as a prerequisite to gaining access to fluid Grade A milk bottling plants in the Southeast." (Compl. ¶ 43, *see also id.* ¶ 57.)

- "DFA has used its full-supply agreements to control SMA." (Compl. ¶ 58.)

- "Dean was conspiring with DFA, DMS, and SMA to fix and suppress prices paid by Dean, not only to DFA for its members' Grade A milk, but also to independent dairy farmers for their Grade A milk." (Compl. ¶ 47; *see also id.* ¶ 65.)

- "DFA has utilized its control of SMA to flood the Southeast market with Grade A milk from the Southwest." (Compl. ¶ 60.) "Flooding" is alleged to be a practice that "reduces the minimum blend prices" and thus is used "to stifle competition." (Compl. ¶ 34.)

- DMS and SMA "market nearly all the Grade A milk produced in the Southeast and can therefore monitor the prices paid to all dairy farmers by each of the processing defendants . . . This information is used to fix and stabilize over-order premiums at levels lower than would have been paid in a competitive market." (Compl. ¶ 63; *see also id.* ¶ 66.)

- "Southeast dairy farmer [SMA] members have been subjected to anti-competitive and unlawful fees and dues charged by SMA for the sole benefit of the cartel and to the detriment of Southeast dairy farmers." (Compl. ¶ 63.)

- DFA and SMA share common employees "who enable Defendants to monitor and enforce compliance with their conspiracy." (Compl. ¶ 69.)

As to SMA, Plaintiff does *not* specifically allege:

- When or where SMA joined the alleged conspiracy;

- SMA *ever* met with *any* of the alleged co-conspirators in furtherance of the conspiracy;

- SMA entered into any full-supply agreements with Defendants or co-conspirators;

- SMA (as opposed to DFA) illegally forced or attempted to force independent farmers to join or market their milk through DMS;

- SMA (as opposed to DFA) illegally forced or attempted to force any cooperatives to join SMA;

- SMA illegally cut off or threatened to cut off independent dairy farmers' access to fluid Grade A milk bottling plants

- SMA boycotted independent dairy farmers;

- SMA "punished" independent dairy farmers that failed to comply with the alleged conspiracy; or

- SMA purchased fluid Grade A milk bottling plants.

As to Baird, Plaintiff specifically alleges:

- "Defendant Baird, an individual, is the manager of SMA, an officer, director, and general manager of Lone Star, a dairy cooperative based in Texas, and the principal owner, officer, and manager of Lone Star Milk Transport, Inc., Bullseye Transport, LLC and Bullseye Logistics, LLC (collectively "Bullseye"), Texas based companies that transport Grade A milk for DFA and SMA." (Compl. ¶ 17.)

- "Baird has participated in, authorized, directed, and/or knowingly approved or ratified the illegal conduct." (Compl. ¶ 17.)

- Baird "actively managed and participated" in the interstate marketing of milk. (Compl. ¶ 10.)

- "DFA . . . in collaboration with Dean, NDH, DMS, SMA[,] Baird, and Co-conspirators have used" their control of the Southeast milk market "to fix, suppress, and maintain prices . . . to ensure no Defendant competes on price for Grade A milk . . . and to make certain that Southeast dairy farmers have no viable alternative to the restrained market." (Compl. ¶ 65.)

- "Defendants have agreed to utilize a trucking Company owned by Baird to haul Grade A milk produced by SMA's member cooperatives. Defendants are thus aware of the amounts, origins, and destinations of nearly all Grade A milk shipped in the Southeast, and are thus able to monitor and confirm compliance with their conspiracy. (Compl. ¶ 69.)

As to Baird, Plaintiff does *not* specifically allege:

- When, where, or with whom Baird agreed to join the alleged conspiracy;

- Baird *ever* met with *any* of the alleged co-conspirators in furtherance of an illegal conspiracy;[7]

- Baird agreed to fix, depress, or stabilize prices for Grade A milk in the Southeast;

- Baird attempted to force independent farmers to market their milk through DMS;

- Baird attempted to force independent cooperatives to market their milk through SMA;

- Baird attempted to punish independent cooperatives and milk bottlers that did not participate in the alleged conspiracy; or

- Baird agreed to use his trucking Company to monitor the conspiracy.

