## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

| | |
|---|---|
| IN RE:  SOUTHEASTERN MILK ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>FOOD LION, LLC, and<br><br>FIDEL BRETO, d/b/a FAMILY FOODS,<br><br>on behalf of themselves and a class of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>DEAN FOODS COMPANY,<br>DAIRY FARMERS OF AMERICA, INC.,<br>NATIONAL DAIRY HOLDINGS, L.P.,<br>DAIRY MARKETING SERVICES, LLC,<br>and<br>SOUTHERN MARKETING AGENCY, INC.<br><br>Defendants. | MDL No. 1899<br>Master File No. 2:08-MD-01000<br><br><br>Case No. 2:07-CV-188<br><br><br>Judge J. Ronnie Greer<br><br>Magistrate Judge Dennis H. Inman<br><br><br><br>Jury Trial Demanded |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Food Lion, LLC ("Food Lion") and Fidel Breto, d/b/a Family Foods ("Breto" and collectively with Food Lion "Plaintiffs"), by and through their undersigned attorneys, based upon personal knowledge with respect to their own acts, and, as to all other matters, based upon the investigation of Plaintiffs' counsel and upon information and belief, bring this civil action for treble damages and equitable relief on behalf of themselves and all others similarly situated against Dean Foods Company ("Dean"), Dairy Farmers of America, Inc. ("DFA"), National Dairy Holdings, L.P. ("NDH"), Dairy Marketing Services, LLC ("DMS"), and Southern Marketing Agency, Inc. ("SMA") (collectively, "Defendants") for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14.

## NATURE OF THE ACTION

1.     Milk is a staple product for many American families.  The milk distribution chain that moves raw milk from the farm to the dinner table comprises farmers, dairy cooperatives, milk processors and bottlers, and retailers like Food Lion and Breto.  Raw milk is produced by dairy farmers, who either independently or as members of farm cooperatives, sell their milk to bottling companies to be made into milk beverages.  Milk bottling companies process the raw milk before placing it into consumer packages for sale to grocers or other retail outlets.  In 2006, almost 73 percent of all retail milk sales to consumers were made by supermarkets.

2.     This case is about the illegal monopolization and lessening of competition in the Southeast United States among milk bottlers for the sale of processed milk to retail outlets and other customers.  Defendant Dean is the largest single milk bottler in the United States, and Food Lion is one of the largest purchasers of milk from Dean in the Southeast.  Dean has obtained a monopoly in the sale of processed milk after several years of acquisitions of milk bottling companies and through a variety of anticompetitive and wrongful actions including agreeing with competitors not to compete for sales of processed milk, purchasing and then closing milk bottling plants or converting them to other uses, terminating raw milk supply contracts with independent farm cooperatives who own competing milk bottling plants and replacing that raw milk supply with exclusive agreements with DFA, the largest dairy cooperative in the United States, and otherwise retaliating against other independent farm cooperatives and milk bottlers in an attempt to keep them from expanding into the southeast United States.

3.     Dean's monopolization of the processed milk market was substantially enhanced by the December 2001 merger between Suiza Foods Corp. ("Suiza") and Dean.  The U.S. Department of Justice ("DOJ") allowed the merger to go forward on the condition that eleven of the milk bottling plants of the merging entities be sold, nine of which were in or near the

2

Southeast. The buyer of those plants was NDH, an entity controlled and financed by DFA. NDH was supposed to serve as a competitor to Dean in the processed milk market in the Southeast and thus eliminate the competitive problems presented by the Dean-Suiza merger. The promise of such competition did not come to pass.

4.     The agreement not to compete with each other is but one part of a corrupt bargain in which Defendants agreed to collaborate to assist each other in their respective efforts to monopolize the market in which each is engaged. Examples of the manner in which this corrupt bargain has been, and continues to be, carried out are:

    a.    DFA aided Dean in obtaining clearance from the DOJ for the Dean-Suiza merger. DFA did so by financing and then offering to use NDH as a vehicle for purchasing and operating the eleven milk processing plants whose divestiture was necessary to permit the merger to go forward. DFA also used its control over NDH to ensure that NDH would not vigorously compete with Dean for the sale of processed milk in the southeast United States. As a result, Dean's monopoly position was cemented.

    b.    Dean, in turn, agreed to cease purchasing raw milk from independent farmers (from which it had been purchasing hundreds of millions of pounds of milk at favorable prices) and to enter into full-supply agreements with DFA, with the purpose and effect of enhancing DFA's efforts to monopolize the market for raw milk sold to milk bottling plants in the southeast United States. Dean also agreed to use DMS, an entity controlled by DFA, in purchasing the raw milk that it needed to run its milk bottling plants. As a result, DFA has been able to force previously independent farmers and other independent milk coops into joining either DFA or the DFA-controlled SMA, thus aiding DFA's efforts to monopolize the market for the sale of raw milk to milk bottlers in the southeast United States.

    c.    This has benefited both DFA (by allowing it to obtain or nearly obtain a monopoly in the market for raw milk sold to milk bottling plants in the southeast) and Dean (by insulating Dean from the entry of new processed milk bottling plants in the southeast by locking up the supply of raw milk that any new entrant into the bottling business would need to compete).

5.     Dean's monopolization, attempt to monopolize, and conspiracy to monopolize the market for processed milk, along with Dean's and the other Defendants' scheme to suppress competition in both the markets for processed milk and raw milk sold to milk bottling plants, has

resulted in Food Lion, Breto and other class members paying higher prices for processed Grade A milk than they otherwise would have paid in the absence of such unlawful conduct.

6.     Food Lion and Breto bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representatives of the following class of persons:

> All persons, other than schools and school districts, within the Southeast United States who have purchased, at any time from January 1, 2002 until the present, directly from any Defendant, Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers.

7.     This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs, expenses, as well as attorneys' fees as well as such additional and further relief as may be deemed just and proper.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

8.     Food Lion and Breto bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14.  Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

9.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

10.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the relevant period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Food Lion's and Breto's claims occurred, and a substantial portion

of the affected interstate trade and commerce described below has been carried out, in this district.

11.     The Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391 as well as pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

12.     Defendant Dean purchases, processes and ships milk across state lines. Defendant DFA markets, processes and ships milk across state lines. Defendant NDH purchases, processes and ships milk across state lines. Defendants DMS and SMA market milk across state lines. All Defendants received substantial payments across state lines from the sale of raw and/or processed milk. Defendants' business activities that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

## THE PARTIES

13.     Food Lion is a North Carolina limited liability company. Its executive offices are located at 2110 Executive Drive, Salisbury, North Carolina, 28147. Food Lion operates approximately 1,300 supermarkets, either directly or through affiliated entities, under the names of Food Lion, Bloom, Bottom Dollar, Harvey's and Reid's in eleven Southeastern and Mid-Atlantic states, including Delaware, Florida, Georgia, Kentucky, Maryland, North Carolina, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia. Food Lion purchases processed milk directly from Defendants Dean and DFA for sale at certain of its supermarket stores.

14.     Plaintiff Fidel Breto, d/b/a/ Family Foods, is a citizen and resident of Jonesborough, Tennessee, who regularly purchases processed milk directly from Dean for sale at its retail grocery store.

