# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## GREENEVILLE DIVISION

|  |  |
|---|---|
| IN RE SOUTHEASTERN MILK ANTITRUST LITIGATION | No. 2:08-MD-01000 |
| | Judge J. Ronnie Greer |
| | Magistrate Judge Dennis H. Inman |
| THIS DOCUMENT RELATES TO: | |
| *Food Lion, LLC, et al. v. Dean Foods Company, et al.*, Case No. 2:07-CV-188. | |

## DEFENDANT SOUTHERN MARKETING AGENCY, INC.'S ANSWER TO PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Defendant Southern Marketing Agency, Inc. ("SMA"), by and through its attorneys, in answer to Plaintiffs' Amended Class Action Complaint (the "Complaint") states as follows:

## NATURE OF THE ACTION

1.      Milk is a staple product for many American families. The milk distribution chain that moves raw milk from the farm to the dinner table comprises farmers, dairy cooperatives, milk processors and bottlers, and retailers like Food Lion and Breto. Raw milk is produced by dairy farmers, who either independently or as members of farm cooperatives, sell their milk to bottling companies to be made into milk beverages. Milk bottling companies process the raw milk before placing it into consumer packages for sale to grocers or other retail outlets. In 2006, almost 73 percent of all retail milk sales to consumers were made by supermarkets.

**ANSWER:**     SMA admits the allegations in the first sentence of Paragraph 1.  SMA denies the allegations in the second sentence of Paragraph 1 to the extent they suggest that the allegations describe the only means by which processed milk products reach consumers.  SMA denies the allegations in the third sentence of Paragraph 1 to the extent they suggest that raw milk is sold only to milk bottling plants.  SMA denies the allegations in the fourth sentence of Paragraph 1 to the extent they suggest that processed milk is sold only to grocers or other retail

outlets. SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth sentence of Paragraph 1 and, therefore, SMA denies those allegations. SMA denies any remaining allegations in Paragraph 1.

2.     This case is about the illegal monopolization and lessening of competition in the Southeast United States among milk bottlers for the sale of processed milk to retail outlets and other customers. Defendant Dean is the largest single milk bottler in the United States, and Food Lion is one of the largest purchasers of milk from Dean in the Southeast. Dean has obtained a monopoly in the sale of processed milk after several years of acquisitions of milk bottling companies and through a variety of anticompetitive and wrongful actions including agreeing with competitors not to compete for sales of processed milk, purchasing and then closing milk bottling plants or converting them to other uses, terminating raw milk supply contracts with independent farm cooperatives who own competing milk bottling plants and replacing that raw milk supply with exclusive agreements with DFA, the largest dairy cooperative in the United States, and otherwise retaliating against other independent farm cooperatives and milk bottlers in an attempt to keep them from expanding into the southeast United States.

     **ANSWER:**     SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 2 and, therefore, SMA denies those allegations. SMA denies the remaining allegations in Paragraph 2.

3.     Dean's monopolization of the processed milk market was substantially enhanced by the December 2001 merger between Suiza Foods Corp. ("Suiza") and Dean. The U.S. Department of Justice ("DOJ") allowed the merger to go forward on the condition that eleven of the milk bottling plants of the merging entities be sold, nine of which were in or near the Southeast. The buyer of those plants was NDH, an entity controlled and financed by DFA. NDH was supposed to serve as a competitor to Dean in the processed milk market in the Southeast and thus eliminate the competitive problems presented by the Dean-Suiza merger. The promise of such competition did not come to pass.

     **ANSWER:**     SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second, third, and fourth sentences of Paragraph 3 and, therefore, SMA denies those allegations. SMA denies the remaining allegations in Paragraph 3.

2

4.     The agreement not to compete with each other is but one part of a corrupt bargain in which Defendants agreed to collaborate to assist each other in their respective efforts to monopolize the market in which each is engaged. Examples of the manner in which this corrupt bargain has been, and continues to be, carried out are:

a.     DFA aided Dean in obtaining clearance from the DOJ for the Dean-Suiza merger. DFA did so by financing and then offering to use NDH as a vehicle for purchasing and operating the eleven milk processing plants whose divestiture was necessary to permit the merger to go forward. DFA also used its control over NDH to ensure that NDH would not vigorously compete with Dean for the sale of processed milk in the southeast United States. As a result. Dean's monopoly position was cemented.

b.     Dean, in turn, agreed to cease purchasing raw milk from independent farmers (from which it had been purchasing hundreds of millions of pounds of milk at favorable prices) and to enter into full-supply agreements with DFA, with the purpose and effect of enhancing DFA's efforts to monopolize the market for raw milk sold to milk bottling plants in the southeast United States. Dean also agreed to use DMS, an entity controlled by DFA, in purchasing the raw milk that it needed to run its milk bottling plants. As a result, DFA has been able to force previously independent farmers and other independent milk coops into joining either DFA or the DFA-controlled SMA, thus aiding DFA's efforts to monopolize the market for the sale of raw milk to milk bottlers in the southeast United States.

c.     This has benefited both DFA (by allowing it to obtain or nearly obtain a monopoly in the market for raw milk sold to milk bottling plants in the southeast) and Dean (by insulating Dean from the entry of new processed milk bottling plants in the southeast by locking up the supply of raw milk that any new entrant into the bottling business would need to compete).

**ANSWER:**     SMA denies the allegations in Paragraph 4 and its subparts as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 4 and its subparts and, therefore, denies those allegations.

5.     Dean's monopolization, attempt to monopolize, and conspiracy to monopolize the market for processed milk, along with Dean's and the other Defendants' scheme to suppress competition in both the markets for processed milk and raw milk sold to milk bottling plants, has resulted in Food Lion, Breto and other class members paying higher prices for processed Grade A milk than they otherwise would have paid in the absence of such unlawful conduct.

3

**ANSWER:** SMA denies the allegations in Paragraph 5 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5 and, therefore, denies those allegations.

6. Food Lion and Breto bring this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on its own behalf and as representatives of the following class of persons:

> All persons, other than schools and school districts, within the Southeast United States who have purchased, at any time from January 1, 2002 until the present, directly from any Defendant, Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers.

**ANSWER:** SMA admits that Plaintiffs purport to bring this lawsuit as a class action on behalf of themselves and the putative "class" as defined in Paragraph 6, but denies that this case may be properly maintained as a class action. The remaining allegations in Paragraph 6 state a legal conclusion to which no response is required.

7. This action seeks to enjoin Defendants' unlawful conduct and to recover treble damages, costs, expenses, as well as attorneys' fees as well as such additional and further relief as may be deemed just and proper.

**ANSWER:** SMA admits that Plaintiffs purport to seek the various forms of relief described in Paragraph 7, but SMA denies that Plaintiffs' Complaint states any claim upon which relief may be granted against SMA and denies that Plaintiffs are entitled to any of the requested relief whatsoever from SMA. SMA denies the remaining allegations in Paragraph 7.

## JURISDICTION, VENUE AND INTERSTATE COMMERCE

8. Food Lion and Breto bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendants' violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14. Subject matter

jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

**ANSWER:** SMA admits that Plaintiffs purport to bring this lawsuit pursuant to the Clayton Act and the Sherman Act, but SMA denies that Plaintiffs have any viable or meritorious claims thereunder. The remaining allegations in Paragraph 8 state a legal conclusion to which no response is required.

9. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

**ANSWER:** Paragraph 9 states a legal conclusion to which no response is required.

10. Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the relevant period Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of events giving rise to Food Lion's and Breto's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

**ANSWER:** Paragraph 10 states a legal conclusion to which no response is required.

11. The Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. § 1391 as well as pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

**ANSWER:** Paragraph 11 states a legal conclusion to which no response is required.

12. Defendant Dean purchases, processes and ships milk across state lines. Defendant DFA markets, processes and ships milk across state lines. Defendant NDH purchases, processes and ships milk across state lines. Defendants DMS and SMA market milk across state lines. All Defendants received substantial payments across state lines from the sale of raw and/or processed milk. Defendants' business activities that are the subject of this Complaint are within the flow of, and have substantially affected, interstate trade and commerce.

5

CHI:2292580.1

**ANSWER:** SMA denies the allegations in Paragraph 12 as they relate to SMA, except SMA admits that it markets raw Grade A milk in many parts of the United States and receives payments in connection with those marketing activities. SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 as they relate to non-SMA Defendants and, therefore, SMA denies those allegations. The remaining allegations in Paragraph 12 state a legal conclusion to which no response is required.

## THE PARTIES

13. Food Lion is a North Carolina limited liability company. Its executive offices are located at 2110 Executive Drive, Salisbury, North Carolina, 28147. Food Lion operates approximately 1,300 supermarkets, either directly or through affiliated entities, under the names of Food Lion, Bloom, Bottom Dollar, Harvey's and Reid's in eleven Southeastern and Mid-Atlantic states, including Delaware, Florida, Georgia, Kentucky, Maryland, North Carolina, Pennsylvania, South Carolina, Tennessee, Virginia and West Virginia. Food Lion purchases processed milk directly from Defendants Dean and DFA for sale at certain of its supermarket stores.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 13 and, therefore, SMA denies those allegations.