As discussed below, Plaintiff's insubstantial allegations about SMA and Baird fail to state a claim for conspiracy and cannot be transformed into a claim for conspiracy merely by lumping SMA and Baird into vague claims about "Defendants" as a whole.

---

[7] Plaintiff does allege, for purposes of personal jurisdiction, that Baird met with DFA, DMS, and SMA management in Tennessee but does not state when these meetings allegedly took place or that the meetings were conspiratorial in any way. (*See* Compl. ¶ 6(a).) Given the context of this industry, in which agreements and related communications among dairy market participants such as these entities are normal and immune from antitrust liability, there is no basis to assume that the alleged meetings were not within Capper-Volstead protection.

### B.     *Twombly* Sets the Standard for Pleading in This Case

The Supreme Court recently held in *Bell Atlantic Corp. v. Twombly* that Federal Rule of Civil Procedure 8 requires a plaintiff to plead sufficient facts to state a claim for relief that is *plausible* on its face and not merely possible or speculative.   127 S. Ct. at 1965-66.   The *Twombly* Court reversed a circuit court's holding that plaintiffs in that case had stated a Sherman Act conspiracy claim where the plaintiffs had not alleged the "specific time, place, or person involved in the alleged conspiracies," but rather alleged parallel conduct by the defendants and combined these factual allegations with a general allegation that the defendants had illegally conspired. *Id.* at 1971 n.10.

The *Twombly* plaintiffs alleged that the defendant telecommunication companies, who were regional monopolists providing local telephone and high-speed Internet services, worked together to thwart a federal statute intended to introduce competition into the formerly-regional monopolies.  *Id.* at 1962.  After the passage of the statute, each former regional monopolist did not attempt to enter into and compete in the others' territories.  *Id.*  Further, each former monopolist dealt unfairly with new companies attempting to provide competing services in their territories by providing the competitors with inferior connections to the phone networks, overcharging, and billing in ways designed to harm the relationships between the new competitors and their customers.  *Id.*  Based on the defendants' lack of competition with one another and the similar actions each took toward competitors, the plaintiffs alleged that defendants had agreed not to compete with one another and to prevent entry into their respective markets by competitors. *Id.* at 1962-63.

The Supreme Court held that the plaintiffs had failed to state a plausible claim for conspiracy under these facts.  The Court held that plaintiffs must allege "enough factual matter

(taken as true) to suggest that an agreement was made." *Id.* at 1965. The Court held it was doubtful that the plaintiffs could have satisfied this pleading standard because the complaint "mentioned no specific time, place, or person involved in the alleged conspiracies." *Id.* at 1971 n.10.

Furthermore, the Court held that parallel conduct alone would not support a Sherman Act conspiracy claim when the alleged conduct "could just as well be independent action." *Id.* at 1965-66. The Court reasoned that each telephone company could have independent, self-interested reasons for preferring not to compete in one another's zones of influence and for resisting competition with competitors. *See id.* at 1970-73. Thus, the challenged conduct alone did not state a plausible case for conspiracy as opposed to independent action. *Id.* at 1971. Even though the plaintiffs had directly alleged an agreement between the competitors, the Court held that such allegations, as they were unsupported by specific factual allegations, were "merely legal conclusions" and failed to state a claim for conspiracy. *Id.* at 1970. *Twombly* thus held that allegations of conduct that could just as well be lawful and independent do not by themselves support a claim for an antitrust conspiracy.

The *Twombly* Court placed its holding in the context of "the costs of modern federal antitrust litigation and the increasing caseload of the federal courts" which "counsel against sending parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint." *Id.* at 1967. To avoid cumbersome and unnecessary discovery, the Court reasoned that pleading deficiencies in antitrust cases must be exposed as early as possible and facially implausible antitrust complaints must be dismissed prior to the onslaught of discovery. *See id.*