5

15.     Defendant Dean is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201.

16.     Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Southeast Council headquarters located at 10411 Cogdill Road, Knoxville, Tennessee 37932. Defendant DFA is a vertically integrated cooperative that controls raw milk production, and also owns and operates its own hauling companies, processing plants and distribution centers for processed milk.

17.     Defendant NDH is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 3811 Turtle Creek Boulevard, Suite 1300, Dallas, Texas, 75219. DFA owns a 50 percent common equity interest and approximately 92 percent preferred equity interest in NDH.

18.     Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221, and with its Southeast regional office located at 10411 Cogdill Road, Knoxville, Tennessee 37932. DMS, which was formed by DFA and Dairylea Cooperative, Inc. in 1999, is a milk marketing organization which markets milk on behalf of its member dairy cooperatives. DMS arranges contracts with buyers of raw milk such as Dean, arranges for the transportation of raw milk, schedules deliveries, allocates marketing costs, and handles the payment of checks to coop member dairy farmers. Upon information and belief, DMS is substantially controlled by DFA. DMS has full-supply contracts with both Dean and NDH.

6

19. Defendant SMA is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business at 13002 Honeysuckle Way, Prospect, Kentucky 40059. Originally formed in 2002, SMA's current members include DFA, Maryland and Virginia Milk Producers, Lone Star Milk Producers, Dairymen's Marketing Cooperative and Arkansas Dairy Cooperative Association. DFA is SMA's largest member.

## RELEVANT PRODUCT MARKET: PROCESSED GRADE A MILK

20. The relevant product market is Grade A milk, other than school milk, which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers (referred to herein as "processed milk"), and the market segments thereunder. Only Grade A milk can be used to make processed milk beverages for human consumption. Given consumer demand for milk and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk. In 2006, more than 92 percent of supermarket shoppers purchased processed milk.

## RELEVANT GEOGRAPHIC MARKET: SOUTHEAST UNITED STATES

21. The relevant geographic market is the Southeast United States (the "Southeast"), and the market segments thereunder, which consists of the regions covered by the following Federal Milk Market Orders established by the United States Department of Agriculture (1) Appalachian Marketing Area (Federal Order No. 5—covering North Carolina, South Carolina, and portions of Georgia, Indiana, Kentucky, Tennessee, Virginia, and West Virginia), and (2) the Southeast Marketing Area (Federal Order No. 7—covering Alabama, Arkansas, Mississippi, Louisiana, and parts of Florida, Georgia, Kentucky, Missouri, and Tennessee.)

7

22.     Consumer preferences for fresh milk, its highly perishable nature and high transportation costs for processed milk substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. As a practical matter, retailers like Food Lion and Breto are unable to turn to milk bottlers located outside of the Southeast to supply them with milk even when the price of processed milk increases by a small but significant amount. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

## FACTUAL ALLEGATIONS
### Milk Distribution and Pricing

23.     Numerous companies have tried to sell processed milk nationally and have ultimately failed. Milk is mostly water and is thus relatively heavy and costly to transport a substantial distance. Transporting raw milk an extra thousand miles has been estimated to add approximately 25 cents a gallon to its cost. Bottled processed milk cannot be transported in bulk, so it costs even more to transport. In addition, the quality of milk deteriorates during each extra day it spends on the road. Given its perishable nature, every day that processed milk is on the road reduces its shelf life by a day (or more). As a result of these economic realities, processed milk markets have traditionally been regional in scope. For these reasons, a leading dairy industry publication has concluded that a milk bottler does not need to achieve a large share of the national market to exercise the power of a monopolist; it only needs a large share of the relevant regional market.

24.     Milk prices that retail outlets, like Food Lion and Breto, pay for processed milk are not set by government regulations but are, absent illegal anticompetitive conduct, subject to the economic forces of supply and demand.

8

25.     Minimum prices for raw milk paid to dairy farmers, however, are calculated by using a system set by Federal Milk Marketing Orders ("FMMO" or "Order").  Under the Classified Pricing System, the U.S. Department of Agriculture classifies raw Grade A milk into four categories for minimum pricing purposes.  Class I milk, typically referred to as "fluid milk," is used for milk beverages for human consumption, and is the type at issue in this case. The USDA's milk market administrators calculate minimum prices each month pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions or orders.  This case does not challenge the minimum prices for raw milk set by any FMMO.

26.     Cooperatives and independent producers are free to negotiate for prices in excess of FMMO minimum prices to more accurately reflect market conditions.  The amounts by which prices charged by cooperatives and independent producers for raw milk exceed FMMO minimum blend prices are known generically as "over-order premiums."  The actual price received by a dairy farmer is known as the "mailbox price" and comprises the federal minimum price plus any negotiated over-order premium, minus costs and expenses for marketing and transportation.

27.     The minimum price for raw milk that is bottled and sold for beverage use is higher than the minimum price for milk that is used to make cheese, butter or other dairy products.  In the Southeast, heat and humidity raise the average cost of producing milk so much that only fluid uses are economical.  Thus, a southeast dairy farmer whose raw milk is not pooled in a FMMO by shipping it to a regulated milk bottling plant obtains such a low price for his milk as to put him in danger of going out of business.

28.     In an unrestrained market an efficient cooperative would be able to negotiate with milk bottlers to provide raw milk at a lower cost to the bottlers while simultaneously providing

9

higher payments to its farmer members. For example, in areas outside the Southeast, such as Order 6 which comprises all but four counties of Florida, Southeast Milk, Inc. ("SMI") exists as an independent cooperative which competes with DFA by offering higher mailbox prices to its farmer members and lower prices to milk bottlers.

### Consolidation In The Milk Industry
#### *Milk Cooperatives*

29.     The dairy industry in the Southeast is highly concentrated, at both the dairy farmer producer and bottler level. Throughout the United States, the trend towards cooperative consolidation began in the late 1960s when approximately 170 local cooperatives integrated into three large cooperatives with about 64,000 dairy farmer producers.

30.     Dairy cooperatives are associations of dairy farmers who agree to market collectively their raw milk and other dairy products. Cooperatives are supposed to be "voluntary associations," owned, operated, and controlled by their member farmers. Cooperatives typically "market" their farmers' raw milk, which usually consists of locating buyers, negotiating sales prices, coordinating the hauling, performing the testing, recording and reporting related data to milk market regulators, and paying member farmers for their raw milk. The Capper-Volstead Act permits cooperatives to operate without regard to certain antitrust laws. This case alleges conduct by the Defendants that is outside the scope of the Act's protections.

31.     Not all dairy farmers are cooperative members. Some dairy farmers seek to remain independent of cooperatives and are referred to as "independent dairy farmers." Independent dairy farmers seek to market their raw milk to fluid milk bottling plants by contracting with plants either directly or through agents and/or marketing associations.

32.     In the mid 1970s, the DOJ filed antitrust actions against three cooperatives for violations of Sections 1 and 2 of the Sherman Act, *United States v. Associated Milk Producers, Inc.*, Civ. A. No. 72-49 (W.D. Tex. Feb. 1, 1972), *United States v. Dairymen, Inc.*, Civ. A. No.

73-7364 (W.D. Ky. Mar. 29, 1973), *United States v. Mid-America Dairymen, Inc.*, Civ. A. No. 73-681 (W.D. Mo. Dec. 27, 1973).