14. Plaintiff Fidel Breto, d/b/a/ Family Foods, is a citizen and resident of Jonesborough, Tennessee, who regularly purchases processed milk directly from Dean for sale at its retail grocery store.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and, therefore, SMA denies those allegations.

15. Defendant Dean is a for profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas 75201.

6

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 and, therefore, SMA denies those allegations.

16. Defendant DFA is a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Southeast Council headquarters located at 10411 Cogdill Road, Knoxville, Tennessee 37932. Defendant DFA is a vertically integrated cooperative that controls raw milk production, and also owns and operates its own hauling companies, processing plants and distribution centers for processed milk.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16 and, therefore, SMA denies those allegations.

17. Defendant NDH is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business at 3811 Turtle Creek Boulevard, Suite 1300, Dallas, Texas, 75219. DFA owns a 50 percent common equity interest and approximately 92 percent preferred equity interest in NDH.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17 and, therefore, SMA denies those allegations.

18. Defendant DMS is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221, and with its Southeast regional office located at 10411 Cogdill Road, Knoxville, Tennessee 37932. DMS, which was formed by DFA and Dairlylea Cooperative, Inc. in 1999, is a milk marketing organization which markets milk on behalf of its member dairy cooperatives. DMS arranges contracts with buyers of raw milk such as Dean, arranges for the transportation of raw milk, schedules deliveries, allocates marketing costs, and handles the payment of checks to coop member dairy farmers. Upon information and belief, DMS is substantially controlled by DFA. DMS has full-supply contracts with both Dean and NDH.

CHI:2292580.1

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, therefore, SMA denies those allegations.

19. Defendant SMA is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Kentucky with its principal place of business at 13002 Honeysuckle Way, Prospect, Kentucky 40059. Originally formed in 2002, SMA's current members include DFA, Maryland and Virginia Milk Producers, Lone Star Milk Producers, Dairymen's Marketing Cooperative and Arkansas Dairy Cooperative Association. DFA is SMA's largest member.

**ANSWER:** SMA admits that it is a not-for-profit corporation organized and existing under the laws of the Commonwealth of Kentucky. SMA admits that its registered agent's office is at 1812 Waterfront Plaza, 325 West Main Street, Louisville, Kentucky 40202. SMA denies the remaining allegations in Paragraph 19.

## RELEVANT PRODUCT MARKET: PROCESSED GRADE A MILK

20. The relevant product market is Grade A milk, other than school milk, which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers (referred to herein as "processed milk"), and the market segments thereunder. Only Grade A milk can be used to make processed milk beverages for human consumption. Given consumer demand for milk and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk. In 2006, more than 92 percent of supermarket shoppers purchased processed milk.

**ANSWER:** Paragraph 20 states a legal conclusion to which no response is required. To the extent a response is required, SMA admits that Plaintiffs purport to define a product market consisting of Grade A milk, other than school milk, which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, but SMA denies that this comprises a relevant product market.

SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 20 and, therefore, SMA denies those allegations.

## RELEVANT GEOGRAPHIC MARKET:  SOUTHEAST UNITED STATES

21.     The relevant geographic market is the Southeast United States (the "Southeast"), and the market segments thereunder, which consists of the regions covered by the following Federal Milk Market Orders established by the United States Department of Agriculture (1) Appalachian Marketing Area (Federal Order No. 5—covering North Carolina, South Carolina, and portions of Georgia, Indiana, Kentucky, Tennessee, Virginia, and West Virginia), and (2) the Southeast Marketing Area (Federal Order No. 7—covering Alabama, Arkansas, Mississippi, Louisiana, and parts of Florida, Georgia, Kentucky, Missouri, and Tennessee.)

**ANSWER:**     Paragraph 21 states a legal conclusion to which no response is required.  To the extent a response is required, SMA admits that Plaintiffs purport to define a geographic market defined as the "Southeast" and consisting of Federal Milk Marketing Orders 5 and 7, but SMA denies that this comprises a relevant geographic market.

22.     Consumer preferences for fresh milk, its highly perishable nature and high transportation costs for processed milk substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. As a practical matter, retailers like Food Lion and Breto are unable to turn to milk bottlers located outside of the Southeast to supply them with milk even when the price of processed milk increases by a small but significant amount. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

**ANSWER:**     SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and, therefore, SMA denies those allegations.

CHI:2292580.1

## FACTUAL ALLEGATIONS

### Milk Distribution and Pricing

23.     Numerous companies have tried to sell processed milk nationally and have ultimately failed. Milk is mostly water and is thus relatively heavy and costly to transport a substantial distance. Transporting raw milk an extra thousand miles has been estimated to add approximately 25 cents a gallon to its cost. Bottled processed milk cannot be transported in bulk, so it costs even more to transport. In addition, the quality of milk deteriorates during each extra day it spends on the road. Given its perishable nature, every day that processed milk is on the road reduces its shelf life by a day (or more). As a result of these economic realities, processed milk markets have traditionally been regional in scope. For these reasons, a leading dairy industry publication has concluded that a milk bottler does not need to achieve a large share of the national market to exercise the power of a monopolist; it only needs a large share of the relevant regional market.

**ANSWER:**     SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and, therefore, SMA denies those allegations.

24.     Milk prices that retail outlets, like Food Lion and Breto, pay for processed milk are not set by government regulations but are, absent illegal anticompetitive conduct, subject to the economic forces of supply and demand.

**ANSWER:**     SMA admits that the prices paid by retail outlets for processed milk are not "set" by governmental regulations, but denies the allegations in Paragraph 24 to the extent they suggest that governmental regulations play no role in the pricing of processed milk products.  SMA denies the remaining allegations in Paragraph 24.

25.     Minimum prices for raw milk paid to dairy farmers, however, are calculated by using a system set by Federal Milk Marketing Orders ("FMMO" or "Order"). Under the Classified Pricing System, the U.S. Department of Agriculture classifies raw Grade A milk into four categories for minimum pricing purposes. Class I milk, typically referred to as "fluid milk," is used for milk beverages for human consumption, and is the type at issue in this case. The USDA's milk market administrators calculate minimum prices each month pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions or orders. This case does not challenge the minimum prices for raw milk set by any FMMO.

**ANSWER:** Paragraph 25 states a legal conclusion to which no response is required. To the extent a response is required, SMA admits that Plaintiffs' Complaint purports to address only Class I milk and that the Complaint purports not to challenge the minimum prices for raw grade A milk set by any Federal Milk Marketing Order. SMA admits that U.S. Department of Agriculture classifies Grade A milk into four classes according to the purpose for which it was and is used, but SMA denies that the allegations in Paragraph 25 fully and accurately describe those classes of Grade A milk. SMA admits that on a monthly basis milk market administrators calculate, according to a formula established by the Secretary of Agriculture, the minimum price for each class of Grade A milk for each Order, but SMA denies that the allegations in Paragraph 25 fully and accurately describe those minimum prices or how they are calculated. SMA denies the remaining allegations in Paragraph 25.

26. Cooperatives and independent producers are free to negotiate for prices in excess of FMMO minimum prices to more accurately reflect market conditions. The amounts by which prices charged by cooperatives and independent producers for raw milk exceed FMMO minimum blend prices are known generically as "over-order premiums." The actual price received by a dairy farmer is known as the "mailbox price" and comprises the federal minimum price plus any negotiated over-order premium, minus costs and expenses for marketing and transportation.

**ANSWER:** SMA denies the allegations in Paragraph 26 fully and accurately describe the prices charged by cooperatives and independent producers for raw Grade A milk, except SMA (1) admits that cooperatives and dairy farmers are free to negotiate and contract for the payment of prices by processing plants in excess of the "minimum blend price" and (2) admits that the prices in excess of the "minimum blend price" negotiated and contracted for between the processing plants and cooperatives or dairy farmers are commonly referred to as "over-order premiums." SMA admits that the actual price a dairy farmer receives for Grade A milk is commonly referred to as the "mailbox price." SMA denies the allegations in Paragraph

CHI:2292580.1

26 fully and accurately describe mailbox prices, except SMA admits that the "mailbox price" is the net price that dairy farmer cooperative members receive for their milk after deductions for marketing and other costs incurred in connection with the marketing, sale, and transportation of their raw Grade A milk to processing plants. SMA denies the remaining allegations in Paragraph 26.

27.     The minimum price for raw milk that is bottled and sold for beverage use is higher than the minimum price for milk that is used to make cheese, butter or other dairy products. In the Southeast, heat and humidity raise the average cost of producing milk so much that only fluid uses are economical. Thus, a southeast dairy farmer whose raw milk is not pooled in a FMMO by shipping it to a regulated milk bottling plant obtains such a low price for his milk as to put him in danger of going out of business.