**C.     Plaintiff Fails to Plausibly Allege that Baird or SMA Ever Joined an Illegal Conspiracy**

Plaintiff fails to bear its burden to allege "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 127 S. Ct. at 1965. Under *Twombly*, which is in accord with prior Sixth Circuit precedent, an antitrust plaintiff fails to state a plausible claim for conspiracy if it does not specifically allege facts regarding the specific time, place, and persons involved in the conspiracy. *Id.* at 1071 n.10. For example, in *Ezzo's Investments, Inc. v. Aveda Corp.*, the plaintiff, a salon, alleged that a manufacturer of hair products and a wholesaler had conspired with one another to refuse to sell hair products to the plaintiff because of the plaintiff's discounting practices. 238 F.3d 420 (Table), No. 99-6489, 2000 WL 1888677, at *3 (6th Cir. Dec. 19, 2000). The Sixth Circuit held that the plaintiff failed to state a claim for conspiracy under the Sherman Act because the plaintiff "put forward no evidence suggesting either that [the manufacturer] had any communication with" the wholesaler concerning the salon's discounting practices, "or that [the manufacturer] was involved with, or even aware of" the wholesaler's decision not to sell to the plaintiff. *Id.*; *accord Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994) (complaint failed to state Sherman Act conspiracy claim where it did not allege "communications, meetings, or other means through which one might infer the existence of a conspiracy").

As in *Twombly* and *Aveda*, Plaintiff has failed to allege facts that plausibly set forth that Baird or SMA ever joined into an illegal agreement. As in *Twombly*, Plaintiff has not alleged a specific time that SMA or Baird entered into an illegal conspiracy; a specific place where they are supposed to have entered into such a conspiracy; and, as to Baird, specifically who he is

alleged to have conspired with.[8]  As in *Aveda*, Plaintiff has not even alleged that Baird or SMA

met or corresponded with their alleged co-conspirators in furtherance of the conspiracy.  As in

*Twombly* and *Aveda*, Plaintiff's bald allegations of conspiracy do not state a claim against Baird

or SMA.

### D.   Plaintiff Has, at Most, Alleged Independent Conduct by Baird and SMA

At most, Plaintiff has alleged lawful, independent conduct by Baird and SMA.  *Twombly*

holds that allegations of parallel conduct, standing alone, fail to state a claim, as parallel conduct

"mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with

a wide swath of [independent] rational and competitive business strategy."  *Twombly*, 127 S. Ct.

at 1964.   The Court explicitly connected this rationale with its previous holding that, at the

summary judgment stage, "plaintiffs' offer of conspiracy evidence must tend to rule out the

possibility that defendants were acting independently."  *Id.* (*citing Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574 (1986)).   The *Twombly* Court, therefore, held that plaintiffs

failed to state a claim where there was "no reason to infer that the [defendants] had agreed to do

among themselves what was only natural anyway."  *Id.* at 1971.   As in *Twombly*, the conduct

alleged against Baird and SMA is as suggestive of independent conduct as it is of conspiracy

and, thus, fails to support a claim for conspiracy.

### 1.   *Baird*

The allegations Plaintiff incorporated in its antitrust causes of action against Baird, as

discussed above, do not even allege when Baird agreed to join the conspiracy or with whom,

specifically, he is supposed to have conspired.  The closest Plaintiff gets to a specific allegation

---

[8]   Plaintiff does allege in a conclusory fashion that DFA collaborated with all of the Defendants, including SMA and Baird, but does not back this conclusion up with specific factual allegations.  (*See* Compl. ¶ 65.)

against Baird, involving his ownership of a trucking company, is at most an allegation of conduct that has obvious independent justifications.

Plaintiff asserts that "Defendants have agreed to utilize a trucking company owned by Baird to haul Grade A milk produced by SMA's member cooperatives" so that "Defendants" are "aware of the amounts, origins, and destinations of nearly all Grade A milk shipped in the Southeast, and are thus able to monitor and confirm compliance with their conspiracy. (Compl. ¶ 69.) Assuming Plaintiff's allegation is true, the fact that a trucking company owned by Baird hauls milk for SMA member cooperatives is in no way suspicious—a milk hauling company would naturally attempt to haul for as many customers as it is can profitably handle. Plaintiff's assertion of a bad motive for the hauling—to monitor milk prices—is nothing more than a conclusory statement, unsupported by any specific allegations that Baird transmitted information to any specific Defendant or that Baird, as opposed to "Defendants" as a whole, agreed to do anything in furtherance of the "conspiracy." At most, Plaintiff has alleged that Baird owns a milk hauling company that hauls milk for its customers.