33.     The DOJ sought redress for, *inter alia*, entering into contracts, agreements and understandings in an attempt to monopolize trade and commerce in the raw milk market, requiring processors to contract for a set quantity of raw milk for a twelve-month period and penalizing processors failing or refusing to do so, and entering into membership agreements which unreasonably restricted the rights of members to withdraw and market their milk in a freely competitive manner. Judgment was entered against each of the cooperatives enjoining them from, *inter alia*, entering into or enforcing agreements for a term in excess of one year in several states, including Georgia, Kentucky and Tennessee.

34.     On January 1, 1998, DFA, a new marketing cooperative, was created from the merger of four leading cooperatives, including two of the cooperatives that had been sued by the DOJ: Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairy Cooperative, Inc. Since then, three additional cooperatives have become part of DFA: Independent Cooperative Milk Producers Association, Valley of Virginia Producers Association, and California Cooperative Creamery. By the close of 2000, following nearly a decade of consolidation, DFA was the largest dairy cooperative in the United States and controlled more than 50 percent of the raw Grade A milk produced in the Southeast United States.

### *Milk Bottlers*

35.     Milk bottlers process raw milk purchased from cooperatives, independent dairy farmers or other supply plants into pasteurized milk for human consumption. Bottling plants process milk into a variety of beverage products including whole milk, fat-free or skim milk, low and reduced-fat milk, chocolate milk, buttermilk, and cream. The processed milk is then

packaged into a variety of consumer containers including gallon jugs, half-gallon cartons and other smaller packages.

36.     Milk bottling plants then sell the processed milk to retail outlets, like Food Lion, Breto and other customers. Milk processors include independent bottling plants, bottlers owned by cooperatives or in joint ventures with cooperatives, and retail food chains that own their own bottling plants. The bottling plants of some retail chains are referred to as captive bottlers because they process and bottle milk exclusively for the retail outlets owned by that chain except for some insignificant "merchant" sales to unaffiliated retailers.

37.     In 1996, there were sixty-two milk bottling plants in the Southeast, three of which were owned by Dean, including Forrest Hill Dairy in Memphis, Tennessee, Mayfield in Athens, Tennessee and Dean Foods in Louisville, Kentucky and two of which were operated under joint ventures by Mid-America Dairymen (one of DFA's predecessors), including Ideal American Dairy in Evansville, Indiana and Dairy Fresh in Baker, Louisiana.

38.     Following a series of acquisitions, by late 2001, Suiza, a Dallas, Texas based dairy company, had become the largest fluid milk processor in the United States. Suiza owned 67 dairy processing plants in 29 states, and had net sales of more than $5 billion. Following its own series of acquisitions, by 2001 Dean had become the second largest buyer of raw milk and the second largest bottler of processed milk in the United States, operating 43 dairy plants in 19 states. In 2000, Dean had net sales of approximately $4.4 billion.

39.     In 2001, Suiza announced a plan to merge with Dean and to thereafter operate the merged company under the name Dean. Dean and Suiza anticipated antitrust concerns by DOJ because they were the first and second largest processed milk bottlers in the United States. Dean and Suiza agreed to address DOJ's concerns by means of what is known as a "fix-it-first" divestiture of eleven milk bottling plants in eight states (Alabama, Florida, Indiana, Kentucky,

Ohio, South Carolina, Virginia, and Utah) to the buyer of Dean/Suiza's choice, NDH, an entity controlled by DFA. At the same time, Dean agreed to buy out DFA's 33.8 percent stake in Suiza. The DOJ also required Suiza to modify its pre-merger full-supply contract with DFA, who would also own a one-half equity interest in NDH.

40. The spin-off involved selling seven Suiza dairies and four Dean dairies to NDH. The Suiza dairies that were divested included Barber/Meadow Gold Dairies in Huntsville, Alabama; Velda Farms in Miami, Florida; Velda Farms in Winter Haven, Florida; Burger Dairy in New Paris, Indiana; Flav-O-Rich in London, Kentucky; Dairymen's in Cleveland, Ohio; and Flav-O-Rich in Bristol, Virginia. The divested Dean dairies included Goldenrod Dairy Foods/U.C. Milk Co. in Madisonville, Kentucky; H. Meyer Dairy Co. in Cincinnati, Ohio; Coburg Dairy in North Charleston, South Carolina; and Cream O' Weber Dairy in Salt Lake City, Utah.

41. Upon information and belief, DFA and its subsidiaries, including Mid-Am Capital LLC, have provided more than $400 million in financing to NDH, enabling it to acquire and operate the 11 processed milk bottling plants divested by Dean and Suiza and other bottling plants. At all times relevant to this Complaint, DFA has owned at least 50 percent of NDH's equity and voting shares. DFA owns a 50% common equity interest and approximately 92% preferred equity interest in NDH. DFA also has a 50% interest in Dairy Management LLC, which is the managing arm of NDH. Based on its financial interests in NDH, DFA has the rights to between 50% and 75% or more of NDH's profits. In forming NDH, DFA and its partners agreed, among other things, that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers. As a result, NDH does not take any significant action without DFA's express approval or without having been directed to take such action by DFA.

42.     In connection with Dean's agreement to acquire DFA's 33.8 percent stake in Suiza, Dean signed a $40 million promissory note ("Note") to DFA which becomes due in 2021 in the amount of $96 million.

43.     Dean currently operates 17 processed milk bottling plants in the Southeast and, upon information and belief, controls at least 60 percent of the processed milk bottling capacity in the Southeast, making Dean the largest processed milk bottler in the Southeast. NDH currently owns eight processed milk bottling plants in the Southeast and on information and belief is the second largest processed milk bottler in the Southeast. Even after divesting its stake in Suiza, DFA has continued to maintain substantial interests in milk bottling through a series of joint ventures. Through those joint ventures, DFA fully or partially owns at least eight processed milk bottling plants (not including NDH) in the Southeast, and upon information and belief is the third largest processed milk bottler in this area.

44.     Thus, following the merger and divestiture, Dean, NDH and DFA had collectively increased their shares of the market for processed milk in the Southeast. Whereas in 1996, Dean and DFA had owned only 5 of the 62 milk bottling plants in the Southeast, by 2007 they, along with NDH, owned 33 of the 51 processed milk bottling plants operating in the Southeast. These 33 plants, upon information and belief, represent 77 percent of the processed milk bottling capacity in the Southeast. Nine of the remaining bottling plants in the Southeast are owned by retail supermarket chains which typically do not sell processed milk to competing retailers. Many of the other nine bottling plants are small or do not have the capacity to serve large retail customers.

45.     As a result of Dean's growing market concentration, retail customers can become almost completely dependent upon Dean for much of their processed milk purchases. For example, at two of Food Lion's distribution centers, i.e., warehouses, accounting for more than

14

fifty percent of Food Lion's milk purchases, Dean is the only viable source from which Food Lion can buy processed milk. During the period relevant to this Complaint four of Food Lion's six distribution centers have purchased processed milk from either Dean or a DFA controlled milk bottling plant.

## DEFENDANTS' DOMINANCE AND PREDATORY CONDUCT
### Overview

46.     The Dean-Suiza merger had the potential to virtually eliminate competition in the Southeast among milk bottlers for the sale of processed Grade A milk to retail outlets and other customers. The agreements among Dean, Suiza, DFA and NDH to spin off eleven former Dean or Suiza bottling plants to NDH were necessary to allow the merger to go forward. The premise of that spin-off was that NDH would serve as an active competitor to a merged Dean/Suiza, thus providing a check on Dean's ability to acquire and maintain even more market power in the sale of processed milk to retailers. This premise of continued active competition, however, was soon undermined.