        **ANSWER:**     SMA denies the allegations in Paragraph 27.

28.     In an unrestrained market an efficient cooperative would be able to negotiate with milk bottlers to provide raw milk at a lower cost to the bottlers while simultaneously providing higher payments to its farmer members. For example, in areas outside the Southeast, such as Order 6 which comprises all but four counties of Florida, Southeast Milk, Inc. ("SMI") exists as an independent cooperative which competes with DFA by offering higher mailbox prices to its farmer members and lower prices to milk bottlers.

        **ANSWER:**     SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and, therefore, SMA denies those allegations.

### Consolidation In The Milk Industry

#### *Milk Cooperatives*

29.     The dairy industry in the Southeast is highly concentrated, at both the dairy farmer producer and bottler level. Throughout the United States, the trend towards cooperative consolidation began in the late 1960s when approximately 170 local cooperatives integrated into three large cooperatives with about 64,000 dairy farmer producers.

CHI:2292580.1

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29 and, therefore, SMA denies those allegations.

30. Dairy cooperatives are associations of dairy farmers who agree to market collectively their raw milk and other dairy products. Cooperatives are supposed to be "voluntary associations," owned, operated, and controlled by their member farmers. Cooperatives typically "market" their farmers' raw milk, which usually consists of locating buyers, negotiating sales prices, coordinating the hauling, performing the testing, recording and reporting related data to milk market regulators, and paying member farmers for their raw milk. The Capper-Volstead Act permits cooperatives to operate without regard to certain antitrust laws. This case alleges conduct by the Defendants that is outside the scope of the Act's protections.

**ANSWER:** SMA admits that dairy cooperatives are associations of dairy farmers who agree to market collectively their Grade A milk and other dairy products. SMA admits that dairy cooperatives are owned, operated, and controlled by their member farmers. SMA denies the allegations in Paragraph 30 fully and accurately describe the responsibilities and operations of dairy cooperatives. SMA admits that the Capper-Volstead Act permits and authorizes dairy farmers, associations of dairy farmers (*i.e.*, dairy cooperatives), and their marketing agencies in common to come together to collectively market and sell their milk without fear of violating the federal antitrust laws. SMA denies the remaining allegations in Paragraph 30.

31. Not all dairy farmers are cooperative members. Some dairy farmers seek to remain independent of cooperatives and are referred to as "independent dairy farmers." Independent dairy farmers seek to market their raw milk to fluid milk bottling plants by contracting with plants either directly or through agents and/or marketing associations.

**ANSWER:** SMA admits that not all dairy farmers are cooperative members. SMA admits that some dairy farmers remain independent of dairy cooperatives and that these dairy farmers are commonly referred to as "independent dairy farmers." SMA is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 31 and, therefore, SMA denies those remaining allegations.

32. In the mid 1970s, the DOJ filed antitrust actions against three cooperatives for violations of Sections 1 and 2 of the Sherman Act, *United States v. Associated Milk Producers, Inc.*, Civ. A. No. 72-49 (W.D. Tex. Feb. 1, 1972), *United States v. Dairymen, Inc.*, Civ. A. No. 10 73-7364 (W.D. Ky. Mar. 29, 1973), *United States v. Mid-America Dairymen, Inc.*, Civ. A. No. 73-681 (W.D. Mo. Dec. 27, 1973).

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and, therefore, SMA denies those allegations.

33. The DOJ sought redress for, *inter alia*, entering into contracts, agreements and understandings in an attempt to monopolize trade and commerce in the raw milk market, requiring processors to contract for a set quantity of raw milk for a twelve-month period and penalizing processors failing or refusing to do so, and entering into membership agreements which unreasonably restricted the rights of members to withdraw and market their milk in a freely competitive manner. Judgment was entered against each of the cooperatives enjoining them from, *inter alia*, entering into or enforcing agreements for a term in excess of one year in several states, including Georgia, Kentucky and Tennessee.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and, therefore, SMA denies those allegations.

34. On January 1, 1998, DFA, a new marketing cooperative, was created from the merger of four leading cooperatives, including two of the cooperatives that had been sued by the DOJ: Associated Milk Producers, Inc., Mid-America Dairymen, Inc., Milk Marketing, Inc., and Western Dairy Cooperative, Inc. Since then, three additional cooperatives have become part of DFA: Independent Cooperative Milk Producers Association, Valley of Virginia Producers Association, and California Cooperative Creamery. By the close of 2000, following nearly a decade of consolidation, DFA was the largest dairy cooperative in the United States and controlled more than 50 percent of the raw Grade A milk produced in the Southeast United States.

14

**ANSWER:**  SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and, therefore, SMA denies those allegations.

### *Milk Bottlers*

35.  Milk bottlers process raw milk purchased from cooperatives, independent dairy farmers or other supply plants into pasteurized milk for human consumption. Bottling plants process milk into a variety of beverage products including whole milk, fat-free or skim milk, low and reduced-fat milk, chocolate milk, buttermilk, and cream. The processed milk is then packaged into a variety of consumer containers including gallon jugs, half-gallon cartons and other smaller packages.

**ANSWER:**  SMA admits that milk bottlers process raw milk purchased from cooperatives, independent dairy farmers, or other supply plants into pasteurized milk intended for human consumption and use this milk to make a variety of beverage and other products that are sold in a variety of package sizes.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 35 and, therefore, SMA denies those allegations.

36.  Milk bottling plants then sell the processed milk to retail outlets, like Food Lion, Breto and other customers. Milk processors include independent bottling plants, bottlers owned by cooperatives or in joint ventures with cooperatives, and retail food chains that own their own bottling plants. The bottling plants of some retail chains are referred to as captive bottlers because they process and bottle milk exclusively for the retail outlets owned by that chain except for some insignificant "merchant" sales to unaffiliated retailers.

**ANSWER:**  SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and, therefore, SMA denies those allegations.

37.  In 1996, there were sixty-two milk bottling plants in the Southeast, three of which were owned by Dean, including Forrest Hill Dairy in Memphis, Tennessee, Mayfield in Athens, Tennessee and Dean Foods in Louisville, Kentucky and two of which were operated under joint

15

ventures by Mid-America Dairymen (one of DFA's predecessors), including Ideal American Dairy in Evansville, Indiana and Dairy Fresh in Baker, Louisiana.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and, therefore, SMA denies those allegations.

38. Following a series of acquisitions, by late 2001, Suiza, a Dallas, Texas based dairy company, had become the largest fluid milk processor in the United States. Suiza owned 67 dairy processing plants in 29 states, and had net sales of more than $5 billion. Following its own series of acquisitions, by 2001 Dean had become the second largest buyer of raw milk and the second largest bottler of processed milk in the United States, operating 43 dairy plants in 19 states. In 2000, Dean had net sales of approximately $4.4 billion.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and, therefore, SMA denies those allegations.

39. In 2001, Suiza announced a plan to merge with Dean and to thereafter operate the merged company under the name Dean. Dean and Suiza anticipated antitrust concerns by DOJ because they were the first and second largest processed milk bottlers in the United States. Dean and Suiza agreed to address DOJ's concerns by means of what is known as a "fix-it-first" divestiture of eleven milk bottling plants in eight states (Alabama, Florida, Indiana, Kentucky, Ohio, South Carolina, Virginia, and Utah) to the buyer of Dean/Suiza's choice, NDH, an entity controlled by DFA. At the same time, Dean agreed to buy out DFA's 33.8 percent stake in Suiza. The DOJ also required Suiza to modify its pre-merger full-supply contract with DFA, who would also own a one-half equity interest in NDH.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, therefore, SMA denies those allegations.

40. The spin-off involved selling seven Suiza dairies and four Dean dairies to NDH. The Suiza dairies that were divested included Barber/Meadow Gold Dairies in Huntsville, Alabama; Velda Farms in Miami, Florida; Velda Farms in Winter Haven, Florida; Burger Dairy in New Paris, Indiana; Flav-O-Rich in London, Kentucky; Dairymen's in Cleveland, Ohio; and Flav-O-Rich in Bristol, Virginia. The divested Dean dairies included Goldenrod Dairy

Foods/U.C. Milk Co. in Madisonville, Kentucky; H. Meyer Dairy Co. in Cincinnati, Ohio; Coburg Dairy in North Charleston, South Carolina; and Cream O' Weber Dairy in Salt Lake City, Utah.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and, therefore, SMA denies those allegations.

41. Upon information and belief, DFA and its subsidiaries, including Mid-Am Capital LLC, have provided more than $400 million in financing to NDH, enabling it to acquire and operate the 11 processed milk bottling plants divested by Dean and Suiza and other bottling plants. At all times relevant to this Complaint, DFA has owned at least 50 percent of NDH's equity and voting shares. DFA owns a 50% common equity interest and approximately 92% preferred equity interest in NDH. DFA also has a 50% interest in Dairy Management LLC, which is the managing arm of NDH. Based on its financial interests in NDH, DFA has the rights to between 50% and 75% or more of NDH's profits. In forming NDH, DFA and its partners agreed, among other things, that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers. As a result, NDH does not take any significant action without DFA's express approval or without having been directed to take such action by DFA.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, therefore, SMA denies those allegations.