## 2. *SMA*

Plaintiff's specific allegations about SMA amount to: (1) SMA accepts as members cooperatives whom another entity, DFA, has allegedly coerced into joining SMA; (2) SMA monitors and markets the quantity of milk sold by its members and the amounts paid to its members; (3) SMA charges fees and costs to its member cooperatives for its services, including the transportation of milk; and (4) SMA is engaged in "flooding" the Southeast market with outside milk.

None of these allegations indicate anything more than natural, independent behavior by SMA. As for the allegations about SMA's membership, it is natural and in no way indicative of

a conspiracy for SMA to accept new members and to seek to expand its membership. As for the allegations about monitoring amounts of milk sold and amounts paid to its members, Plaintiff has identified a feature, not a flaw—in order to function effectively as a collective marketing agency, SMA naturally tracks information related to sales of milk by its members. As for the allegations regarding the fees and costs passed to SMA's member cooperatives, it is natural and no way indicative of a conspiracy that SMA should pass some of the costs to its member cooperatives for its services in marketing, hauling, and negotiating the prices for the members' raw Grade A milk. As for the allegations about "flooding," they fail as well to indicate anything other than natural and independent behavior by SMA for the same reasons as with Baird.

### E. Plaintiff Has Not Met the Burden of Pleading Required by the Capper-Volstead Act

Plaintiff bears the burden of showing that Baird's and SMA's acts were the product of an *unlawful* conspiracy—a conspiracy that is unprotected by Capper-Volstead. Even if Plaintiff is assumed to have properly alleged a conspiracy involving Baird and SMA, Plaintiff still has failed to state a claim because it does not allege specific facts showing that any such conspiracy is *unlawful*. Given the broad protection Congress has afforded to dairy market participants such as Baird and SMA under the Capper-Volstead Act, Plaintiff must specifically allege facts that show that Baird's and SMA's alleged conduct is not immunized—simply alleging that Baird made agreements with protected entities such as SMA and DFA will not suffice. Plaintiff has not, for example, alleged that Baird or SMA engaged in specific predatory acts so as to lose Capper-Volstead immunity. Nor has Plaintiff alleged that Baird and SMA personally conspired with non-exempt entities. As in *Twombly*, Plaintiff has generally alleged apparently lawful behavior by Baird and SMA—behavior which is immunized by Capper-Volstead—and has tacked on a

conclusory allegation that this behavior is unlawful. As in *Twombly*, Plaintiff fails to state a claim upon which relief can be granted.

### F.     Plaintiff's Generalized Allegations About "Defendants" are Not Sufficient to State a Claim Against Baird or SMA

Plaintiff cannot avoid the consequences of its failure to plead specific facts against Baird or SMA by pointing to vague allegations concerning "Defendants" sprinkled throughout the Complaint. Under Sixth Circuit law, *"each* defendant . . . has the right to know what he . . . is alleged to have done which made him . . . a part of the conspiracy." *Vermilion Foam Products Co. v. General Electric Co.*, 386 F. Supp. 255 (E.D. Mich. 1974).

In a relevant case from another circuit, *Jung v. Ass'n of Am. Med. Colleges*, the district court for the District of Columbia dismissed antitrust claims against certain individual defendants based on the failure of the plaintiffs to adequately allege specific facts joining them to the larger conspiracy. 300 F. Supp. 2d 119 (D.D.C. 2004). The plaintiffs argued that allegations about "defendants" as a group, because the individual defendants were incorporated in that term, sufficed to state a claim against the individual defendants. *Id.* at 163-64. The court rejected this argument, holding, "Plaintiffs cannot escape their burden of alleging that each defendant participated in or agreed to join the conspiracy by using the term 'defendants' to apply to numerous parties without specific allegations as to [each defendant]." *Id.* at 163. "Although the Court must consider defendants' motions to dismiss in the context of the larger conspiracy," the *Jung* court held that "plaintiffs are not relieved from alleging that each individual defendant joined the conspiracy and played some role in it." *Id.* at 164.