47.     The Dean-Suiza merger also presented the opportunity for DFA and its affiliates to strengthen their hold on the raw milk market in the Southeast. Prior to the merger, Suiza had entered into a full supply agreement with DFA, under which Suiza had agreed to buy all of its raw milk from DFA. If Suiza's policy of utilizing full supply agreements were to be extended to the newly acquired Dean plants, it would have the effect of lessening competition among dairy cooperatives and independent farmers. Accordingly, as a condition for allowing the merger to proceed, DOJ also required Suiza to modify its full-supply agreement with DFA. DOJ's goal in setting that condition was to ensure that the merged entity's plants would actively compete to buy their raw milk.

48.     The twin premises for allowing the Dean-Suiza merger to go forward, however, were not carried out. The former Suiza plants have not only entered into a new full-supply

15

agreement with DFA, but Dean has cancelled virtually all of its supply arrangements with independent dairy farmers and replaced them with a full-supply agreement with DFA. Dean did so even though prior to the merger, the former Dean plants had been buying hundreds of millions of pounds of milk from independent producers at lower prices than it had been paying to cooperatives such as DFA.

49.     DFA has used these full-supply agreements, as more fully described below, to lessen competition among independent dairy farmers and cooperatives. This weakening of competition in the raw milk market has also served to insulate Dean from competition in the processed milk market.

**Lessening Competition for the Sale of Processed Milk**

50.     Specifically, Dean, DFA and NDH have entered into an agreement to lessen competition for sales of processed milk and, pursuant to that agreement, have in fact refrained from competing for such sales to grocery retailers. As part of that agreement, Dean, DFA and NDH took steps to undermine the divestiture process by agreeing that at least one major customer would be switched from the divested dairies back to Dean plants and thus would not be served by NDH.

51.     Following the Dean-Suiza merger a senior NDH executive in charge of three of the divested milk bottling plants, including the Flav-O-Rich plant in Bristol, Virginia and the Meadow Gold plant in Huntsville, Alabama, took steps to sell processed milk to new retail customers. The NDH executive then received a telephone call from NDH's President (a former Suiza executive and one of the founding investors in NDH) in which he was told that there had been complaints from "Dallas" (which the executive interpreted to mean Dean) about NDH's efforts to compete and that he could not solicit Dean's customers.

52.     The NDH executive then went to the NDH Board of Directors to tell them that the three plants were operating at a substantial loss and that without any new business the plants would have to be closed. The NDH board, which was controlled by DFA-appointed members, told the executive that NDH could not close the plants just yet (because it was too soon after the merger). Subsequently, NDH did in fact close the Flav-O-Rich milk bottling plant in Virginia. Later, NDH also closed the Meadow Gold plant in Alabama.

53.     The closure of those NDH plants was significant for retail customers. For example, NDH's Flav-O-Rich plant in Bristol, Virginia was located less than 200 miles from two major Food Lion distribution centers, one of which is currently supplied by Dean and another of which is supplied by a milk bottling plant that, until recently, was owned by a DFA joint venture. When more than one processed milk bottler exists to serve a retail customer, the potential competition offered by a second bottler serves to provide meaningful price competition. Indeed, because milk is a commodity, retail customers like Food Lion and Breto can switch processed milk suppliers to take advantage of price differences.

54.     In addition, through its control over NDH, DFA has an incentive, and the ability, to facilitate or encourage cooperation between NDH and bottlers operated by DFA joint ventures. Since any milk customers obtained by NDH from a DFA joint venture, or vice versa, would likely reduce DFA's profits, reduced competition between NDH and DFA joint ventures is in DFA's financial interest.

55.     The benefits of competition from competing milk bottlers are clear. For example, Gustafson's Dairy ("Gustafson's"), a small dairy owned by one of the remaining independent farmer cooperatives (Southeast Milk), continues to actively compete with Dean and NDH for the sale of processed milk (although largely in areas outside the Southeast) and has been able to win

17

retail customers from both Dean and NDH by offering lower prices to purchasers of processed milk.

56.     Gustafson's was able to obtain an agreement to supply Food Lion's Harvey's supermarkets with processed milk by offering lower prices than Dean had been charging Harvey's. Likewise, Gustafson's also entered into agreements to supply processed milk to some Costco stores and Sam's Club stores by offering lower prices and taking business away from NDH and Dean.

57.     Dean has reacted to such competition from Gustafson's by threatening to retaliate against both Gustafson's and Southeast Milk, and then carrying out such threats with the assistance and active support of DFA and NDH. For example, Dean has retaliated against Gustafson's by terminating an agreement under which Southeast Milk, the dairy cooperative that owns Gustafson's, had been supplying raw milk to Dean's T. G. Lee milk bottling plant in Orlando, Florida. NDH also retaliated against Southeast Milk by cutting off purchases of milk from SMI by two Velda Farms plants in Florida.

58.     DFA actively supported Dean's retaliation against Gustafson's by agreeing to supply raw milk to the Orlando T. G. Lee plant on the same terms that Dean was paying to Southeast Milk. However, because DFA does not have enough member farmers in the Florida or Southeast milk order areas to supply that plant, or because its farmer members' milk in those areas was already committed to supplying other Dean plants, DFA has had to truck raw milk in from Texas and New Mexico at a substantial loss to DFA.

59.     Dean and DFA's retaliation against Southeast Milk for Gustafson's competition with Dean has, along with natural barriers to entry into the dairy processing business (including high capital and labor costs) served as a deterrent to both Gustafson's and other independent milk bottling companies from entering into the Southeast market, or from expanding their

existing operations in the Southeast to compete for sales of bottled milk in the Southeast market. Independent dairy cooperatives who are considering opening their own processed milk bottling facilities in the Southeast are apprehensive about competing with Dean for sales of processed milk. In fact, despite the higher prices for processed milk that resulted from the lessening of competition for such milk in the Southeast following the Dean-Suiza merger, there has been no substantial new entry into the Southeast market of new milk bottlers.

60. In addition to its agreement with NDH and DFA to lessen competition, and its retaliation against independent milk bottlers, Dean has taken other steps to acquire and maintain market power in the market for processed milk sold to retail outlets in the Southeast. For example, Dean (along with NDH and DFA) has continued to acquire processed milk bottling plants for the purpose of increasing its dominance of the Southeast market, and has acted to close down bottling plants and/or has refused to operate bottling plants with the purpose and effect of decreasing capacity and eliminating sources of access to bottling plants.

61. In the last few years, Defendants have purchased and closed fourteen milk bottling plants in the Southeast. The plants closed by Dean include Flav-O-Rich in Goldsboro, NC; Flav-O-Rich in Wilkesboro, NC; Barber Dairy in Oxford, MS; Barber Pure Milk Co. in Birmingham, AL; Barber Pure Milk Co. in Tupelo, MS; Barbe's Dairy in Westwego, LA; Borden Milk Products in Monroe, LA; and Flav-O-Rich in Canton, MS. In addition to the Flav-O-Rich plant in Bristol, VA, NDH has closed the following, Chattanooga Dairy in Chattanooga, TN; Valley Rich Dairy in Roanoke, VA; and Meadow Gold/Huntsville in Huntsville, AL. DFA joint ventures have closed two plants including Ideal American Dairy in Evansville, IN; and Turner Holdings/Gold Star in Little Rock, AR.