42. In connection with Dean's agreement to acquire DFA's 33.8 percent stake in Suiza, Dean signed a $40 million promissory note ("Note") to DFA which becomes due in 2021 in the amount of $96 million.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, therefore, SMA denies those allegations.

43. Dean currently operates 17 processed milk bottling plants in the Southeast and, upon information and belief, controls at least 60 percent of the processed milk bottling capacity in the Southeast, making Dean the largest processed milk bottler in the Southeast. NDH currently owns eight processed milk bottling plants in the Southeast and on information and belief is the

17

second largest processed milk bottler in the Southeast. Even after divesting its stake in Suiza, DFA has continued to maintain substantial interests in milk bottling through a series of joint ventures. Through those joint ventures, DFA fully or partially owns at least eight processed milk bottling plants (not including NDH) in the Southeast, and upon information and belief is the third largest processed milk bottler in this area.

> **ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and, therefore, SMA denies those allegations.

44. Thus, following the merger and divestiture, Dean, NDH and DFA had collectively increased their shares of the market for processed milk in the Southeast. Whereas in 1996, Dean and DFA had owned only 5 of the 62 milk bottling plants in the Southeast, by 2007 they, along with NDH, owned 33 of the 51 processed milk bottling plants operating in the Southeast. These 33 plants, upon information and belief, represent 77 percent of the processed milk bottling capacity in the Southeast. Nine of the remaining bottling plants in the Southeast are owned by retail supermarket chains which typically do not sell processed milk to competing retailers. Many of the other nine bottling plants are small or do not have the capacity to serve large retail customers.

> **ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44 and, therefore, SMA denies those allegations.

45. As a result of Dean's growing market concentration, retail customers can become almost completely dependent upon Dean for much of their processed milk purchases. For example, at two of Food Lion's distribution centers, *i.e.*, warehouses, accounting for more than fifty percent of Food Lion's milk purchases, Dean is the only viable source from which Food Lion can buy processed milk. During the period relevant to this Complaint four of Food Lion's six distribution centers have purchased processed milk from either Dean or a DFA controlled milk bottling plant.

> **ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and, therefore, SMA denies those allegations.

CHI:2292580.1

## DEFENDANTS' DOMINANCE AND PREDATORY CONDUCT

### Overview

46.     The Dean-Suiza merger had the potential to virtually eliminate competition in the Southeast among milk bottlers for the sale of processed Grade A milk to retail outlets and other customers. The agreements among Dean, Suiza, DFA and NDH to spin off eleven former Dean or Suiza bottling plants to NDH were necessary to allow the merger to go forward. The premise of that spin-off was that NDH would serve as an active competitor to a merged Dean/Suiza, thus providing a check on Dean's ability to acquire and maintain even more market power in the sale of processed milk to retailers. This premise of continued active competition, however, was soon undermined.

    **ANSWER:**    SMA is without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 46 and, therefore, SMA denies those

allegations.

47.     The Dean-Suiza merger also presented the opportunity for DFA and its affiliates to strengthen their hold on the raw milk market in the Southeast. Prior to the merger, Suiza had entered into a full supply agreement with DFA, under which Suiza had agreed to buy all of its raw milk from DFA. If Suiza's policy of utilizing full supply agreements were to be extended to the newly acquired Dean plants, it would have the effect of lessening competition among dairy cooperatives and independent farmers. Accordingly, as a condition for allowing the merger to proceed, DOJ also required Suiza to modify its full-supply agreement with DFA. DOJ's goal in setting that condition was to ensure that the merged entity's plants would actively compete to buy their raw milk.

    **ANSWER:**    SMA is without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 47 and, therefore, SMA denies those

allegations.

48.     The twin premises for allowing the Dean-Suiza merger to go forward, however, were not carried out. The former Suiza plants have not only entered into a new full-supply agreement with DFA, but Dean has cancelled virtually all of its supply arrangements with independent dairy farmers and replaced them with a full-supply agreement with DFA. Dean did so even though prior to the merger, the former Dean plants had been buying hundreds of millions of pounds of milk from independent producers at lower prices than it had been paying to cooperatives such as DFA.

CHI:2292580.1

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and, therefore, SMA denies those allegations.

49. DFA has used these full-supply agreements, as more fully described below to lessen competition among independent dairy farmers and cooperatives. This weakening of competition in the raw milk market has also served to insulate Dean from competition in the processed milk market.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and, therefore, SMA denies those allegations.

### Lessening Competition for the Sale of Processed Milk

50. Specifically, Dean, DFA and NDH have entered into an agreement to lessen competition for sales of processed milk and, pursuant to that agreement, have in fact refrained from competing for such sales to grocery retailers. As part of that agreement, Dean, DFA and NDH took steps to undermine the divestiture process by agreeing that at least one major customer would be switched from the divested dairies back to Dean plants and thus would not be served by NDH.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and, therefore, SMA denies those allegations.

51. Following the Dean-Suiza merger a senior NDH executive in charge of three of the divested milk bottling plants, including the Flav-O-Rich plant in Bristol, Virginia and the Meadow Gold plant in Huntsville, Alabama, took steps to sell processed milk to new retail customers. The NDH executive then received a telephone call from NDH's President (a former Suiza executive and one of the founding investors in NDH) in which he was told that there had been complaints from "Dallas" (which the executive interpreted to mean Dean) about NDH's efforts to compete and that he could not solicit Dean's customers.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and, therefore, SMA denies those allegations.

52. The NDH executive then went to the NDH Board of Directors to tell them that the three plants were operating at a substantial loss and that without any new business the plants would have to be closed. The NDH board, which was controlled by DFA-appointed members, told the executive that NDH could not close the plants just yet (because it was too soon after the merger). Subsequently, NDH did in fact close the Flav-O-Rich milk bottling plant in Virginia. Later, NDH also closed the Meadow Gold plant in Alabama.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and, therefore, SMA denies those allegations.

53. The closure of those NDH plants was significant for retail customers. For example, NDH's Flav-O-Rich plant in Bristol, Virginia was located less than 200 miles from two major Food Lion distribution centers, one of which is currently supplied by Dean and another of which is supplied by a milk bottling plant that, until recently, was owned by a DFA joint venture. When more than one processed milk bottler exists to serve a retail customer, the potential competition offered by a second bottler serves to provide meaningful price competition. Indeed, because milk is a commodity, retail customers like Food Lion and Breto can switch processed milk suppliers to take advantage of price differences.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and, therefore, SMA denies those allegations.

54. In addition, through its control over NDH, DFA has an incentive, and the ability, to facilitate or encourage cooperation between NDH and bottlers operated by DFA joint ventures. Since any milk customers obtained by NDH from a DFA joint venture, or vice versa, would likely reduce DFA's profits, reduced competition between NDH and DFA joint ventures is in DFA's financial interest.

CHI:2292580.1

**ANSWER:**    SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 and, therefore, SMA denies those allegations.

55.    The benefits of competition from competing milk bottlers are clear. For example, Gustafson's Dairy ("Gustafson's"), a small dairy owned by one of the remaining independent farmer cooperatives (Southeast Milk), continues to actively compete with Dean and NDH for the sale of processed milk (although largely in areas outside the Southeast) and has been able to win retail customers from both Dean and NDH by offering lower prices to purchasers of processed milk.

**ANSWER:**    SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 and, therefore, SMA denies those allegations.

56.    Gustafson's was able to obtain an agreement to supply Food Lion's Harvey's supermarkets with processed milk by offering lower prices than Dean had been charging Harvey's. Likewise, Gustafson's also entered into agreements to supply processed milk to some Costco stores and Sam's Club stores by offering lower prices and taking business away from NDH and Dean.

**ANSWER:**    SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and, therefore, SMA denies those allegations.

57.    Dean has reacted to such competition from Gustafson's by threatening to retaliate against both Gustafson's and Southeast Milk, and then carrying out such threats with the assistance and active support of DFA and NDH. For example, Dean has retaliated against Gustafson's by terminating an agreement under which Southeast Milk, the dairy cooperative that owns Gustafson's, had been supplying raw milk to Dean's T. G. Lee milk bottling plant in Orlando, Florida. NDH also retaliated against Southeast Milk by cutting off purchases of milk from SMI by two Velda Farms plants in Florida.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and, therefore, SMA denies those allegations.

58. DFA actively supported Dean's retaliation against Gustafson's by agreeing to supply raw milk to the Orlando T. G. Lee plant on the same terms that Dean was paying to Southeast Milk. However, because DFA does not have enough member farmers in the Florida or Southeast milk order areas to supply that plant, or because its farmer members' milk in those areas was already committed to supplying other Dean plants, DFA has had to truck raw milk in from Texas and New Mexico at a substantial loss to DFA.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and, therefore, SMA denies those allegations.