Plaintiff has failed to allege enough specific facts about Baird and SMA to independently state a claim. As in *Jung*, Plaintiff has incorporated Baird and SMA into vague allegations of conspiracy regarding "Defendants" in general. The result should be the same as in *Jung*:

Plaintiff's allegations against "Defendants" as a whole fail to state a claim for conspiracy against Baird or SMA and, therefore, must be dismissed.

### G. Baird May Not be Sued as an Individual Because Plaintiff Has Failed to Allege Specifically That He Actively and Knowingly Engaged in Wrongdoing

For another independent reason, the Court should dismiss the claims as to Baird because Plaintiff has failed to plead facts showing that he should be personally liable for actions he has taken as a corporate officer or agent. The Sixth Circuit has held, "Individual liability under the antitrust laws can be imposed only where corporate agents are actively and knowingly engaged in a scheme designed to achieve anticompetitive ends." *Brown v. Donco Enterprises, Inc.*, 783 F.2d 644, 646 (6th Cir. 1986) (per curiam). Similarly, according to other courts, for individual liability to be asserted against a corporate officer, the corporate officer must have engaged in "conduct that is inherently wrongful." *A&D Supermarkets. Inc., # 2 v. United Food and Commercial Workers Local Union*, 732 F. Supp. 770, 779 (N.D. Ohio 1989); *Murphy Tugboat v. Shipowners & Merchants Tugboat Co.*, 467 F. Supp. 841, 843 (N.D. Cal. 1979) (same).

Specific allegations of active wrongdoing by corporate officers are required because, as the Sixth Circuit explained in *Brown*, "the conduct proscribed by the antitrust laws is often difficult to distinguish 'from the gray zone of socially acceptable and economically justifiable business conduct.'" *Brown*, 783 F.2d at 646 (*quoting United States v. United States Gypsum Co.*, 438 U.S. 422, 440 (1978)). *Brown* built on the guidance of the Supreme Court in *U. S. Gypsum*, in which the Court noted that it can be especially problematic to hold individual defendants personally liable for an employer's anticompetitive conduct under the antitrust laws, given that, in the antitrust context, "the conduct proscribed is difficult to distinguish from conduct permitted and indeed encouraged." 438 U.S. at 442.

In accordance with this logic, the *Brown* and *A&D Supermarkets* courts refused to allow antitrust lawsuits against individual defendants to proceed. The *Brown* court, for example, refused to allow discovery by plaintiffs to support claims that corporate counsel was personally liable for antitrust violations because "plaintiffs failed to allege that the attorney made policy decisions on behalf of [the corporate defendant] that encouraged it to engage in anticompetitive litigation." *Id.*[9]

Similarly, the Northern District of Ohio in *A&D Supermarkets* granted five individual union officers' motion to dismiss, holding that plaintiffs had not alleged the specific facts required to establish the officers' personal liability for the alleged antitrust violations of their union. 732 F. Supp. at 779. The *A&D Supermarkets* court dismissed the claim against the individual defendants even though plaintiffs had alleged in general terms that "each individual knowingly and actively participated in the alleged conduct," because the plaintiffs failed "to specify which of the individual defendants participated in each alleged wrongful act and . . . the specific nature of the individual defendants in the alleged conduct." *Id.* at 779-80. "Absent a showing of specific allegations against the individual defendants [sic] acts and conduct," the *A&D Supermarkets* court held, the claims against the individuals "cannot stand."

*Brown* and *A&D Supermarkets* foreshadowed the Supreme Court's recent broader holding in *Twombly* that a plaintiff fails to state a claim for an antitrust conspiracy unless it pleads specific facts showing that the existence of an illegal agreement among defendants is plausible. Keeping in mind the heavy burden of discovery in antitrust cases, the *Twombly* Court, like the *Brown* and *A&D Supermarket* courts, required that a plaintiff state more than general or conclusory allegations in order to subject defendants to this burden. *Brown*, echoing the

---

[9] *Brown* was decided at the summary judgment stage, but nonetheless its ruling is equally controlling at the motion to dismiss stage because the court held that, "although styled as a motion for summary judgment, appellees' motion is functionally the same as a motion to dismiss for failure to state a claim." 783 F.2d at 647.

concerns about the antitrust liability of individuals explored in *U.S. Gypsum*, points to the need to be especially cautious about allowing generalized claims against individuals to survive a motion to dismiss.