62.     In addition, in 2006, Winn-Dixie, a retail chain owning its own bottling facilities,
filed for bankruptcy.  When one of its bottling plants in Florida was auctioned off, Dean outbid
all the prospective buyers, acquired the facility and promptly closed it down.

### Lessening Competition for Raw Milk through Full-Supply Agreements

63.     Dean and NDH also agreed to enter into exclusive or full-supply agreements for
raw milk with DFA despite the fact that both Dean and NDH knew that DFA did not have
sufficient raw milk production of its own to satisfy all of Dean's requirements let alone all of
NDH's requirements at the same time.  DFA's full-supply agreement with Dean, which consists
of a series of 20 successive one-year agreements, grants DFA the exclusive right to supply the
raw milk requirements of Dean's processed milk bottling plants in the Southeast.  In addition,
Dean, NDH and DFA agreed that all raw milk supplied to Dean, NDH, and DFA's milk bottling
plants in the Southeast must be marketed by DFA or through either SMA or DMS, both of which
were formed by, and are controlled by, DFA.

64.     Despite a DOJ consent decree entered in 1977 in the *Mid-America Dairymen* case,
which remains in effect, that prohibits DFA from entering into supply agreements with terms in
excess of one year, Dean and DFA ensured that their full-supply agreements effectively would
be long-term.  They did so by requiring DFA to forgive the entire balance of the $40 million
Note which Dean owes to DFA if Dean renews the full-supply agreements every year for 20
years and by requiring Dean to pay DFA liquidated damages of up to $47 million if Dean does
not renew the full-supply agreement every year.  As a result, on information and belief, both
Dean and NDH have renewed the full-supply agreements every year.

65.     Through these full-supply agreements, Defendants have attempted to suppress and
restrain competition in the sale of raw milk by forcing other independent cooperatives needed to
fulfill these agreements to join DFA or to market their raw milk through DFA controlled SMA,

and by forcing independent dairy farmers to market their raw milk through DMS to have access to the fluid milk bottling plants in the Southeast.

66.     For example, Dean and DFA informed Maryland & Virginia Coop that, notwithstanding many years of continuously acquiring raw milk from Maryland & Virginia Coop, Dean would no longer accept raw milk from Maryland & Virginia Coop members. Maryland & Virginia Coop was further informed that the only way to obtain access to Dean and NDH plants in the Southeast was to join SMA.  As a result the Maryland & Virginia Coop had no choice but to join SMA so that its members would have access to fluid milk bottling plants.

67.     In addition, as part of Defendants' implementation of their illegal agreements, Dean reversed its historical practice of purchasing raw milk from independent dairy farmers, refused to deal directly with independent dairy farmers and forced all (or virtually all) independents to market their raw milk through DMS.  At the time, independent dairy farmers were informed only that Dean was "outsourcing" certain marketing functions.

68.     Through DFA's full-supply agreements and its control of SMA or DMS, upon information and belief, Defendants DFA, DMS and SMA control 90 percent of the raw milk produced in the Southeast, and more than 80 percent of the raw milk processed by milk bottlers in the Southeast.

69.     In furtherance of their illegal agreements, Defendants have also jointly sought to exclude, discipline, and punish the remaining independent milk bottlers and independent cooperatives that have strived to resist complying with Defendants' stranglehold on the milk market or have attempted to compete with Defendants in the Southeast.  These acts by Defendants, which Food Lion and Breto only learned about in 2007 after the case styled as *Sweetwater Valley Farm, Inc. v. Dean Foods Company* was filed in the United States District

Court for the Middle District of Tennessee, eliminated independent milk bottlers and

cooperatives as sources of potential competition. The following are examples of such activity:

a.    In August 2006, Dean, citing its full-supply agreements with DFA, refused to discuss a raw milk supply agreement with U.S. Milk, a newly-formed Southeast organization consisting of a variety of independent dairy farmers and cooperative members.

b.    Since 2002 and continuing to the present, DFA and Dean have jointly punished a small Southeast cooperative, for its refusal to join SMA by demanding, *inter alia*, that DFA process Dean's monthly payments to the small cooperative thereby enabling DFA to monitor prices paid to the small cooperative and to deduct numerous wrongful fees and penalties from those payments.

c.    In early 2005, and after NDH purchased Dairy Fresh Corp., a processed milk bottler in the Southeast, DFA gave independent dairy farmers serving Dairy Fresh Corp. plants an ultimatum of either joining DFA or finding new markets for their raw milk.

d.    In 2001 and 2003, independent dairy farmers attempted to negotiate an agreement to supply raw milk to a small milk bottling plant located in the Southeast. When DFA learned of these negotiations, it threatened that it would never again balance the small bottling plant's raw milk if it agreed to be supplied by independent dairy farmers. As a result of this threat, the small bottling plant discontinued its negotiations with independent dairy farmers.

e.    In July 2002, after learning that Southeast Milk ("SMI"), an independent cooperative, was paying dairy farmers in the Southeast near the Florida-Georgia border milk pay prices (or "mailbox prices") in excess of what DFA was paying its member dairy farmers in the Southeast, DFA demanded that SMI decrease its payments by $.20 to $.40 per hundredweight, and that SMI make payments to SMA to allow DFA to increase the mailbox price it was paying to its area members. DFA threatened that, if SMI refused to do so, DFA would, among other things, flood Order 6 with raw milk and terminate DFA's agreement to assist SMI in balancing its raw milk supply. DFA also threatened to use its control over NDH to replace SMI's arrangements to supply the Velda Farms bottling plants owned by NDH. As a result of these and other threats, SMI was forced to pay SMA tributes totaling several million dollars. In 2005, when SMI ceased paying that tribute to SMA, DFA caused NDH to replace SMI as the raw milk supplier at the two Velda Farms plants.

70.    In addition, the full-supply agreements between Dean and DFA and between NDH

and DFA have also had the effect of suppressing competition among milk bottlers for wholesale

sales of processed milk to retailers by making it difficult or impossible for new entrants into the

processed milk bottling market to expand into the Southeast because a new bottling plant needs a supply of raw milk to operate its bottling plant.

## INJURY AND DAMAGES

71.     During the relevant period, *i.e.*, from at least January 1, 2002 and continuing until the present, Food Lion purchased processed milk from Dean, and until recently from a bottling plant owned by a DFA joint venture, in substantial amounts. Likewise, Breto has purchased processed milk from Dean during the relevant period. As a result of Dean and the other Defendants' alleged illegal conduct, Food Lion and Breto were compelled to pay, and did pay, unlawfully inflated prices for the processed milk they purchased. The full amount, form and components of such damages will be determined after discovery and upon proof at trial.

72.     Food Lion and Breto would have been able to, *inter alia*, purchase less-expensive processed milk had Dean, DFA and NDH freely and vigorously competed with one another, had competitors to Dean, DFA and NDH been able to enter the processed milk market without unlawful interference and intimidation, and had the Defendants not entered into, and implemented, illegal agreements to lessen competition for the supply of raw milk to bottlers. In addition, prices would have fallen by an even greater amount had these competitors then been able to achieve economies of scale. Paying these overcharges caused Food Lion and Breto (and those purchasers that are similarly situated) substantial losses and damage to their business and property.