59. Dean and DFA's retaliation against Southeast Milk for Gustafson's competition with Dean has, along with natural barriers to entry into the dairy processing business (including high capital and labor costs) served as a deterrent to both Gustafson's and other independent milk bottling companies from entering into the Southeast market, or from expanding their existing operations in the Southeast to compete for sales of bottled milk in the Southeast market. Independent dairy cooperatives who are considering opening their own processed milk bottling facilities in the Southeast are apprehensive about competing with Dean for sales of processed milk. In fact, despite the higher prices for processed milk that resulted from the lessening of competition for such milk in the Southeast following the Dean-Suiza merger, there has been no substantial new entry into the Southeast market of new milk bottlers.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, therefore, SMA denies those allegations.

60. In addition to its agreement with NDH and DFA to lessen competition, and its retaliation against independent milk bottlers, Dean has taken other steps to acquire and maintain market power in the market for processed milk sold to retail outlets in the Southeast. For example, Dean (along with NDH and DFA) has continued to acquire processed milk bottling plants for the purpose of increasing its dominance of the Southeast market, and has acted to close down bottling plants and/or has refused to operate bottling plants with the purpose and effect of decreasing capacity and eliminating sources of access to bottling plants.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, therefore, SMA denies those allegations.

61. In the last few years, Defendants have purchased and closed fourteen milk bottling plants in the Southeast. The plants closed by Dean include Flav-O-Rich in Goldsboro, NC; Flav-O-Rich in Wilkesboro, NC; Barber Dairy in Oxford, MS; Barber Pure Milk Co. in Birmingham, AL; Barber Pure Milk Co. in Tupelo, MS; Barbe's Dairy in Westwego, LA; Borden Milk Products in Monroe, LA; and Flav-O-Rich in Canton, MS. In addition to the Flav-O-Rich plant in Bristol, VA, NDH has closed the following, Chattanooga Dairy in Chattanooga, TN; Valley Rich Dairy in Roanoke, VA; and Meadow Gold/Huntsville in Huntsville, AL. DFA joint ventures have closed two plants including Ideal American Dairy in Evansville, IN; and Turner Holdings/Gold Star in Little Rock, AR.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, therefore, SMA denies those allegations.

62. In addition, in 2006, Winn-Dixie, a retail chain owning its own bottling facilities, filed for bankruptcy. When one of its bottling plants in Florida was auctioned off, Dean outbid all the prospective buyers, acquired the facility and promptly closed it down.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and, therefore, SMA denies those allegations.

### Lessening Competition for Raw Milk through Full-Supply Agreements

63. Dean and NDH also agreed to enter into exclusive or full-supply agreements for raw milk with DFA despite the fact that both Dean and NDH knew that DFA did not have sufficient raw milk production of its own to satisfy all of Dean's requirements let alone all of NDH's requirements at the same time. DFA's full-supply agreement with Dean, which consists of a series of 20 successive one-year agreements, grants DFA the exclusive right to supply the raw milk requirements of Dean's processed milk bottling plants in the Southeast. In addition, Dean, NDH and DFA agreed that all raw milk supplied to Dean, NDH, and DFA's milk bottling plants in the Southeast must be marketed by DFA or through either SMA or DMS, both of which were formed by, and are controlled by, DFA.

**ANSWER:** SMA denies the allegations in Paragraph 63 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 63 and, therefore, SMA denies those allegations.

64.     Despite a DOJ consent decree entered in 1977 in the *Mid-America Dairymen* case, which remains in effect, that prohibits DFA from entering into supply agreements with terms in excess of one year, Dean and DFA ensured that their full-supply agreements effectively would be long-term. They did so by requiring DFA to forgive the entire balance of the $40 million Note which Dean owes to DFA if Dean renews the full-supply agreements every year for 20 years and by requiring Dean to pay DFA liquidated damages of up to $47 million if Dean does not renew the full-supply agreement every year. As a result, on information and belief, both Dean and NDH have renewed the full-supply agreements every year.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and, therefore, SMA denies those allegations.

65.     Through these full-supply agreements, Defendants have attempted to suppress and restrain competition in the sale of raw milk by forcing other independent cooperatives needed to fulfill these agreements to join DFA or to market their raw milk through DFA controlled SMA, and by forcing independent dairy farmers to market their raw milk through DMS to have access to the fluid milk bottling plants in the Southeast.

**ANSWER:** SMA denies the allegations in Paragraph 65 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 65 and, therefore, SMA denies those allegations.

66.     For example, Dean and DFA informed Maryland & Virginia Coop that, notwithstanding many years of continuously acquiring raw milk from Maryland & Virginia Coop, Dean would no longer accept raw milk from Maryland & Virginia Coop members. Maryland & Virginia Coop was further informed that the only way to obtain access to Dean and NDH plants in the Southeast was to join SMA. As a result the Maryland & Virginia Coop had no choice but to join SMA so that its members would have access to fluid milk bottling plants.

**ANSWER:** SMA denies the allegations in Paragraph 66 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and, therefore, SMA denies those allegations.

67. In addition, as part of Defendants' implementation of their illegal agreements, Dean reversed its historical practice of purchasing raw milk from independent dairy farmers, refused to deal directly with independent dairy farmers and forced all (or virtually all) independents to market their raw milk through DMS. At the time, independent dairy farmers were informed only that Dean was "outsourcing" certain marketing functions.

**ANSWER:** SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 and, therefore, SMA denies those allegations.

68. Through DFA's full-supply agreements and its control of SMA or DMS, upon information and belief, Defendants DFA, DMS and SMA control 90 percent of the raw milk produced in the Southeast, and more than 80 percent of the raw milk processed by milk bottlers in the Southeast.

**ANSWER:** SMA denies the allegations in Paragraph 68 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 68 and, therefore, SMA denies those allegations.

69. In furtherance of their illegal agreements, Defendants have also jointly sought to exclude, discipline, and punish the remaining independent milk bottlers and independent cooperatives that have strived to resist complying with Defendants' stranglehold on the milk market or have attempted to compete with Defendants in the Southeast. These acts by Defendants, which Food Lion and Breto only learned about in 2007 after the case styled as *Sweetwater Valley Farm, Inc. v. Dean Foods Company* was filed in the United States District Court for the Middle District of Tennessee, eliminated independent milk bottlers and cooperatives as sources of potential competition. The following are examples of such activity:

   a. In August 2006, Dean, citing its full-supply agreements with DFA, refused to discuss a raw milk supply agreement with U.S. Milk, a newly-formed Southeast organization consisting of a variety of independent dairy farmers and cooperative members.

26

b. Since 2002 and continuing to the present, DFA and Dean have jointly punished a small Southeast cooperative, for its refusal to join SMA by demanding, *inter alia*, that DFA process Dean's monthly payments to the small cooperative thereby enabling DFA to monitor prices paid to the small cooperative and to deduct numerous wrongful fees and penalties from those payments.

c. In early 2005, and after NDH purchased Dairy Fresh Corp., a processed milk bottler in the Southeast, DFA gave independent dairy farmers serving Dairy Fresh Corp. plants an ultimatum of either joining DFA or finding new markets for their raw milk.

d. In 2001 and 2003, independent dairy farmers attempted to negotiate an agreement to supply raw milk to a small milk bottling plant located in the Southeast. When DFA learned of these negotiations, it threatened that it would never again balance the small bottling plant's raw milk if it agreed to be supplied by independent dairy farmers. As a result of this threat, the small bottling plant discontinued its negotiations with independent dairy farmers.

e. In July 2002, after learning that Southeast Milk ("SMI"), an independent cooperative, was paying dairy farmers in the Southeast near the Florida-Georgia border milk pay prices (or "mailbox prices") in excess of what DFA was paying its member dairy farmers in the Southeast, DFA demanded that SMI decrease its payments by $.20 to $.40 per hundredweight, and that SMI make payments to SMA to allow DFA to increase the mailbox price it was paying to its area members. DFA threatened that, if SMI refused to do so, DFA would, among other things, flood Order 6 with raw milk and terminate DFA's agreement to assist SMI in balancing its raw milk supply. DFA also threatened to use its control over NDH to replace SMI's arrangements to supply the Velda Farms bottling plants owned by NDH. As a result of these and other threats, SMI was forced to pay SMA tributes totaling several million dollars. In 2005, when SMI ceased paying that tribute to SMA, DFA caused NDH to replace SMI as the raw milk supplier at the two Velda Farms plants.

 **ANSWER:** SMA denies the allegations in Paragraph 69 and its subparts as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 69 and its subparts and, therefore, SMA denies those allegations.

 70. In addition, the full-supply agreements between Dean and DFA and between NDH and DFA have also had the effect of suppressing competition among milk bottlers for

wholesale sales of processed milk to retailers by making it difficult or impossible for new entrants into the processed milk bottling market to expand into the Southeast because a new bottling plant needs a supply of raw milk to operate its bottling plant.

**ANSWER:**  SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and, therefore, SMA denies those allegations.

## INJURY AND DAMAGES

71.     During the relevant period, *i.e.*, from at least January 1, 2002 and continuing until the present, Food Lion purchased processed milk from Dean, and until recently from a bottling plant owned by a DFA joint venture, in substantial amounts. Likewise, Breto has purchased processed milk from Dean during the relevant period. As a result of Dean and the other Defendants' alleged illegal conduct, Food Lion and Breto were compelled to pay, and did pay, unlawfully inflated prices for the processed milk they purchased. The full amount, form and components of such damages will be determined after discovery and upon proof at trial.