The Court should, consistent with *Brown*, *A&D Supermarkets*, and *Twombly*, dismiss the claims against Baird "without permitting discovery proceedings to develop the . . . elements of antitrust violations." *See Brown*, 783 F.2d at 647. Plaintiff's antitrust-related allegations do not even identify the specific wrongful conduct in which Baird is supposed to have engaged. Just as in *Brown* and *A&D Supermarkets*, Plaintiff has failed to allege specific facts showing that Baird actively and knowingly participated in inherent wrongdoing. Plaintiff cannot circumvent this requirement by alleging in a conclusory manner that Baird was involved in the wrongdoing.

Allowing Plaintiff to proceed with its claims against Baird is particularly inappropriate given the Supreme Court's guidance in *U.S. Gypsum* that personal liability against corporate officers should be considered in the context of the uncertainty of antitrust laws. It would be incongruous to subject persons such as Baird to personal liability given the context of this case, in which the Capper-Volstead Act actually encourages Baird to engage in activities that would ordinarily violate antitrust laws. Because Plaintiff has not pleaded specific facts showing Baird personally engaged in inherent wrongdoing, Plaintiff's claims against Baird must be dismissed with prejudice.

## IV. Plaintiff Has Not Alleged that Baird or SMA Possess Unlawful Monopsony or Monopoly Power

Counts Three and Four of the Complaint, asserting causes of action for unlawful monopoly and monopsony, should be dismissed as to Baird and SMA because Plaintiff does not allege that Baird or SMA possess unlawful monopoly or monopsony power. Count Three alleges only that DFA possesses an unlawful monopoly and thus seeks damages only against

DFA.  (*See* Compl. ¶¶ 102-08.)  Likewise, Count Four alleges only that Dean, or alternately

Dean, NDH, and DFA collectively, possesses unlawful monopsony power and seeks damages

only from those three defendants.  (*See* Compl. ¶¶ 109-17.)  Because Plaintiff has failed to name

or seek relief against Baird or SMA, Counts Three and Four should be dismissed with regard to

them.

**V.      Plaintiff Has Failed to Sufficiently Plead a Cause of Action for Unjust Enrichment
         Against SMA and Baird**

Count Six of the Complaint, alleging a cause of action for unjust enrichment, should be

dismissed as to SMA and Baird because Plaintiff has not alleged that it has conferred a benefit,

either directly or indirectly, upon either SMA or Baird.  The elements of unjust enrichment are

(1) that the plaintiff conferred a benefit upon the defendant, (2) that the defendant appreciated the

benefit, and (3) that acceptance of the benefit was under such circumstances that it would be

inequitable for defendant to retain the benefit without payment of the value thereof.  *See, e.g.*,

*Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005); Restatement

(First) of Restitution § 1.

Plaintiff states that it and the proposed direct purchaser class "conferred a benefit on the

Defendants," but Plaintiff never directly alleges what benefit it conferred on SMA and Baird, or

indeed even how direct purchasers of processed milk could possibly confer a benefit on SMA

and Baird.  According to Plaintiff's description of the milk chain of supply, Plaintiff directly

purchases milk from milk processors, not from marketing agencies, like SMA, or trucking

company owners, like Baird.  (*See* Compl. ¶ 28.)  Since Plaintiff alleges that processors paid

artificially low prices for their "most important input—Grade A milk," which is marketed by

agencies like SMA (Compl. ¶ 66), Plaintiff cannot maintain that processors passed on to SMA or

Baird any profits from the artificially inflated price of milk allegedly charged to direct

purchasers.  Plaintiff does not and cannot allege that direct purchasers directly or indirectly conferred a benefit on SMA or Baird and, thus, Plaintiff has failed to state a claim for unjust enrichment.[10]

## CONCLUSION

In light of the foregoing discussions, Plaintiff has demonstrably failed to plead any legally cognizable cause of action against SMA and Baird.  For this reason, Defendants Southern Marketing Agency, Inc. and James Baird respectfully request this Court to dismiss Plaintiff's Complaint in its entirety for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