73.     Defendants' anticompetitive conduct also has had a negative effect on innovation in the Southeast. The unlawful barriers Defendants created, foreclosed and prevented the emergence in the Southeast of more efficient competitors and technological advances in processed milk bottling, packaging, and transportation. Defendants' illegal domination of the production, marketing and processing of milk in the Southeast has ensured that Defendants'

inefficient marketing methods and outdated processing technology are not effectively challenged by competitors. Accordingly, Food Lion and Breto (and those purchasers that are similarly situated) have been damaged by paying higher prices for a less efficient milk bottling process.

## CONCEALMENT AND TOLLING

74.    Upon information and belief, Defendants and their co-conspirators have affirmatively concealed from Food Lion, Breto and other class members their unlawful combination, conspiracy and agreements not to compete, and their other unlawful conduct. Defendants planned and implemented their unlawful conduct and monitored and enforced their unlawful agreements during numerous non-public meetings, and agreed among themselves not to discuss or disclose the details of their unlawful conduct, and took other actions to hide and conceal their unlawful conduct.

75.    Food Lion, Breto and other class members did not discover, nor could they have discovered through reasonable diligence, that Defendants Dean, DFA and NDH had agreed with each other to lessen competition for sales of processed milk, or that in pursuance of such agreement Defendants had refrained from competing with each other for sales of processed milk to retail customers.

76.    Defendants used, and continue to use, deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Defendants falsely represented to Food Lion, Breto and other class members that the prices that were paid for processed milk were fair and competitive, and that such prices were the result of ordinary market forces and considerations such as increased prices for raw milk and other material costs of producing processed milk. These false and misleading explanations for processed milk prices lulled Food Lion and Breto into believing that the prices for processed milk were the normal result of competitive market forces rather than the product of collusive and monopolistic practices.

77.     As a result of Defendants' affirmative and other acts of concealment, any applicable statute of limitations affecting the rights of Plaintiffs and other class members has been tolled.  Food Lion, Breto and other class members exercised reasonable due diligence, by among other things, promptly investigating the allegations contained in a complaint filed in the United States District Court for the Middle District of Tennessee in the case styled as *Sweetwater Valley Farm, Inc. v. Dean Foods Company*, and filing this suit soon thereafter. Despite other efforts, Food Lion and Breto were unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable plaintiffs to have filed this suit sooner.

## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting the claims alleged in this Amended Complaint on a common basis pursuant to Federal Rule of Civil Procedure 23 on behalf of the class of persons defined in Paragraph 6 above.

79.     Although the size of the class is not yet known with certainty, based on the nature of the trade and commerce involved, and the geographic dispersion of class members among the fourteen states (or parts thereof) comprising the Appalachia and Southeast marketing Orders, joinder of all class members is impracticable.

80.     Questions of law and fact which are common to the class include:

    a.     the proper definition and geographic scope of the relevant product markets at issue;

    b.     whether Dean, DFA and NDH entered into an agreement not to compete for the sale of processed milk to retail outlets;

    c.     whether Dean has monopoly or market power in the market for processed milk;

    d.     whether Dean conspired with NDH or others to obtain a monopoly in the market for processed milk;

25

e.    the duration of the conspiracy to obtain monopoly or market power or agreements in restraint of trade, and the acts carried out by Defendants in furtherance of such conspiracy or agreements;

f.    whether the conduct of the Defendants caused injury to the business or property of plaintiffs and the other members of the class; and

g.    the effect of the agreements and/or conspiracy complained herein on the price of processed milk.

81.    Food Lion's and Breto's claims are typical of the claims of other members of the class. Food Lion, Breto and other members of the class purchased processed milk from Dean and other defendants at prices higher than would have existed absent the anticompetitive and unlawful conduct alleged herein. Thus, Food Lion, Breto and other class members were injured by the same unlawful conduct. Defendants' violations of the antitrust laws, the effect of such violations, and the relief sought, are all common to Food Lion, Breto and other members of the class.

82.    As class representatives, Food Lion and Breto will fairly and adequately protect the class members' interests and to that end have engaged counsel experienced and competent in antitrust and class litigation.

83.    The questions of law and fact that are common to the class predominate over any questions affecting individual class members. Whatever possible issues that may exist in managing the class action are greatly outweighed by the corresponding advantages and efficiencies afforded by common adjudication of all class members' claims in a single proceeding. Those advantages include, but are not limited to, providing class members with a method of redress of claims that might not otherwise warrant individual litigation.

84.    Class action treatment is a superior method for fairly and efficiently adjudicating this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating the evidence, effort, and expense, that numerous individual actions

26

would engender. Class treatment also eliminates the potential for inconsistent adjudication of individual and separate claims.

## CAUSES OF ACTION

## COUNT I

### Violation of Section 1 of the Sherman Act
### Agreement Not to Compete
### Against Dean, DFA and NDH

85.     Plaintiffs re-allege Paragraphs 1 through 84 as set forth above.

86.     Defendants Dean, DFA and NDH agreed to lessen competition for sales of processed milk to retailers in the Southeast, and have, pursuant to such agreement, refrained from competing for such sales to retail stores.

87.     The agreement not to compete for such sales occurred in and/or substantially affected interstate commerce.

88.     As a result of such agreement, retailers such as Food Lion, Breto and other similarly situated class members were injured in their business or property by having paid higher prices for the processed milk they purchased.

## COUNT II

### Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act
### Conspiracy to Unreasonably Restrain Trade
### Against Dean, DFA, NDH, SMA and DMS

89.     Plaintiffs re-allege Paragraphs 1 through 88 as set forth above.

90.     There is a market, or segment thereof, for raw milk which is sold to milk bottling companies. Because of the price differential paid to dairy farmers for raw milk which is processed for fluid milk beverage use as compared to the price paid for raw milk used for other processed dairy products such as butter or cheese, dairy farmers in the Southeast must be able to sell their raw milk for use by milk bottling companies in order to stay in business.

27

91.     There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk.

92.     Defendant Dean has market power in the market for the purchase of raw milk in the Southeast, as well as market power in the market for the sale of processed milk. Defendant DFA and its affiliates DMS and SMA have market power in the market for the sale of raw milk which is sold to milk bottling plants in the Southeast.

93.     Dean and the other Defendants have entered into exclusive supply agreements with, and have actively conspired with one another through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives for the purchase and sale of raw milk to milk bottling and processing plants in the Southeast.

94.     Defendants Dean, DFA and NDH have actively contracted, colluded and conspired with one another through the means described above for the purpose of lessening and/or eliminating competition in the market for processed milk.

95.     Defendants' full-supply agreements collectively and individually constitute unreasonable restraints of trade in the market for raw milk, and have had the effect of ensuring that no competing milk bottlers have a less expensive source of supply of raw milk and have otherwise limited other milk bottling plants from gaining access to the supplies of raw milk which are necessary to operate and/or expand.

96.     These unreasonable restraints of trade have resulted in substantial harm to competition in the Southeast for raw milk sold to milk bottling companies and have also resulted in substantial harm to competition for the sale of processed milk.