**ANSWER:**  SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 71 and, therefore, SMA denies those allegations.  SMA denies the allegations in the third sentence of Paragraph 71 as they relate to SMA and denies that Plaintiffs paid unlawfully inflated prices. The last sentence in Paragraph 71 states a legal conclusion to which no response is required.

72.     Food Lion and Breto would have been able to, *inter alia*, purchase less-expensive processed milk had Dean, DFA and NDH freely and vigorously competed with one another, had competitors to Dean, DFA and NDH been able to enter the processed milk market without unlawful interference and intimidation, and had the Defendants not entered into, and implemented, illegal agreements to lessen competition for the supply of raw milk to bottlers. In addition, prices would have fallen by an even greater amount had these competitors then been able to achieve economies of scale. Paying these overcharges caused Food Lion and Breto (and those purchasers that are similarly situated) substantial losses and damage to their business and property.

**ANSWER:**  SMA denies the allegations in Paragraph 72.

73. Defendants' anticompetitive conduct also has had a negative effect on innovation in the Southeast. The unlawful barriers Defendants created, foreclosed and prevented the emergence in the Southeast of more efficient competitors and technological advances in processed milk bottling, packaging, and transportation. Defendants' illegal domination of the production, marketing and processing of milk in the Southeast has ensured that Defendants' inefficient marketing methods and outdated processing technology are not effectively challenged by competitors. Accordingly, Food Lion and Breto (and those purchasers that are similarly situated) have been damaged by paying higher prices for a less efficient milk bottling process.

**ANSWER:** SMA denies the allegations in Paragraph 73.


## CONCEALMENT AND TOLLING

74. Upon information and belief, Defendants and their co-conspirators have affirmatively concealed from Food Lion, Breto and other class members their unlawful combination, conspiracy and agreements not to compete, and their other unlawful conduct. Defendants planned and implemented their unlawful conduct and monitored and enforced their unlawful agreements during numerous non-public meetings, and agreed among themselves not to discuss or disclose the details of their unlawful conduct, and took other actions to hide and conceal their unlawful conduct.

**ANSWER:** SMA denies the allegations in Paragraph 74.


75. Food Lion, Breto and other class members did not discover, nor could they have discovered through reasonable diligence, that Defendants Dean, DFA and NDH had agreed with each other to lessen competition for sales of processed milk, or that in pursuance of such agreement Defendants had refrained from competing with each other for sales of processed milk to retail customers.

**ANSWER:** SMA denies the allegations in Paragraph 75.


76. Defendants used, and continue to use, deceptive and secret methods to avoid detection and to affirmatively conceal their violations. Defendants falsely represented to Food Lion, Breto and other class members that the prices that were paid for processed milk were fair and competitive, and that such prices were the result of ordinary market forces and considerations such as increased prices for raw milk and other material costs of producing processed milk. These false and misleading explanations for processed milk prices lulled Food Lion and Breto into believing that the prices for processed milk were the normal result of competitive market forces rather than the product of collusive and monopolistic practices.

**ANSWER:** SMA denies the allegations in Paragraph 76.

29

77.     As a result of Defendants' affirmative and other acts of concealment, any applicable statute of limitations affecting the rights of Plaintiffs and other class members has been tolled. Food Lion, Breto and other class members exercised reasonable due diligence, by among other things, promptly investigating the allegations contained in a complaint filed in the United States District Court for the Middle District of Tennessee in the case styled as *Sweetwater Valley Farm, Inc. v. Dean Foods Company*, and filing this suit soon thereafter. Despite other efforts, Food Lion and Breto were unable to discover, and could not have discovered, the unlawful conduct alleged herein at the time it occurred or at an earlier time so as to enable plaintiffs to have filed this suit sooner.

**ANSWER:**     SMA denies the allegations in Paragraph 77.


## CLASS ACTION ALLEGATIONS

78.     Plaintiffs bring this class action on behalf of themselves and all others similarly situated for the purpose of asserting the claims alleged in this Amended Complaint on a common basis pursuant to Federal Rule of Civil Procedure 23 on behalf of the class of persons defined in Paragraph 6 above.

**ANSWER:**     SMA admits that Plaintiffs purport to bring this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23, but SMA denies that this lawsuit may be properly treated or certified as a class action.  SMA denies the remaining allegations in Paragraph 78.


79.     Although the size of the class is not yet known with certainty, based on the nature of the trade and commerce involved, and the geographic dispersion of class members among the fourteen states (or parts thereof) comprising the Appalachia and Southeast marketing Orders, joinder of all class members is impracticable.

**ANSWER:**     The allegations in Paragraph 79 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 79.


80.     Questions of law and fact which are common to the class include:

a.      the proper definition and geographic scope of the relevant product markets at issue;

b.      whether Dean, DFA and NDH entered into an agreement not to compete for the sale of processed milk to retail outlets;

c.      whether Dean has monopoly or market power in the market for processed milk;

d.      whether Dean conspired with NDH or others to obtain a monopoly in the market for processed milk;

e.      the duration of the conspiracy to obtain monopoly or market power or agreements in restraint of trade, and the acts carried out by Defendants in furtherance of such conspiracy or agreements;

f.      whether the conduct of the Defendants caused injury to the business or property of plaintiffs and the other members of the class; and

g.      the effect of the agreements and/or conspiracy complained herein on the price of processed milk.

**ANSWER:**    The allegations in Paragraph 80 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 80.

81.    Food Lion's and Breto's claims are typical of the claims of other members of the class. Food Lion, Breto and other members of the class purchased processed milk from Dean and other defendants at prices higher than would have existed absent the anticompetitive and unlawful conduct alleged herein. Thus, Food Lion, Breto and other class members were injured by the same unlawful conduct. Defendants' violations of the antitrust laws, the effect of such violations, and the relief sought, are all common to Food Lion, Breto and other members of the class.

**ANSWER:**    The allegations in Paragraph 81 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 81.

82.    As class representatives, Food Lion and Breto will fairly and adequately protect the class members' interests and to that end have engaged counsel experienced and competent in antitrust and class litigation.

**ANSWER:** The allegations in Paragraph 82 state legal conclusions to which no response is required. To the extent a response is required, SMA is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and, therefore, SMA denies those allegations.

83. The questions of law and fact that are common to the class predominate over any questions affecting individual class members. Whatever possible issues that may exist in managing the class action are greatly outweighed by the corresponding advantages and efficiencies afforded by common adjudication of all class members' claims in a single proceeding. Those advantages include, but are not limited to, providing class members with a method of redress of claims that might not otherwise warrant individual litigation.

**ANSWER:** The allegations in Paragraph 83 state legal conclusions to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 83.

84. Class action treatment is a superior method for fairly and efficiently adjudicating this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessarily duplicating the evidence, effort, and expense, that numerous individual actions would engender. Class treatment also eliminates the potential for inconsistent adjudication of individual and separate claims.

**ANSWER:** The allegations in Paragraph 84 state legal conclusions to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 84.

## CAUSES OF ACTION

## COUNT I

### Violation of Section 1 of the Sherman Act
### Agreement Not to Compete
### Against Dean, DFA and NDH

85. Plaintiffs re-allege Paragraphs 1 through 84 as set forth above.

**ANSWER:** SMA incorporates by reference and restates its Answers to Paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.     Defendants Dean, DFA and NDH agreed to lessen competition for sales of processed milk to retailers in the Southeast, and have, pursuant to such agreement, refrained from competing for such sales to retail stores.

**ANSWER:** The allegations in Paragraph 86 are directed towards Dean, DFA and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86 and, therefore, SMA denies those allegations.

87.     The agreement not to compete for such sales occurred in and/or substantially affected interstate commerce.

**ANSWER:** The allegations in Paragraph 87 are directed towards Dean, DFA and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and, therefore, SMA denies those allegations.

88.     As a result of such agreement, retailers such as Food Lion, Breto and other similarly situated class members were injured in their business or property by having paid higher prices for the processed milk they purchased.

**ANSWER:** The allegations in Paragraph 88 are directed towards Dean, DFA and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88 and, therefore, SMA denies those allegations.

CHI:2292580.1

## COUNT II

### Violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act
### Conspiracy to Unreasonably Restrain Trade
### Against Dean, DFA, NDH, SMA and DMS

89.     Plaintiffs re-allege Paragraphs 1 through 88 as set forth above.

**ANSWER:**     SMA incorporates by reference and restates its Answers to Paragraphs 1 through 88 of the Complaint as if fully set forth herein.

90.     There is a market, or segment thereof, for raw milk which is sold to milk bottling companies. Because of the price differential paid to dairy farmers for raw milk which is processed for fluid milk beverage use as compared to the price paid for raw milk used for other processed dairy products such as butter or cheese, dairy farmers in the Southeast must be able to sell their raw milk for use by milk bottling companies in order to stay in business.

**ANSWER:**     The allegations in Paragraph 90 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 90 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 90 and, therefore, SMA denies those allegations.