Dated: October 22, 2007                                    Respectfully submitted,


By:____/s/  W. Gordin Dobie_____          By:____/s/  R. Dale Grimes_____

Craig V. Gabbert, Jr.                                      R. Dale Grimes
HARWELL HOWARD HYNE                         E. Steele Clayton, IV
GABBERT & MANNER P.C.                          BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite1800                    315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238-1800                   Nashville, Tennessee 37238-3001
Telephone: (615) 256-0500                            Telephone: (615) 742-6200
Facsimile: (615) 251-1059                             Facsimile:  (615) 742-6293

W. Gordon Dobie (*admitted pro hac vice*)          *Attorneys for James Baird*
Kari M. Rollins  (*admitted pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile:  (312) 558-5700


Dan K. Webb (*of counsel*)

---

[10]       In addition, for the reasons stated in their Motion to Dismiss, Plaintiff fails to state a claim for unjust enrichment against DFA, Dean, and NDH.  Because Plaintiff has failed to state a claim against the only entities, processors, to which they could have conceivably conferred a direct benefit, Plaintiff likewise fails to state a claim against SMA and Baird, on whom Plaintiff could only have conferred an indirect benefit.  Furthermore, it is premature to sue SMA and Baird for unjust enrichment, as Plaintiff's claim against the processor Defendants has not yet been adjudicated.

WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile:  (312) 558-5700

*Attorneys for Southern Marketing Agency, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2007, I caused a copy of the attached **Defendants Southern Marketing Agency, Inc.'s and James Baird's Memorandum of Law in Support of Their 12(b)(6) Motion to Dismiss Plaintiff's Complaint For Failure to State a Claim Upon Which Can Be Granted** to be electronically served through the Electronic Filing System for the Eastern District of Tennessee upon the parties' counsel of record, as follows:

*Alphabetically by firm*

*__Plaintiffs' Counsel__*

**Gordon Ball, Esq.**                              gball@ballandscott.com
BALL & SCOTT
550 Main Street, Suite 601
Knoxville, TN 37902

*__Defendants' Counsel__*

**Paul H. Friedman, Esq.**                         paul.friedman@dechert.com
**Paul T. Denis, Esq.**                            paul.denis@dechert.com
DECHERT LLP
1775 I Street, NW
Washington, DC 20006-2401

**Paul S. Davidson, Esq.**                         paul.davidson@wallerlaw.com
**Lea Carol Owen, Esq.**                           carol.owen@wallerlaw.com
WALLER LANSDEN DORTCH & DAVIS, LLP
511 Union Street, Suite 2700
Nashville, TN 37219

*Attorneys for Dean Foods Co.*

**Jerry L. Beane, Esq.**                           jerrybeane@andrewskurth.com
**Kay Lynn Brumbaugh, Esq.**                       Kaylynnbrumbaugh@andrewskurth.com
ANDREWS KURTH LLP
1717 Main Street, Suite 3700
Dallas, TX 75201

**Robert L. Trentham, Esq.**               rtrentham@millermartin.com
**Taylor B. Mayes, Esq.**             tmayes@millermartin.com
MILLER & MARTIN, LLP
150 Fourth Avenue, N
1200 One Nashville Place
Nashville, TN 37219-2433

*Attorneys for National Dairy Holdings, L.P.*

**Steven R. Kuney, Esq.**              skuney@wc.com
**John E. Schmidtlein, Esq.**          jschmidtlein@wc.com
WILLIAMS & CONNELLY
725 12th Street, NW
Edward Bennett Williams Building
Washington, D.C.  20005

**H. Buckley Cole, Esq.**               hbc@gdm.com
GREENEBAUM, DOLL & MCDONALD, PLLC
315 Deaderick Street, Suite 1425
Nashville, TN  37238

*Attorneys for Dairy Farmers of America, Inc., Dairy Marketing Services, LLC,*
*Gary Hanman, and Gerald Bos*

By:   /s/  R. Dale Grimes

R. Dale Grimes
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238-3001
Telephone: (615) 742-6200
Facsimile:  (615) 742-6293