97.     There are no legitimate business justifications for Defendants' exclusionary and predatory conduct. To the extent that there are any legitimate business reasons for Defendants'

28

restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Defendants' restraints of trade are outweighed by the competitive harm that they have caused to competition in the relevant market(s).

98.     Defendants' activities described in this Count have occurred in and/or substantially affected interstate commerce.

99.     As a result, Food Lion, Breto and other class members, were injured in their business or property by Defendants' restraint of trade in the relevant markets. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT III

### Violation of Section 2 of the Sherman Act
### Unlawful Monopolization
### Against Dean

100.     Plaintiffs re-allege Paragraphs 1 through 99 as set forth above.

101.     There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk. Given consumer demand for milk, and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk.

102.     The relevant geographic market is the Southeast United States, as defined in Paragraph 21 above, which comprises the areas encompassed within Federal Milk Marketing Orders 5 and 7. The highly perishable nature of milk, consumer preferences for fresh milk, and high transportation costs for processed milk substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. As

a practical matter, retailers like Food Lion and Breto are unable to turn to milk bottlers located outside of the Southeast to supply them with milk even when the price of processed milk increases by a small but significant amount. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

103. Defendant Dean possesses monopoly power in the market for processed milk in that it has, on information and belief, at least a 60 percent share of that market in the Southeast.

104. Dean has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to purchasing and then closing milk bottling plants or converting them to other uses, entering into agreements with other bottling companies not to compete for retail customers, retaliating against competing bottlers by terminating contracts with suppliers who also own competing milk bottling plants, and intimidating new entrants from attempting to enter into, or expand their operations in, the Southeast. All of such actions have been taken by Dean with the specific intent to lessen competition and obtain and/or illegally maintain monopoly power in the market for processed milk.

105. In addition, Dean has entered into exclusive supply agreements with, and has actively contracted, combined and conspired with DFA and others through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives in an effort to ensure that no competing milk bottlers have a less expensive source of supply of raw milk, and to otherwise limit other milk bottling plants from gaining access to the supply of raw milk which is necessary to operate or expand milk bottling plants. These actions have been undertaken by Dean for the specific purpose of monopolizing the market for processed milk.

106.    Defendants' conduct in maintaining and extending its monopoly power in the relevant market has foreclosed a substantial share of the market for processed milk in the Southeast and constitutes unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

107.    Defendants have not obtained and/or maintained their monopoly power in the market for processed milk as a consequence of superior product offerings, good faith business acumen, or historical accident.

108.    Dean's activities described in this Count have occurred in and/or substantially affected interstate commerce.

109.    Food Lion, Breto and other class members have been injured in their business or property by Dean's monopolization of the processed milk market. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendant's monopolization.

## COUNT IV

### Violation of Section 2 of the Sherman Act
### Attempt to Monopolize
### Against Dean

110.    Plaintiffs re-allege Paragraphs 1 through 109 as set forth above.

111.    In the alternative, to the extent that Dean does not possess monopoly power in the market for processed milk in the Southeast, it has unlawfully attempted to monopolize the market for processed milk.

112.    There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk. Given consumer demand for milk, and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for

31

processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk.

113. The relevant geographic market is the Southeast United States, as defined in Paragraph 21 above, which comprises the areas encompassed within Federal Milk Marketing Orders 5 and 7. The highly perishable nature of milk, consumer preferences for fresh milk, and high transportation costs for processed milk, substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

114. Dean has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to purchasing and then closing milk bottling plants or converting them to other uses, entering into an agreement with other bottling companies not to compete for retail customers, retaliating against competing bottlers by terminating contracts with suppliers who also own competing milk bottling plants, and intimidating new entrants from attempting to enter into, or expand their operations in, the Southeast. All of such actions have been taken by Dean with the specific intent to lessen competition and obtain and/or illegally maintain monopoly power in the market for processed milk.

115. In addition, Dean has entered into exclusive supply agreements with, and has actively contracted, combined and conspired with DFA and others through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives in an effort to ensure that no competing milk bottlers have a less expensive source of supply of raw milk, and to otherwise limit other milk bottling plants from gaining access to

32

the supply of raw milk which is necessary to operate or expand milk bottling plants. These actions have been undertaken by Dean for the specific purpose of monopolizing the market for processed milk.

116.    Dean had the specific intent to achieve its goal of obtaining monopoly power in the market for processed milk, and engaged in the conduct alleged above for the specific purpose of achieving that goal.

117.    There is a dangerous probability that if left unchecked, Dean will achieve its goal of obtaining monopoly power in the market for processed milk.

118.    Dean's activities described in this Count have occurred in and/or substantially affected interstate commerce.

119.    As a result of Dean's attempt to monopolize the market for processed milk, Food Lion, Breto and other class members have been injured in their business or property. Food Lion, Breto and other class members, have been forced to pay higher prices for processed Grade A milk in the relevant markets than they would have paid in the absence of Dean's attempted monopolization.

## COUNT V

### Violation of Section 2 of the Sherman Act
### Conspiracy to Monopolize
### Against Dean, DFA and NDH

120.    Plaintiffs re-allege Paragraphs 1 through 119 as set forth above.

121.    Dean, DFA and NDH agreed among themselves and otherwise conspired to obtain and/or maintain monopoly power in the market for processed milk.

122.    Pursuant to such conspiracy Dean, DFA and NDH each specifically intended to obtain monopoly power in the market for processed milk.

123. The overt acts done in furtherance of such conspiracy include the agreement between Dean, DFA and NDH not to compete for sales of processed milk to retail stores, as well as Dean and NDH's entry into full-supply agreements with DFA.

124. The acts of Defendants Dean, DFA and NDH done in furtherance of such conspiracy occurred in and/or substantially affected interstate commerce.

125. Plaintiff Food Lion, Breto and other members of the class, were injured in their business or property as a result of such conspiracy to monopolize the market for processed milk. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendants' conspiracy to monopolize.

## REQUEST FOR RELIEF

WHEREFORE, Food Lion and Breto, on behalf of themselves and a class of all others similarly situated, respectfully request that:

(i)     The acts alleged herein be adjudged and decreed to be unlawful acts in violation of Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act;

(ii)    Food Lion and Breto be granted structural, prospective relief, including an appropriate final injunction divesting the Defendants of such property as will be determined at trial to be necessary to promote competition, and any other appropriate relief as may be determined to be just, equitable, and proper by this Court;

(iii)   Food Lion and Breto recover three-fold the damages determined to have been sustained by Defendants' acts during the period beginning at least as of January 1, 2002, and that judgment be entered against Defendants in favor of Food Lion and Breto;

(iv)   Food Lion and Breto recover their costs of suit, including reasonable attorneys'

fees and costs as provided by law; and

(v)    Food Lion and Breto be granted any other appropriate relief as may be determined

to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Respectfully submitted,


_____/s/ Richard L. Wyatt, Jr._____
Richard L. Wyatt, Jr. (admitted *pro hac vice*)
Todd M. Stenerson  (admitted *pro hac vice*)
Michael L. Converse
AKIN GUMP STRAUSS HAUER & FELD, LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
rwyatt@akingump.com
tstenerson@akingump.com
mconverse@akingump.com