91.     There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk.

**ANSWER:**     The allegations in Paragraph 91 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 91 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91 and, therefore, SMA denies those allegations.

34

92.     Defendant Dean has market power in the market for the purchase of raw milk in the Southeast, as well as market power in the market for the sale of processed milk. Defendant DFA and its affiliates DMS and SMA have market power in the market for the sale of raw milk which is sold to milk bottling plants in the Southeast.

**ANSWER:**     The allegations in Paragraph 92 state legal conclusions to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 92 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92 and, therefore, SMA denies those allegations.

93.     Dean and the other Defendants have entered into exclusive supply agreements with, and have actively conspired with one another through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives for the purchase and sale of raw milk to milk bottling and processing plants in the Southeast.

**ANSWER:**     SMA denies the allegations in Paragraph 93 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 93 and, therefore, SMA denies those allegations.

94.     Defendants Dean, DFA and NDH have actively contracted, colluded and conspired with one another through the means described above for the purpose of lessening and/or eliminating competition in the market for processed milk.

**ANSWER:**     The allegations in Paragraph 94 are directed towards Dean, DFA and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94 and, therefore, SMA denies those allegations.

95.     Defendants' full-supply agreements collectively and individually constitute unreasonable restraints of trade in the market for raw milk, and have had the effect of ensuring that no competing milk bottlers have a less expensive source of supply of raw milk and have otherwise limited other milk bottling plants from gaining access to the supplies of raw milk which are necessary to operate and/or expand.

35

**ANSWER:** SMA denies the allegations in Paragraph 95 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 95 and, therefore, SMA denies those allegations.

96. These unreasonable restraints of trade have resulted in substantial harm to competition in the Southeast for raw milk sold to milk bottling companies and have also resulted in substantial harm to competition for the sale of processed milk.

**ANSWER:** The allegations in Paragraph 96 state a legal conclusion to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 96 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 96 and, therefore, SMA denies those allegations.

97. There are no legitimate business justifications for Defendants' exclusionary and predatory conduct. To the extent that there are any legitimate business reasons for Defendants' restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed pro-competitive business reasons for Defendants' restraints of trade are outweighed by the competitive harm that they have caused to competition in the relevant market(s).

**ANSWER:** The allegations in Paragraph 97 state a legal conclusion to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 97 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 97 and, therefore, SMA denies those allegations.

98. Defendants' activities described in this Count have occurred in and/or substantially affected interstate commerce.

36

**ANSWER:** SMA denies the allegations in Paragraph 92 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92 and, therefore, SMA denies those allegations.

99. As a result, Food Lion, Breto and other class members, were injured in their business or property by Defendants' restraint of trade in the relevant markets. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendants' unlawful conduct.

**ANSWER:** SMA denies the allegations in Paragraph 99.

## COUNT III

### Violation of Section 2 of the Sherman Act
### Unlawful Monopolization
### Against Dean

100. Plaintiffs re-allege Paragraphs 1 through 99 as set forth above.

**ANSWER:** SMA incorporates by reference and restates its Answers to Paragraphs 1 through 99 of the Complaint as if fully set forth herein.

101. There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk. Given consumer demand for milk, and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk.

**ANSWER:** The allegations in Paragraph 101 state legal conclusions to which no response is required. To the extent a response is required, SMA denies the allegations in Paragraph 101 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 101 and, therefore, SMA denies those allegations.

102.     The relevant geographic market is the Southeast United States, as defined in Paragraph 21 above, which comprises the areas encompassed within Federal Milk Marketing Orders 5 and 7. The highly perishable nature of milk, consumer preferences for fresh milk, and high transportation costs for processed milk substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. As a practical matter, retailers like Food Lion and Breto are unable to turn to milk bottlers located outside of the Southeast to supply them with milk even when the price of processed milk increases by a small but significant amount. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

**ANSWER:**     The allegations in Paragraph 102 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 102 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 102 and, therefore, SMA denies those allegations.

103.     Defendant Dean possesses monopoly power in the market for processed milk in that it has, on information and belief, at least a 60 percent share of that market in the Southeast.

**ANSWER:**     The allegations in Paragraph 103 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103 and, therefore, SMA denies those allegations.

104.     Dean has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to purchasing and then closing milk bottling plants or converting them to other uses, entering into agreements with other bottling companies not to compete for retail customers, retaliating against competing bottlers by terminating contracts with suppliers who also own competing milk bottling plants, and intimidating new entrants from attempting to enter into, or expand their operations in, the Southeast. All of such actions have been taken by Dean with the specific intent to lessen competition and obtain and/or illegally maintain monopoly power in the market for processed milk.

CHI:2292580.1

**ANSWER:**     The allegations in Paragraph 104 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104 and, therefore, SMA denies those allegations.

105.     In addition, Dean has entered into exclusive supply agreements with, and has actively contracted, combined and conspired with DFA and others through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives in an effort to ensure that no competing milk bottlers have a less expensive source of supply of raw milk, and to otherwise limit other milk bottling plants from gaining access to the supply of raw milk which is necessary to operate or expand milk bottling plants. These actions have been undertaken by Dean for the specific purpose of monopolizing the market for processed milk.

**ANSWER:**     The allegations in Paragraph 105 are directed towards Dean and DFA, and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105 and, therefore, SMA denies those allegations.

106.     Defendants' conduct in maintaining and extending its monopoly power in the relevant market has foreclosed a substantial share of the market for processed milk in the Southeast and constitutes unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

**ANSWER:**     The allegations in Paragraph 106 state legal conclusions to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 106 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 106 and, therefore, SMA denies those allegations.

107.     Defendants have not obtained and/or maintained their monopoly power in the market for processed milk as a consequence of superior product offerings, good faith business acumen, or historical accident.

**ANSWER:** SMA denies the allegations in Paragraph 107 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 107 and, therefore, SMA denies those allegations.

108. Dean's activities described in this Count have occurred in and/or substantially affected interstate commerce.

**ANSWER:** The allegations in Paragraph 108 are directed towards Dean and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108 and, therefore, SMA denies those allegations.

109. Food Lion, Breto and other class members have been injured in their business or property by Dean's monopolization of the processed milk market. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendant's monopolization.

**ANSWER:** SMA denies the allegations in Paragraph 109 as they relate to SMA. SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 109 and, therefore, SMA denies those allegations.

## COUNT IV

### Violation of Section 2 of the Sherman Act
### Attempt to Monopolize
### Against Dean

110. Plaintiffs re-allege Paragraphs 1 through 109 as set forth above.

**ANSWER:** SMA incorporates by reference and restates its Answers to Paragraphs 1 through 109 of the Complaint as if fully set forth herein.

40

111.    In the alternative, to the extent that Dean does not possess monopoly power in the market for processed milk in the Southeast, it has unlawfully attempted to monopolize the market for processed milk.

**ANSWER:**    The allegations in Paragraph 111 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 and, therefore, SMA denies those allegations.

112.    There is a market for Grade A milk which has been pasteurized and processed for human consumption and then packaged into containers which are sold to retail outlets and other customers, *i.e.* processed milk. Given consumer demand for milk, and the lack of consumer acceptance of alternative beverages as a replacement for milk, there is no substitute for processed milk. To meet consumer demand, grocery stores and other retail outlets must purchase processed milk.

**ANSWER:**    The allegations in Paragraph 112 state a legal conclusion to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 112 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 112 and, therefore, SMA denies those allegations.

113.    The relevant geographic market is the Southeast United States, as defined in Paragraph 21 above, which comprises the areas encompassed within Federal Milk Marketing Orders 5 and 7. The highly perishable nature of milk, consumer preferences for fresh milk, and high transportation costs for processed milk, substantially limit the ability of retailers like Food Lion and Breto to purchase processed milk from milk bottlers located outside the Southeast. To the extent that there are milk bottlers outside of the Southeast who sell processed milk within the Southeast, or have the capacity to do so, they are not meaningful market participants within the Southeast and they provide no meaningful competition to bottlers located in the Southeast such as Dean.

**ANSWER:**    The allegations in Paragraph 113 state a legal conclusion to which no response is required.  To the extent a response is required, SMA denies the allegations in Paragraph 113 as they relate to SMA.  SMA is without knowledge or information sufficient to

CHI:2292580.1

form a belief as to the truth of the remaining allegations in Paragraph 113 and, therefore, SMA denies those allegations.

114.    Dean has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to purchasing and then closing milk bottling plants or converting them to other uses, entering into an agreement with other bottling companies not to compete for retail customers, retaliating against competing bottlers by terminating contracts with suppliers who also own competing milk bottling plants, and intimidating new entrants from attempting to enter into, or expand their operations in, the Southeast. All of such actions have been taken by Dean with the specific intent to lessen competition and obtain and/or illegally maintain monopoly power in the market for processed milk.

**ANSWER:**    The allegations in Paragraph 114 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 and, therefore, SMA denies those allegations.