AND

R. Laurence Macon (admitted *pro hac vice*)
AKIN GUMP STRAUSS HAUER & FELD, LLP
300 Convent Street, Suite 1500
San Antonio, TX  78205-3732
Telephone: (210) 281-7000
Facsimile: (210) 224-2035
lmacon@akingump.com

AND

Gordon Ball, BPR # 001135
BALL & SCOTT LAW OFFICES
550 W. Main Street, Suite 601
Knoxville, TN 37902
(865) 525-7028
gball@ballandscott.com

March 28, 2008

## CERTIFICATE OF SERVICE

I certify that, on March 28, 2008, a true and correct copy of the Amended Class Action Complaint was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee, upon:

Roberta D. Liebenberg
Ria C. Momblanco
Fine, Kaplan & Black
1835 Market St.
28th Floor
Philadelphia, PA 19103
rliebenberg@finekaplan.com
gdever@finekaplan.com
rmomblanco@finekaplan.com
*Counsel for Aker Plaintiffs*

Steven A. Kanner
Freed Kanner London & Millen LLC
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
skanner@fklmlaw.com
*Counsel for Scott Dairy Plaintiffs*

Stephen K. Griffith
Knight, Griffith, McKenzie, Knight &
McLeroy, LLP
409 First Avenue, S.W.
Griffith Building
Cullman, AL 35055
skgriff@knight-griffith.com
*Counsel for Scott Dairy Plaintiffs*

Gary E. Mason
Khushi Desai
Donna Solen
The Mason Law Firm, L.L.P.
1225 19th Street, N.W.
Suite 500
Washington, D.C. 20036
gmason@masonlawdc.com
kdesai@masonlawdc.com
dsolen@masonlawdc.com
*Counsel for Farrar Plaintiffs*

H. Buckley Cole, Esq.
Greenebaum, Doll & McDonald PLLC
AmSouth Center
315 Deaderick Street, Suite 1425
Nashville, TN 37238
hbc@gdm.com
*Counsel for Defendants Dairy Farmers of America, Inc., Mid-Am Capital LLC,*

W. Todd Miller, Esq.
Baker & Miller PLLC
2401 Pennsylvania Ave., N.W.,
Suite 300
Washington, DC 20037
tmiller@bakerandmiller.com
*Counsel for Defendants Dairy Farmers of America, Inc., Mid-Am Capital, LLC, Dairy Marketing Services LLC, Gary Hanman and Gerald Bos*

Steven R. Kuney, Esq.
John E. Schmidtlein, Esq.
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
SKuney@wc.com
jschmidtlein@wc.com
*Counsel for Defendants Dairy Farmers of America, Inc., Mid-Am Capital LLC, Dairy Marketing Services LLC, Gary Hanman and Gerald Bos*

Jerry L. Beane, Esq.
Kay Lynn Brumbaugh, Esq.
Andrews Kurth LLP
Suite 3700, 1717 Main Street
Dallas, TX 75201
jerrybeane@andrewskurth.com
kaylynnbrumbaugh@andrewskurth.com
*Counsel for Defendant National Dairy Holdings, L.P.*

36

Thomas C. Jessee
Jessee & Jessee
P.O. Box 997
Johnson City, TN 37605
jjlaw@jesseeandjessee.com
*Counsel for Scott Dairy Plaintiffs, Aker
Plaintiffs, Farrar Plaintiffs, and Groseclose
Plaintiffs*

Arthur N. Bailey
Arthur N. Bailey & Associates
111 West Second Street, Suite 4500
Jamestown, NY 14701
artlaw@alltell.net
*Counsel for Scott Dairy Plaintiffs, Aker
Plaintiffs, and Groseclose Plaintiffs*

Daniel K. Bryson
Lewis & Roberts, PLLC
1305 Navaho Drive
Suite 400
Raleigh, NC 27609
danielbryson@lewis-roberts.com
*Counsel for Farrar Plaintiffs*

Robert L. Arrington
Andrew Wampler
Wilson, Worley, Moore, Gamble & Stout, P.C.
Eastman Credit Union Building
2021 Meadowview Lane
2nd Floor, P.O. Box 88
Kingsport, TN 37662
rarrington@wwmgs.com
awampler@wwmgs.com
*Counsel for Defendant James Baird*

Mark S. Dessauer, Esq.
William C. Bovender, Esq.
Hunter, Smith & Davis, LLP
P.O. Box 3740
Kingsport, TN 37664
dessauer@hsdlaw.com
bovender@hsdlaw.com
*Counsel for Defendant Dean Foods Co*

Steven E. Kramer
Robert P. Murrian
Kramer, Rayson, Leake, Rodgers & Morgan,
LLP
P.O. Box 629
Knoxville, TN 37901
skramer@kramer-rayson.com
rpmurrian@kramer-rayson.com
*Counsel for Defendant National Dairy
Holdings, L.P.*

D. Alexander Fardon, Esq.
J. David McDowell, Esq.
Craig V. Gabbert, Jr.
Harwell Howard Hyne Gabbert & Manner,
P.C.
315 Deaderick Street
Suite 1800
Nashville, Tennessee 37238-1800
daf@h3gm.com
jdm@h3gm.com
cvg@h3gm.com
*Counsel for Southern Marketing Agency, Inc.*

Michael D. Hausfeld
James J. Pizzirusso
Richard A. Koffman
Cohen, Milstein, Hausfeld, & Toll
1100 New York Avenue, N.W.
Suite 500 West Tower
Washington, DC 20005
*Interim Co-Lead Counsel for Independent
Farmer Plaintiffs*

Robert G. Abrams
Gregory J. Commins, Jr.
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
Telephone: (202) 783-0800
Facsimile: (202) 383-6610
*Interim Co-Lead Counsel for Independent
Farmer Plaintiffs, and Interim Lead Counsel
for DFA Farmer Plaintiffs*

Carolyn H. Feeney, Esq.
Dechert LLP
Cira Centre, 2929 Arch St.
Philadelphia, PA 19104
Carolyn.feeney@dechert.com
*Counsel for Defendant Dean Foods Co*

Paul H. Friedman, Esq.
Paul Denis, Esq.
Dechert LLP
1775 I Street, NW
Washington, DC 20006
paul.friedman@dechert.com
paul.denis@dechert.com
*Counsel for Defendant Dean Foods Co*

G.P. Gaby
Thomas J. Garland
Milligan & Coleman
P.O. Box 1060
Greeneville, TN 37744
ggaby@milligancoleman.com
*Counsel for Defendants Dairy Farmers of
America, Inc., Mid-Am Capital, LLC, Dairy
Marketing Services LLC, Gary Hanman and
Gerald Bos*

W. Gordon Dobie, Esq.
Kari Rollins, Esq.
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
WDobie@winston.com
karollins@winston.com
*Counsel for Southern Marketing Agency, Inc.*

William A. Isaacson
Boies, Schiller & Flexner LLP
5301 Wisconsin Avenue, NW
Washington, D.C. 20015
*Interim Co-Lead Counsel for Independent
Farmer Plaintiffs*

I certify that, on March 28, 2008, a true and correct copy of Amended Class Action Complaint was served by United States Postal Service upon:

John C. Whitfield
Whitfield & Cox, P.S.C.
29 East Center Street
Madisonville, KY 42431
*Counsel for Farrar Plaintiffs*

Dated: March 28, 2008

                              /s/ Richard L. Wyatt, Jr.
                              Counsel for Plaintiffs