115.    In addition, Dean has entered into exclusive supply agreements with, and has actively contracted, combined and conspired with DFA and others through the means described above, for the purpose of lessening competition among independent milk producers and cooperatives in an effort to ensure that no competing milk bottlers have a less expensive source of supply of raw milk, and to otherwise limit other milk bottling plants from gaining access to the supply of raw milk which is necessary to operate or expand milk bottling plants. These actions have been undertaken by Dean for the specific purpose of monopolizing the market for processed milk.

**ANSWER:**    The allegations in Paragraph 115 are directed towards Dean and DFA and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115 and, therefore, SMA denies those allegations.

116.    Dean had the specific intent to achieve its goal of obtaining monopoly power in the market for processed milk, and engaged in the conduct alleged above fir the specific purpose of achieving that goal.

CHI:2292580.1

**ANSWER:**     The allegations in Paragraph 116 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116 and, therefore, SMA denies those allegations.

117.     There is a dangerous probability that if left unchecked, Dean will achieve its goal of obtaining monopoly power in the market for processed milk.

**ANSWER:**     The allegations in Paragraph 117 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117 and, therefore, SMA denies those allegations.

118.     Dean's activities described in this Count have occurred in and/or substantially affected interstate commerce.

**ANSWER:**     The allegations in Paragraph 118 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 118 and, therefore, SMA denies those allegations.

119.     As a result of Dean's attempt to monopolize the market for processed milk, Food Lion, Breto and other class members have been injured in their business or property. Food Lion, Breto and other class members, have been forced to pay higher prices for processed Grade A milk in the relevant markets than they would have paid in the absence of Dean's attempted monopolization.

**ANSWER:**     The allegations in Paragraph 119 are directed towards Dean and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 119 and, therefore, SMA denies those allegations.

43

## COUNT V

## Violation of Section 2 of the Sherman Act
## Conspiracy to Monopolize
## Against Dean, DFA and NDH

120.     Plaintiffs re-allege Paragraphs 1 through 119 as set forth above.

**ANSWER:**     SMA incorporates by reference and restates its Answers to Paragraphs 1 through 119 of the Complaint as if fully set forth herein.

121.     Dean, DFA and NDH agreed among themselves and otherwise conspired to obtain and/or maintain monopoly power in the market for processed milk.

**ANSWER:**     The allegations in Paragraph 121 are directed towards Dean, DFA, and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and, therefore, SMA denies those allegations.

122.     Pursuant to such conspiracy Dean, DFA and NDH each specifically intended to obtain monopoly power in the market for processed milk.

**ANSWER:**     The allegations in Paragraph 122 are directed towards Dean, DFA, and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and, therefore, SMA denies those allegations.

123.     The overt acts done in furtherance of such conspiracy include the agreement between Dean, DFA and NDH not to compete for sales of processed milk to retail stores, as well as Dean and NDH's entry into full-supply agreements with DFA.

**ANSWER:**     The allegations in Paragraph 123 are directed towards Dean, DFA, and NDH and, thus, no response by SMA is required. To the extent a response is required, SMA

44

states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and, therefore, SMA denies those allegations.

124.    The acts of Defendants Dean, DFA and NDH done in furtherance of such conspiracy occurred in and/or substantially affected interstate commerce.

**ANSWER:**    The allegations in Paragraph 124 are directed towards Dean, DFA, and NDH and, thus, no response by SMA is required.  To the extent a response is required, SMA states that it is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and, therefore, SMA denies those allegations.

125.    Plaintiff Food Lion, Breto and other members of the class, were injured in their business or property as a result of such conspiracy to monopolize the market for processed milk. Food Lion, Breto and other class members have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendants' conspiracy to monopolize.

**ANSWER:**    SMA denies the allegations in Paragraph 125 as they relate to SMA.  SMA is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 125 and, therefore, SMA denies those allegations.

## PRAYER FOR RELIEF

With respect to Plaintiffs' Prayer for Relief, SMA denies that Plaintiffs are entitled to the relief requested or to any relief whatsoever.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden that otherwise rests with Plaintiffs, in further answer to Plaintiffs' Amended Complaint, and by way of defense, SMA states as follows:

## FIRST DEFENSE

All of the allegedly improper conduct averred against SMA in Plaintiffs' Amended Complaint is immune from attack by virtue of the Capper-Volstead Act, 7 U.S.C. § 291. The Capper-Volstead Act permits and authorizes dairy farmers, associations of dairy farmers (*i.e.*, dairy cooperatives), and their marketing agencies in common to come together to collectively market and sell their milk without fear of violating the federal antitrust laws. Plaintiffs' claims against SMA allege nothing more than the collective marketing and sale of milk on behalf of SMA's dairy cooperative members. SMA is a Capper-Volstead protected marketing agency in common and, therefore, Plaintiffs' Amended Complaint and each and every claim asserted against SMA therein is barred by the Capper-Volstead Act.

## SECOND DEFENSE

Plaintiffs lack standing and/or antitrust standing to bring the Amended Complaint and to assert each and every claim set forth therein.

## THIRD DEFENSE

Plaintiffs' claims asserted against SMA are barred, in whole or in part, because any conduct in which SMA is alleged to have engaged was unilateral, reasonable, and based on independent, legitimate business and economic justification, and was not the product of any

46

illicit contract, combination, or conspiracy between or among SMA and any other persons or entities.

## FOURTH DEFENSE

Plaintiffs' claims asserted against SMA are barred, in whole or in part, because any conduct in which SMA is alleged to have engaged was not intended to have, did not have, and is not likely to have any adverse effects on competition in any relevant market, and did not otherwise restrain trade or commerce.

## FIFTH DEFENSE

Plaintiffs have not pled fraudulent concealment with the requisite degree of particularity.

## SIXTH DEFENSE

The injury allegedly incurred by Plaintiffs and the purported class was not proximately caused by any conduct of SMA's, nor did SMA directly or indirectly induce the acts or acts constituting the alleged causes of action.

## SEVENTH DEFENSE

The injury allegedly incurred by Plaintiffs and the purported class resulted from the acts or omissions of third parties or individuals outside the knowledge or control of SMA and for which SMA has no responsibility.

## EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and the members of the proposed class have not suffered and will not suffer antitrust injury.

**NINETH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs and the members of the proposed class have not suffered or incurred any injury or damages as a result of any alleged act, omission, or other conduct of SMA, and therefore do have any right, standing, or competency to maintain claims for damages or other relief against SMA.

**TENTH DEFENSE**

Plaintiffs' Complaint and each and every purported claim therein fails to state, in whole or in part, a claim upon which relief can be granted.

**ELEVENTH DEFENSE**

Plaintiffs' Amended Complaint and each and every purported claim therein are barred, in whole or in part, by the applicable statute of limitations.

**TWELFTH DEFENSE**

Plaintiffs' Amended Complaint and each and every purported claim therein are barred, in whole or in part, by the doctrines of waiver, estoppel, and laches.

**THIRTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands and/or *in pari delicto*.

**FOURTEENTH DEFENSE**

Plaintiffs' claims for damages are barred, in whole or in part, because their alleged damages, if any, are speculative, uncertain, and incapable of being ascertained or allocated.

## FIFTEENTH DEFENSE

To the extent any recovery by Plaintiffs would subject SMA to multiple or duplicative liability, such recovery violates SMA's Due Process rights under the Fifth and Fourteenth Amendments to the Constitution of the United States.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs failed to mitigate any alleged injury or damages.

## SEVENTEENTH DEFENSE

To the extent not set forth herein, SMA asserts and incorporates by reference herein the defenses of the other Defendants in this action as may be applicable to the causes of actions asserted against SMA. SMA reserves the right to supplement their Answer and Defendants with additional defenses that become available or apparent during the course of investigation, preparation or discovery and to amend accordingly.

## TRIAL BY JURY

SMA hereby demands that this action be tried by a jury on all issues triable by jury.

WHEREFORE, having fully answered all of the allegations of Plaintiffs' Amended Complaint to which any answer was required, Defendant SMA prays that the Amended Complaint be dismissed with prejudice and that SMA be awarded its costs and expenses incurred as a result of having to defend this action.

Dated:  August 10, 2009                    Respectfully submitted,

SOUTHERN MARKETING AGENCY, INC.

By:＿＿＿/s/ Kari M. Rollins＿＿＿＿＿＿＿＿＿＿

One of Its Attorneys

Craig V. Gabbert, Jr.
Harwell Howard Hyne Gabbert & Manner, P.C.
315 Deaderick Street, Suite 1800
Nashville, TN 37238-1800
Tel: (615) 256-0500
cvg@h3gm.com


W. Gordon Dobie
Kari M. Rollins
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
wdobie@winston.com
karollins@winston.com

*Attorneys for Defendant Southern Marketing Agency, Inc.*

CHI:2292580.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of August, 2009, a true and correct copy of the foregoing Defendant Southern Marketing Agency, Inc's Answer to Plaintiffs' Amended Class Action Complaint was served by operation of the electronic filing system of the U.S. District Court for the Eastern District of Tennessee.

*/s/* Kari M. Rollins
Kari M. Rollins

CHI:2292580.1