# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### GREENEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: SOUTHEASTERN MILK | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | **Judge J. Ronnie Greer** |
| *Food Lion, LLC, et al.* | ) | **Inman** |
| *v. Dean Foods Company, et al.,* | ) | |
| *No. 2:07-CV-188* | ) | |
| | ) | |

## MEMORANDUM OPINION

### I.      Introduction

This multi-district class action antitrust case involves allegations by plaintiffs Food Lion, LLC ("Food Lion") and Fidel Breto, d/b/a Family Foods ("Breto"), on behalf of themselves and a class of all others similarly situated, [1] purchasers of processed milk, involving allegations against Dean Foods Company ("Dean"), Dairy Farmers of America, Inc. ("DFA"), National Dairy Holdings, L.P. ("NDH"), Dairy Marketing Services, LLC ("DMS"), and Southern Marketing Agency, Inc. ("SMA") (collectively, "defendants") for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. More specifically, Count I of the amended complaint accuses Dean, DFA and NDH of an agreement "to lessen competition for sales of processed milk in the Southeast" in violation of § 1 of the Sherman Act; Count II of the amended complaint accuses all defendants of a conspiracy to unreasonably unrestrain trade by conspiring to lessen competition for the purchase and sale of raw milk to milk bottling and processing plants in the southeast, resulting in higher prices for processed milk paid by the plaintiffs; Counts III and IV of the amended complaint assert claims of monopolization and

---

[1]   There is a pending motion for class certification.

attempted monopolization against Dean in violation of § 2 of the Sherman Act; and Count V of the amended complaint charges a conspiracy to monopolize in violation of § 2 of the Sherman Act against Dean, DFA and NDH.

All defendants have moved for summary judgment, [Doc. 461].[2] The plaintiffs have responded to the motion for summary judgment, defendants have replied and supplemental briefs have been filed. In other words, the parties have now exhaustively briefed the issues before the Court and they are ripe for disposition. The Court heard oral argument on the motion for summary judgment on December 18, 2009, as to Counts I and II and plaintiffs were given additional time to file their full responses as to Counts III, IV and V. The Court has determined that no further oral argument on the motion is necessary. For the reasons which follow, the motion will be GRANTED IN PART and DENIED IN PART.

## II.    Factual Background

This Court would ordinarily set out the relevant factual findings related to the issues raised by the summary judgment motion. In this particular case, that is virtually impossible, largely because of the voluminous pleadings filed by the parties, especially the plaintiffs. The manner in which plaintiffs have presented their response to the motion for summary judgment has made it practically impossible for the Court to prepare a concise statement of *material* facts which are undisputed and, more importantly, to identify material, relevant facts which are in dispute. Plaintiffs have filed a very lengthy response to defendants' statement of facts and have, in addition, filed a lengthy statement of facts on behalf of the plaintiffs. These pleadings do not comply with paragraph 4 of the Court's January 7, 2009 amended scheduling order, nor do they comply with current Rule 56. Plaintiffs have

---

[2]    All references to docket numbers are to the docket in No. 2:08-md-1000.

not set out, in concise form, those facts which are material to the resolution of this motion for summary judgment but have used these pleadings to advance their allegations, and make arguments and state conclusions. These pleadings more often than not fail to provide specific record citations and they include many facts which are clearly immaterial or irrelevant.

These deficiencies were called to the attention of plaintiffs' counsel during the Court's December 18 hearing and the plaintiffs were advised, at that time, that the Court had considered striking these pleadings. Despite the Court's admonishment, plaintiffs thereafter submitted an even longer "replacement" statement of facts that does not correct the shortcomings in any of their original pleadings. Plaintiffs' conduct in this respect evidences either a lack of familiarity with the relevant Rules of Civil Procedure and/or the Court's scheduling order and displays a lack of respect for the Court's oral instructions. These actions, as well as the continued filing by plaintiffs of "supplemental" pleadings, one as late as July 15, 2010, have unnecessarily delayed the Court's resolution of the pending motion.[3]

Although, as set forth above, the Court will not set forth any exhaustive statement of facts, some statement about the nature and identity of the parties and some background information relevant to the issues raised in this case is important. Other facts which are relevant to the Court's determination of these issues will be discussed throughout the body of the memorandum opinion.

---

[3] Plaintiffs also appear to have engaged in what was referred to during the undersigned's days of practice before state courts as a "paper dump" in response to the motion for summary judgment. In other words, it appears that part of the plaintiffs' strategy has been to file an inordinate amount of paper in this case and to address many, many immaterial and irrelevant facts as far as the motion for summary judgement is concerned. In state court parlance, plaintiffs' goal appears to have been to convince the court that, somewhere in this huge volume of paper, there must be a disputed issue of material fact sufficient to defeat defendants' motion for summary judgment. Although the Court has not chosen to strike any of plaintiffs' pleadings related to this motion, plaintiffs are forewarned that such conduct in the future may well result in having pleadings stricken from the record.

Food Lion is a North Carolina limited liability company which operates approximately 1,300 supermarkets in 11 southeastern and mid-atlantic states. Food Lion purchases processed milk directly from Dean and DFA for sale at retail at certain of its supermarket stores. Fidel Breto, d/b/a Family Foods, is the operator of a retail grocery store in Jonesborough, Tennessee, who regularly purchases processed milk directly from Dean for sale at his retail store.

Dean is a Delaware corporation which buys raw milk and bottles processed milk in the United States. DFA is a not-for-profit Kansas corporation. DFA is a milk cooperative that markets raw milk for its members and also owns and operates its own hauling companies, processing plants and distribution centers for processed milk. NDH is a Delaware limited partnership which operates processed milk bottling plants. DFA owns a 50% equity interest and approximately 92% preferred equity interest in NDH. DMS is a Delaware limited liability company which was formed by DFA and Dairlylea Cooperative, Inc. in 1999. DMS is a milk marketing organization which markets milk on behalf of its member dairy cooperatives. DMS arranges contracts with buyers of raw milk such as Dean, arranges for the transportation of raw milk, schedules deliveries, allocates marketing costs, and handles the payment of checks to cooperative member dairy farmers. Plaintiffs claim DMS is controlled by DFA. SMA is a Kentucky not-for-profit corporation which represents its member dairy cooperatives including DFA, Maryland and Virginia Milk Producers, Lone Star Milk Producers, Dairymen's Marketing Cooperative and Arkansas Dairy Cooperative Association.

Milk bottlers process raw milk purchased from cooperatives, independent dairy farmers or other supply plants into pasturized milk for human consumption. Milk bottlers then sell the processed milk to retail outlets, like Food Lion and Breto. By late 2001, Suiza, a Dallas, Texas dairy company, had become the largest fluid milk processor in the United States. Dean was the second

largest buyer of raw milk and the second largest bottler of processed milk in the United States. Suiza owned 67 dairy processing plants in 29 states and Dean operated 43 plants in 19 states.

In 2001, plans were announced for a Suiza merger with Dean, with the merged company to operate under the name Dean. To address Department of Justice ("DOJ") concerns because Dean and Suiza were the first and second largest process milk bottlers in the United States, Dean and Suiza agreed to the divestiture of 11 milk bottling plants in Alabama, Florida, Indiana, Kentucky, Ohio, South Carolina, Virginia and Utah to NDH, an entity created for that purpose, and largely controlled by DFA[4], as set forth above. At the same time, Dean agreed to buy DFA's 33.8% stake in Suiza. In order to allow NDH to purchase the divested plants,[5] DFA and its subsidiaries provided more than $400,000,000.00 in financing to NDH. By 2002, Dean was the number one seller of processed milk in the southeast and NDH was second.

## III.    Summary Judgment Standard

Generally, summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.*, 862 F.2d 597, 601 (6th Cir. 1988). Only factual disputes that might effect the outcome of a lawsuit under substantive law are "material." *Anderson v. Liberty*

---

[4]    At the time of its formation, NDH had four (4) partners: (1) DFA, (2) Allen Meyer (a business partner of DFA's CEO), (3) Tex Beshears, and (4) Tracy Noll (former Suiza senior executives). DFA owned half of NDH and the individual partners collectively owned the other half

The plaintiffs premise a fair part of their argument on its allegation that DFA controlled NDH. At a minimum, this will be a matter for the jury to decide.

[5]    The plaintiffs argue that DFA created NDH as a false competitor, vested it with weak assets, including "second-best" plants, and guaranteed its failure as a competitor by staffing it with unqualified managers and making decisions which were against its economic interests.

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be "genuine," a dispute must involve evidence upon which a jury could find for the nonmoving party. *Id*. The burden is upon the moving party to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thereafter, the nonmoving party must present significant probative evidence in support of the complaint to defeat the motion. *Anderson*, 477 U.S. at 249-50. The nonmoving party is required to show more than a metaphysical doubt as to the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In deciding the motion, "[t]he court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute." *Stephens v. Koch Foods, LLC*, 667 F.Supp.2d 768, 2009 WL 3297289, *8 (E.D. Tenn. 2009) (citing *Anderson*).

The parties in this case have devoted considerable of their briefing and oral argument to the question of whether or not antitrust plaintiffs must meet a different standard from that required of other civil plaintiffs. The burden on the plaintiff in an antitrust case is the same as it is on any other civil plaintiff. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69 (1992). As in other civil cases, courts addressing summary judgment motions in antitrust cases "must . . . consider all the facts in the light most favorable to the non-movant and must give the non-movant the benefit of every reasonable inference." *Spirit Airlines, Inc. v. Northwest Airlines, Inc.*, 431 F.3d 917, 930 (6th Cir. 2005) (internal quotations and citations omitted).

Some special rules do apply, however, with respect to the manner in which the court views certain ambiguous circumstantial evidence. In conspiracy cases, "[t]he element of agreement, . . . is nearly always established by circumstantial evidence, as conspirators seldom make records of their illegal agreements." *United States v. Short*, 671 F.2d 178, 182 (6th Cir. 1982). Both the Supreme

Court and the Sixth Circuit have, however, made it clear that in a case based on circumstantial evidence, an antitrust plaintiff may not reach a jury where the evidence on which he relies to prove an agreement is, at best, ambiguous. *Matsushita*, 475 U.S. 588) ("conduct as consistent with permissible competition as illegal conspiracy does not, standing alone, support an inference of agreement"). An antitrust plaintiff bears the burden of presenting evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). An antitrust plaintiff will be unable to demonstrate a conspiracy if, "using ambiguous evidence, the inference of a conspiracy is less than or equal to an inference of independent action." *See Riverview Investments, Inc. v. Ottawa Cmty. Imp. Corp.*, 899 F.2d 474, 483 (6th Cir. 1990) (citing *Matsushita*, 475 U.S. at 588). The Supreme Court reiterated that standard as recently as 2007 in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007):

> [P]roof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, *see Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, ( ) (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,() (1986).

550 U.S. at 554. This is consistent with the standard set forth by the Sixth Circuit in numerous cases. *See Nat'l Hockey League Players Ass'n. v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 475 (6th Cir. 2005) (Sherman Act conspiracy claim fails if evidence is "equally consistent with independent conduct"); *Sancap Abrasives Corp. v. Swiss Industrial Abrasives*, 19 F. App'x. 181, 187 (6th Cir. 2001); *Super Sulky, Inc. v. United States Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009-10 (6th Cir. 1999); *Bailey's Inc. v. Windsor America, Inc.*, 948 F.2d 1018, 1028 (6th Cir. 1991); *Nurse Midwifery Assoc. v. Hibbett*, 918 F.2d 605,

616-17 (6th Cir. 1990); *City Communications, Inc. v. City of Detroit*, 888 F.2d 1081, 1085 (6th Cir. 1989).

## IV.    Analysis and Discussion

### A.    Count I (violation of § 1 of the Sherman Act/ agreement not to compete against Dean, DFA and NDH)

In Count I of the amended complaint, plaintiffs allege a violation of § 1 of the Sherman Act by Dean, DFA and NDH.  More specifically, the plaintiffs allege a horizontal agreement among Dean, DFA and NDH to lessen competition for sales of processed milk to retailers in the southeast and, in fact, not to compete for such sales.

#### 1.    Defendants' Argument

Dean, DFA and NDH argue, in support of their motion for summary judgment as to Count I, that  "[t]here is no evidence of a conspiracy to lessen competition for processed milk."  More specifically, defendants argue that none of the conduct alleged by plaintiffs, *i.e.*, allocation of the business of "at least one major customer," failure to solicit one another's customers, closing of bottling plants, and retaliation against a competitor that took business from Dean and NDH, even if proven, violates § 1 of the Sherman Act.  Quoting *Monsanto*, defendants correctly assert that plaintiffs bear the burden of producing evidence, direct or circumstantial, "that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto*, 465 U.S. at 768.

In response to plaintiffs' allegation that Dean and NDH did not compete with one another after the Dean-Suiza merger in 2001, Dean and NDH point to record evidence which, they argue, establishes that NDH and Dean have vigorously competed for sales of processed milk to customers

8

in the southeast.[6] They also argue that the record contradicts plaintiffs' allegations that NDH and Dean conspired to allocate the business of a major customer, Wal-Mart, pointing to evidence in the record that Wal-Mart made its own decision because it wanted to deal with one supplier, Dean, in the southeast and had a good relationship with Dean executives.

Defendants also respond to an allegation made in plaintiffs' amended complaint that an NDH executive told another not to solicit Dean's customers. Plaintiffs allege, in their memorandum in support of their motion for class certification, that this occurred in a telephone conversation between NDH executives Tracy Noll and Rob Cottet; however, as plaintiffs point out, Messrs. Noll and Cottet both denied plaintiffs' allegation under oath. Plaintiffs also, however, point to documentary evidence in the record which they claim shows that NDH agreed, at Dean's instruction, not to bid for certain customer's business. Defendants painstakingly respond to each item of documentary evidence cited and argue that the allegation is implausible because plaintiffs cannot explain why NDH would agree to a deal that benefitted Dean but gave nothing to NDH. In sum, NDH and Dean argue that plaintiffs misconstrue, misread and speculate about the meaning of the various items of documentary evidence and cannot survive a motion for summary judgment.

With respect to plaintiffs' argument that the closing of certain bottling plants is evidence of an agreement to limit competition, Dean and NDH argue, and correctly so, that the closing of unprofitable plants is not evidence of violation of the antitrust laws. They further argue that the closing of milk bottling plants in the southeast has resulted from mere parallel conduct rather than any agreement that the defendants conspired to close any plants. The defendants point to significant

---

[6] Dean and NDH list approximately 30 examples of claimed competition in support of their argument.

evidence in the record that the only two plants closed by Dean in the southeast since the merger were closed for legitimate, independent business reasons.

Dean and NDH also vigorously contest the allegation of plaintiffs that Dean and NDH conspired to block competition from others. Plaintiffs point to two transactions as evidence from which the jury could infer that the defendants conspired to foreclose competition-dealings with Southeast Milk, Inc.,[7] a Florida-based dairy farmer cooperative with members in Florida and the southeast, and the plan by a group of investors for a new bottling plant in Baxley, Georgia, known as Red Oak. Once again, defendants argue in painstaking detail that neither of these projects may form the basis of an inference that Dean was conspiring to block competition. They describe these events as "innocuous business events" rather than evidence of a conspiracy.

Finally, defendants argue that plaintiffs have offered no proof of a horizontal price-fixing agreement. Apparently, plaintiffs rely largely on events in 2003 involving the Dairy Cooperative Marketing Association, a marketing agency to which DFA and other cooperatives belong, to support their allegation. Those events included a .33 cent per hundredweight increase in the over-order premium charged to customers for raw milk and an .11 cent per hundredweight rebate simultaneously received by some processors. Dean points out that these events involved the market for raw milk, not processed milk, and are not probative of an agreement to fix prices for processed milk.

### 2.     Plaintiffs' Argument

Plaintiffs have filed an extensive response to the motion for summary judgment with respect to Count I of the amended complaint, committing approximately 40 pages of their responsive brief

---

[7] Although plaintiffs make this allegation in their amended complaint, they do not mention it in their response to the instant motion and appear to have abandoned the argument.

to responding to the contentions of DFA, Dean and NDH as set forth above. Simply put, plaintiffs vigorously dispute each of the contentions put forth by the defendants. For instance, while plaintiffs acknowledge certain "anecdotal instances of competition," they further argue that such anecdotal evidence is not inconsistent with their theory of recovery because the conspiracy was carried out at the highest levels of management of the defendants and various lower level managers and employees were likely not aware of the conspiracy. They further claim that much of the anecdotal evidence is irrelevant because it occurred outside the relevant geographic market and that these sales accounted for only a "minuscule amount of sales." Plaintiffs assert that, although NDH was set up as a competitor of Dean and DFA as a result of the DOJ approved 2001 merger, NDH was in fact a false competitor, controlled by DFA for the purpose of eliminating competition for Dean. In return, plaintiffs argue, DFA got full supply rights to Dean's network of plants, leading to an expansion of DFA's "empire."

Plaintiffs cite what they see as numerous acts which were against the independent economic interests of defendants, absent a conspiracy, including acceptance by DFA/NDH of weak assets in the divestiture process, most favored nations clauses in the full supply agreements, an outsourcing agreement with DMS and the sale of certain profitable assets while keeping certain unprofitable plants open. They claim that DFA took certain acts to benefit Dean, while at the same time undercutting its subsidiary NDH. Plaintiffs also point to the close relations among the key players involved in the various entities both before and after the merger and, cite the Red Oak and "Flagship"[8] ventures as efforts by defendants to block competition in the southeast.

---

[8] Flagship was a venture, in 2005, according to plaintiffs, which sought to buy the new Atlanta Dairy and provide a vehicle for disgruntled dairy farmers to enter into the southeast bottling market. According to plaintiffs, Dean officials were concerned about losing millions of dollars and Dean prevailed upon DFA to relax its full supply agreements and allow Dean to buy milk from non-DFA farmers, allowing

### 3. Applicable Legal Principles

Section 1 of the Sherman Antitrust Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. To establish a § 1 violation, a plaintiff must first show a conspiracy or agreement between at least two legally distinct economic entities, then demonstrate that the agreement constituted an unreasonable restraint of trade either *per se* or under the rule of reason. *Capital Imaging Assoc. v. Mohawk Valley Medical Assocs.*, 996 F.2d 537, 542 (2d Cir.), *cert. denied*, 114 S. Ct. 388 (1993). Section 1 requires proof of a conspiracy or concerted action and does not reach unilateral conduct. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 767-68 (1984).

### 4. Discussion

Plaintiffs and defendants have committed many, many pages of their briefing to their widely divergent views of the evidence put forth by plaintiffs in support of their Count I conspiracy claim. In addition, the parties have filed hundreds and hundreds of pages of exhibits, affidavits, and deposition testimony, almost all of which they see differently. Many of plaintiffs' arguments are unconvincing on their merits; however, reaching that conclusion requires the Court to weigh the evidence and resolve factual disputes, something the Court is not permitted to do on a motion for summary judgment.

Defendants rather convincing respond to many of the individual allegations made by plaintiffs and the Court would be constrained to agree with defendants on many of the individual issues raised

---

Dean to keep those farmers within the Dean system rather than suppling Flagship. Plaintiffs cite a host of other evidence which they assert creates genuine issues of material fact as to Count I, and defendants respond to each in meticulous detail.

by the respective parties in their briefs, if the Court viewed each separate document or transcript of testimony in isolation. Defendants appear to invite the Court to do just that; however, the Court must view the record as a whole and, while testimony or documentary exhibits viewed in isolation might not create a genuine issue of material fact, the cumulative effect of such evidence does so. *See American Tobacco Co. v. United States*, 147 F.2d 93, 107 (6th Cir. 1945) ("Acts done to give effect to the conspiracy may be, in themselves, wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

That the parties have many disputes about the appropriate inferences which could be drawn by a reasonable jury with respect to such a large volume of evidence simply illustrates the existence of genuine issues of material fact with respect to the conspiracy claim. It is not the strength of the plaintiffs' case on the merits that is being tested by this motion; rather, the Court must determine only whether or not there are genuine issues of material fact without weighing the evidence, resolving issues of credibility of witnesses or resolving factual disputes. Simply put, that is a matter for a jury.

For these reasons, the motion for summary judgment with respect to Count I will be DENIED.

**B.     Count II (violation of § 1 of the Sherman Act and § 3 of the Clayton Act/conspiracy to unreasonably restrain trade against Dean, DFA, NDH, SMA and DMS)**

Plaintiffs allege in Count II of their complaint a lessening of competition "for raw milk" supply through certain full supply agreements. Amended Comp., ¶¶ 63-70. More specifically, plaintiffs allege that Dean and NDH entered into exclusive or full-supply agreements for raw milk with DFA which grant DFA the exclusive right, in a series of 20 successive one year agreements, to supply the raw milk requirements of Dean's processed milk bottling plants in the southeast. Plaintiffs

13

also allege that Dean, NDH and DFA agreed that all raw milk supplied to Dean, NDH and DFA's milk bottling plants in the southeast must be marketed by DFA or through SMA or DMS, both of which were formed by, and are controlled by, DFA. Through these full supply agreements, plaintiffs allege, the defendants have attempted to restrain competition in the sale of raw milk in the southeast by forcing independent cooperatives and independent dairy farmers to market their raw milk through DMS to have access to the fluid milk bottling plants in the southeast. As a result, plaintiffs allege that DFA, DMS and SMA control 90% of the raw milk produced in the southeast and more than 80% of the raw milk processed by milk bottlers in the southeast. These full supply agreements are at the heart of the coordinated cases brought by dairy farmer plaintiffs alleging antitrust violations by these same defendants and others in the market for raw milk.

Count II of the Food Lion and Breto amended complaint alleges a violation of § 1 of the Sherman Act and § 3 of the Clayton Act in that Dean, DFA, NDH, SMA and DMS have entered into a conspiracy to unreasonably restrain trade. They allege that "Dean and the other Defendants have entered into exclusive supply agreements with, and have actively conspired with one another through the means described [in the complaint, summarized above], for the purpose of lessening competition among independent milk producers and cooperatives for the purchase and sale of raw milk to milk bottling and processing plants in the southeast." Amended. Comp., ¶ 93. Plaintiffs further allege that these "full-supply agreements collectively and individually constitute unreasonable restraints of trade in the market for raw milk," Amended. Comp., ¶ 95, which have "resulted in substantial harm to competition in the Southeast for raw milk sold to milk bottling companies and have also resulted in substantial harm to competition for the sale of processed milk." *Id*., ¶ 96. As a result, plaintiffs allege that "Food Lion, Breto and other class members, were injured in their business or property by

Defendants' restraint of trade in the relevant markets" and "have been forced to pay higher prices for processed milk than they would have paid in the absence of Defendants' unlawful conduct." *Id.,* ¶ 99.

### 1.      Defendants' Argument

Defendants argue that retailer Plaintiffs lack standing to challenge the raw milk conspiracy alleged in the dairy farmer cases; that plaintiffs cannot establish a causal connection between the alleged raw milk conspiracy and higher prices for processed milk; and that even if there were a casual relationship between the alleged violation and the alleged injury, it is too remote and speculative for Plaintiffs to have antitrust standing, [Doc. 582, pp. 2-4].   Defendants allege that these retailer plaintiffs would have benefitted from the alleged raw milk conspiracy since lower raw milk prices result in lower processed milk prices, that plaintiffs are neither consumers nor competitors in the raw milk market, that there is no connection between the alleged raw milk conspiracy and higher prices for processed milk, and that the potential for duplicative recovery is real because the dairy farmer plaintiffs seek treble damages for the same alleged conduct.

### 2.      Plaintiffs' Argument

Plaintiffs respond to defendants' motion by arguing that they in fact "have antitrust standing to recover the overcharges they paid for bottled-milk-price increases." [Doc. 538, p. 8].   Plaintiffs suggest that there is record evidence which shows that defendants have colluded to increase "over-order premiums-the amounts that milk bottlers must pay *above* the federal minimum," a government regulated minimum price bottlers pay to producers of raw milk.   Unlike the federal minimum, over-order premiums are not government regulated.   Therefore, the plaintiffs' argument goes, since defendants have artificially inflated over-order premiums and, since over-order premiums increase

the cost of raw milk which is "directly pegged" to the price retailers pay for processed milk, the overcharges have resulted in an increase in the amount Food Lion and others have paid for processed milk. Since Food Lion buys processed milk from Dean, it argues that it is a direct victim of the alleged conspiracy and thus has antitrust standing to recover the inflated costs of processed milk. Food Lion further argues that, even setting aside the relationship between over-order premiums and bottled milk prices, retailer plaintiffs still have standing because the evidence establishes that prices Food Lion paid for processed milk went up more than the raw milk premiums.

### 3. Applicable Legal Principles

The elements which plaintiffs must prove to make out a § 1 Sherman Act claim are examined in the preceding section and the Court will not repeat those here. Standing to bring an action under the Sherman Act is conferred by § 4 of the Clayton Act, which provides, in pertinent part, " . . . any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . ., and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15. "Standing, in a conventional Article III sense, requires just proof of actual injury, causation and redressability. *NicSand, Inc. v. 3M Company*, 507 F.3d 442, 449 (6th Cir. 2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). A determination of antitrust standing, however, requires more. "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983). Furthermore,

> Antitrust standing to sue is at the center of all antitrust law and policy. It is not a mere technicality. It is the glue that cements each

suit with the purposes of the antitrust laws, and prevents abuses of those laws. The requirement of antitrust standing insures that antitrust litigants use the laws to prevent anticompetitive action and make certain that they will not be able to recover under the antitrust laws when the action challenged would tend to promote competition in the economic sense. Antitrust laws reflect considered policies regulating economic matters. The antitrust standing requirement makes certain that the laws are used only to deal with the economic problems whose solutions these policies were intended to effect.

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).

In other words, standing under the Clayton Act requires more than mere injury proximately caused by a violation of the antitrust laws. *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Instead, plaintiffs must prove

[a]ntitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be the type of losss that the claimed violations . . . would be likely to cause.

*Id.* (citation and quotation marks omitted). "Injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anticomptitive aspect of the practice under scrutiny ..." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). In other words, a private plaintiff can recover on an antitrust claim only for a loss which stems from a competition reducing aspect or effect or the defendant's behavior. *Id.* Antitrust plaintiffs do not suffer antitrust injury merely because they are in a worse position than they would have been had the challenged conduct not occurred. *Brunswick*, 429 U.S. at 486-87. Even a showing of antitrust injury is not always sufficient to establish antitrust standing. *Cargill Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986) ("a showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4 [of the Clayton Act)"].

A plaintiff must also demonstrate that he is the proper party to bring the antitrust suit. In the case of antitrust laws, the Supreme Court has interpreted the Clayton Act to limit statutory standing to parties fewer than would be allowed by the full extent of Article III. *Associated Gen. Contractors*, 459 U.S. at 534-46 and 535 n.31. In analyzing whether a plaintiff falls within the class of persons who have standing to sue under § 4, the Court considers several factors that are to balanced, with no single factor being conclusive. *Peck v. Gen. Motors Corp*., 894 F.2d 844, 846 (6th Cir. 1990) (citing *Province v. Cleveland Publishing Co.,* 787 F.2d 1047, 1051 (6th Cir. 1986)). The factors to be considered are:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation.

*Bodie-Rickett & Assocs. v. Mars, Inc*., 957 F.2d 287, 290 (6th Cir. 1992) (quoting *Southhaven Land Co. v. Malone & Hyde, Inc*., 715 F.2d 1079, 1085 (6th Cir. 1983), and citing *Associated Gen. Contractors*, 459 U.S. 519)).

### 4.    Discussion

This Court is constrained to agree with defendants on this count. Plaintiffs argue that the DFA raw milk supply agreements with Dean and NDH, the most favored nations clauses in those agreements and Dean's outsourcing agreement with DMS constitute unreasonable restraints of trade, resulting in overcharges to the plaintiffs. They also now argue that DFA used its raw milk supply agreement with NDH to prevent NDH from acquiring two bottling plants, one within the boundaries of the proposed relevant market and the other outside the proposed relevant market, and they claim

that DFA used its raw milk supply agreements "to prevent its own members from opening bottling operations that might compete with Dean." The problem with plaintiffs' arguments is that they make little or no attempt to show any direct harm to them flowing directly from the alleged antitrust violations. As noted above, they must do more than allege or show harm, the harm must result from a violation of the antitrust laws.[9]

Plaintiffs have alleged that defendants have engaged in a conspiracy to ***reduce*** prices paid to dairy farmers for raw milk and they acknowledge that, as a general rule, "purchasers of processed milk pay [ ] for processed milk based on a formula-which is based in part on, and moves up and down with, changes in raw milk costs." As a consequence, defendants argue that the prices paid by retailers for processed milk have been lower, not higher, as a consequence of the alleged conspiracy involving raw milk, and retailer plaintiffs cannot show an injury from the alleged raw milk conspiracy, let alone an antitrust injury. This Court concludes that retailer plaintiffs have not met their burden of establishing antitrust standing as to the alleged raw milk conspiracy which is the focus of Count II of their amended complaint. Although the plaintiffs argue that they have been harmed by the over-order premiums charged, they do not show how that is a harm which flows directly from the antitrust

---

[9] In fact, as defendants argue, plaintiffs appear to acknowledge that they have suffered no direct harm from the alleged conspiracy involving raw milk. In their response to defendants' motion, they state:

> . . . Defendants' agreement was simple: DFA would help Dean raise prices for bottled (also called "processed") milk by creating and controlling a faux competitor, by collusively reducing bottled milk output, and by otherwise conspiring with Dean to artificially increase bottled milk prices. Dean, for its part, would help DFA dominate the raw-milk market by granting DFA the right to supply substantially all of Dean's raw-milk needs.
>
> It was the first half of this agreement, the portion that raised bottled milk prices, that ***directly*** harmed Retailer Plaintiffs. (emphasis added)

[Doc. 538, p. 1]. Furthermore, the "first half" of this alleged agreement appears to be the very same separate conspiracy alleged in Count I of the plaintiffs' amended complaint.

violation alleged, *i.e.*, the full supply agreements for raw milk.  As noted above, plaintiffs have not suffered antitrust injury just because they may be in a worse position than they would have been otherwise.

Two additional issues raised by the defendants should be addressed.  The amended complaint filed by Food Lion  appears to assert a claim under § 3 of the Clayton Act.  Defendants have moved for summary judgment on this claim as well.  Plaintiffs have never made any effort to explain how they have a cause of action under § 3 of the Clayton Act and have never responded to defendants' allegation that they are entitled to judgment as a matter of law on Count II to the extent the complaint purports to assert a claim under § 3 of the Clayton Act.  It thus appears that plaintiffs do not contest that judgment should be entered in favor of the defendants on Count II in so far as it is based on any claim under § 3 of the Clayton Act.

SMA also separately argues that it is entitled to summary judgment because it is not a party to any of the raw milk supply agreements, a matter which is undisputed.  Plaintiffs furthermore do not dispute that SMA does not sell raw milk to any dairy processing plant and does not engage in the sale of processed milk products to retailers.  Plaintiffs make no effort to offer any evidence which would suggest that SMA was part of a conspiracy to fix prices, for either raw or processed milk, or to otherwise not compete for sales of processed milk.  For this reason as well, SMA would be entitled to summary judgment.

For the reasons set forth above, summary judgment will be GRANTED in favor of the defendants as to Count II and Court II of plaintiffs' complaint will be DISMISSED.

### C.     Counts III, IV (violation of § 2 of the Sherman Act/unlawful monopolization and attempt to monopolize against Dean)

In Counts III and IV of the amended complaint, plaintiffs assert claims of unlawful

monopolization and attempt to monopolize in violation of § 2 of the Sherman Act against Dean. More specifically, plaintiffs allege in Count III of the amended complaint that Dean possesses monopoly power in the market for processed milk, that is, at least a 60% share of that market in the southeast, and has willfully and unlawfully used exclusionary and predatory conduct to obtain and/or illegally maintain monopoly power in the market for processed milk. In Count IV of the amended complaint, the plaintiffs make similar allegations except that they allege that Dean has the specific intent to achieve monopoly power in the market for processed milk and that there is a dangerous probability that Dean will achieve its goal.

### 1. Dean's Argument

Dean argues that it is entitled to summary judgment on the monopolization claims which are brought under § 2 of the Sherman Act. Dean alleges that these claims fail because plaintiffs cannot establish the relevant geographic market and cannot establish that Dean possesses or has a dangerous probability of achieving monopoly power in the alleged market.

### 2. Plaintiffs' Argument

Plaintiffs' arguments are set forth in the relevant sections below.

### 3. Applicable Legal Principles

Section 2 of the Sherman Act, 15 U.S.C. § 2, provides: "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several states . . . shall be deemed guilty of a felony . . . ." The offenses of monopolization, attempt to monopolize, and conspiracy to monopolize (discussed in subpart D below) are distinct causes of action and require different proofs.

To establish a monopoly under § 2 of the Sherman Act, plaintiffs must establish two elements:

"1) possession of monopoly power in the relevant market [10] ; and 2) willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak*, 504 U.S. at 481; *United States v. Grinnell Corp.* 384 U.S. 563, 570-571 (1966). An attempted monopolization occurs when a competitor, with a "dangerous probability of success," engages in anticompetitive practices, the specific design of which are to build a monopoly or exclude or destroy competition. *See Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 627 (1953); *Swift & Co. v. United States*, 196 U.S. 375, 396 (1905).

In order to succeed on either a monopolization or attempt to monopolize claim, plaintiffs must establish the relevant market in which they compete [or do business] with the alleged monopolizer. *See, e.g., Grinnell*, 384 U.S. at 571-73; *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177 (1965); *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395-99, 396 n.23 (1956); *Times-Picayune*, 345 U.S. at 611-12. The relevant market consists of two components: product and service market and geographic market. *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962). The relevant product market is not at issue in this motion.[11]

A geographic market is "an area of effective competition." *Re/Max Int'l.*, 173 F.3d at 1016. The area is not defined by "metes and bounds," but "is the locale in which consumers of a product

---

[10]   Defendants' motion for summary judgment focuses exclusively on this element.

[11]   As defendants note in their response to plaintiffs' supplemental brief, plaintiffs appear to have now defined a different product market than they did in their complaint. Dr. Froeb opines that the relevant product is "fresh white fluid milk, excluding such alternate beverages as flavored milk, extended shelf life milk, organic and hormone free milk, buttermilk, lactose-free and lactose-reduced milk, and soy and rice milk." In their amended complaint, plaintiffs allege that the relevant product market consists of "Grade A milk, other than school milk, which has been pasteurized and processed for human consumption and then repackaged into containers which are sold to retail outlets and other customers."

or service can turn for alternative sources of supply." *Id.*; *see also White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 501 (6th Cir. 1983) ("The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.") (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

Thus, "[t]he first step in any action brought under § 2 of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact possesses monopoly power." *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768, 782 (6th Cir. 2002) (citing *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 268-69 (2d Cir. 1979)). The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *E.I. duPont de Nemours & Co.*, 351 U.S. at 391. A plaintiff may establish that a defendant holds monopoly power by presenting either 1) direct evidence of actual control over prices or actual exclusion of competitors, or 2) circumstantial evidence showing a high market share within a defined market. *Re/Max Int'l, Inc. ,*173 F.3d at 1016.

Neither the Supreme Court nor the Sixth Circuit has subscribed to a hard and fast rule of a percentage of market power that triggers monopoly power for purposes of § 2. As a general rule, however, monopoly power requires proof of more than 60% market power. *See Grinnell*, 384 U.S. at 571 (80% market power constitutes a monopoly); *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946) (over 2/3rds of market constitutes a monopoly); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1443 (6th Cir. 1990) ("There is substantial merit in a presumption that market shares below 50 or 60% do not constitute monopoly power.") (quoting *Areeda & Hovenkamp,*

*Antitrust Law*, § 578.3 (1988 Supp.)).

Section 2 monopoly power "requires . . . something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 481. The standard for monopoly power appears to be very high, and market share is typically a determining factor. *See Grinnell*, 384 U.S. at 570. While market share might, in many instances lead to an inference of monopoly power, it is not, in and of itself, the only factor to consider. *Amer. Council of Certified Podiatric Physicians & Surgeons v. Amer. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 623 (6th Cir. 1999) ("[M]arket share is only a starting point for determining whether monopoly power exists, and the inference of monopoly power does not automatically follow from the possession of a commanding market share.").

"Market power is the power to force a purchaser to do something that he would not do in a competitive market," and it entails the "ability of one seller to restrict output or raise prices." *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 817 (quoting *Eastman Kodak Co.*, 504 U.S. at 464) (quotation marks omitted). In order for a Sherman Act claim to lie against a defendant, there must be a finding of market power. *Hand v. Central Transp., Inc.*, 779 F.2d 8, 11 (6th Cir. 1985).

### 4. Discussion

#### a. The relevant geographic market

In their amended complaint, plaintiffs contend that the relevant geographic market for the sale of processed milk is the "Southeast," which they define as the geographic area within Federal Milk Marketing Orders 5 and 7. These Orders cover all or part of 14 states, North Carolina, South Carolina, Georgia, Indiana, Kentucky, Tennessee, Virginia, West Virginia, Alabama, Arkansas, Mississippi, Louisiana, Florida and Missouri. Dean claims that plaintiffs' definition of the relevant market is arbitrary and unsupported by relevant evidence. Dean cites evidence that retail customers

in Orders 5 and 7 receive processed milk from plants in Ohio, Oregon, New York, Kansas, Illinois, Michigan, Texas, Arizona, Oklahoma, Minnesota, Iowa and South Florida (a portion of Florida not in Order 7). In addition, Dean points to evidence that processing plants in Orders 5 and 7 have sold to customers in Orders 1, 6 and 124.

Plaintiffs initially respond, without making any effort to support their choice of the relevant market, that it is not necessary for them to define the relevant market's contours, since genuine issues of material fact exist with respect to Dean's market power, relying on *Re/Max Int'l.* In that case, the district court, consistent with every reported and unreported Sixth Circuit decision to that date, dismissed the plaintiffs § 2 claims. The Sixth Circuit reversed, finding "that although plaintiffs failed to define the relevant market with precision and therefore failed to establish the defendant's monopoly power through circumstantial evidence, there did exist a genuine issue of material fact as to whether the plaintiff's evidence showed direct evidence of a monopoly, that is, actual control over prices or actual exclusion of competitors," 173 F.3d at 1012, adopting the view of the First, Eighth, Ninth and Tenth Circuits. Quoting the Eighth circuit, the court said:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'

*Id*. at 1018 (quoting *Flegel v. Christian Hosp.*, 4 F.3d 682, 688 (8th Cir. 1993) (quoting *F.T.C. v. Indiana Fed'n. of Dentists*, 476 U.S., 447, 461 (2009)).

In an effort to take advantage of the *Re/Max Int'l.* holding, plaintiffs claim they have direct evidence of Dean's ability to control pricing and exclude competition. Plaintiffs point to two pieces of evidence which, they contend, shows Dean's control over prices. First, Food Lion's outside

consultant testified that he could not convince Dean to lower its margins below six percent when a competitive margin was only four percent.[12] Additionally, Dean's eastern region CEO testified that no processors could beat Dean on price unless he allowed them to do so.[13] This kind of ambiguous evidence falls far short of evidence, even when looked at favorably to plaintiffs, which would create a genuine issue of material fact on the question of Dean's ability to control prices.[14] *Re/Max Int'l.* is inapposite here.

Plaintiffs then argue that, "[e]ven if defining the relevant market were necessary," they have adequately done so. First, they argue that retailer plaintiffs' "expert report," which was not yet due at the time of plaintiffs' replacement response, "will further demonstrate that Retailer Plaintiffs can establish a relevant geographic market. If Defendants can find an expert to testify to a different geographic market, a genuine issue of material fact will exist." [Doc. 669, p. 66]. This disingenuous argument turns the respective burdens of the parties with respect to a motion for summary judgment upside down. Plaintiffs must show, to survive the defendants' motion, a genuine issue of material ***fact***, not a difference in expert opinions. Second, the burden of establishing the relevant geographic market is on plaintiffs, not Dean, and Dean is not required to provide expert testimony as to a

---

[12]   High prices do not necessarily suggest monopoly power. *See Bailey v. Allgas, Inc*., 284 F.3d 1237, 1252-53 (11th Cir. 2002).

[13]   The most logical inference to be drawn from this statement is that Dean would ***reduce*** its price to meet competition. At best, the statement is ambiguous.

[14]   Although made in a different context, plaintiffs also claim that there is other direct evidence of Dean's monopoly power. Citing the Red Oak venture and the circumstances related to the Winn-Dixie plant in High Point, N.C. and the SuperValu plant in Richmond, plaintiffs claim Dean has taken "unilateral" efforts to eliminate or block competitors. They also point to evidence of non-competition agreements, plant closings and restrictive deed covenants to keep closed bottling plants closed. If anything, this is circumstantial, not direct, evidence and is clearly ambiguous evidence when considered on this issue.

different geographic market.[15]

In their supplemental memorandum in opposition to defendants' motion for summary judgement, plaintiffs assert that "Professor Luke Froeb's[16] expert declarations present evidence that, along with other evidence in the record,[17] is sufficient to establish [geographic market and market power]." Professor Froeb concludes that the relevant geographic market for the purposes of the plaintiffs' monopolization claims "consists of North Carolina, South Carolina, Virginia, Georgia and the Eastern part of Tennessee,"[18] an area considerably smaller[19] than the geographic region covered by Federal Milk Marketing Orders 5 and 7.[20] Professor Froeb reaches that conclusion based on his

---

[15] Plaintiffs' shifting positions with respect to their response to defendants' motion for summary judgment on the monopolization claims has been a source of frustration and delay for the Court. When the Court initially suggested to the parties at the July 1, 2009 status conference that these issues might better be resolved through a motion for summary judgment rather than a motion to dismiss, the Court specifically asked plaintiffs whether they would need additional discovery to respond to such a motion. Counsel for plaintiffs responded that he "[didn't] think so." Yet plaintiffs filed, along with their response to the motion for summary judgment, the declaration of counsel "pursuant to Federal Rule of Civil Procedure 56(f)" that they could not "yet fully respond to defendants' motion for summary judgment with respect to the issues of market definition and market power," primarily because expert reports had not yet been completed. Despite the fact that expert opinions likely have little, if any, bearing on the question of whether genuine issues of material fact exist, the Court delayed ruling on the motion and allowed supplemental responses to be filed. Plaintiffs have now had a full opportunity to respond to defendants' motion.

[16] Professor Froeb is an Associate Professor of Entrepreneurship and Free Enterprise at Vanderbilt University's Owen Graduate School of Management.

[17] Plaintiffs do not identify what this additional evidence is by citation to the record.

[18] Professor Froeb's proposed market apparently includes part of order 5, part of order 7, part of order 1, and parts of Virginia that are regulated at the state level.

[19] Plaintiffs refer to Professor Froeb's definition of the relevant market as "slightly different than the one that was pleaded."

[20] Professor Froeb also concludes that the boundaries of Federal Milk Marketing Orders 5 and 7 constitute the relevant market for purposes of plaintiffs' claims under Count II. The plaintiffs see their midstream change of direction with respect to the relevant market as no impediment to the pursuit of their claims. They argue that "numerous courts have recognized that the evidence in a case may support a market with contours that differ from those pled in a complaint once discovery has been obtained and expert analysis performed." Plaintiffs cite two district court decisions as support for their claim that numerous courts have

27

analysis of an economic model constructed for the purpose of his analysis. Professor Froeb's analysis, based on his constructed model, works its way from a geographic area too small to be monopolized to a larger region that includes several states. "That evidence," according to plaintiffs, "is sufficient for a jury to establish the geographic boundaries of the proposed market for processed fluid milk."

Thus, it appears, plaintiffs now concede that they cannot establish the relevant geographic market as Federal Milk Marketing Orders 5 and 7 as alleged in their amended complaint. The Court will, therefore, focus its attention on whether plaintiffs can survive summary judgment as to the different and smaller geographic region identified by Professor Froeb. The most obvious problem with plaintiffs' current position as to the relevant geographic market is that plaintiffs cannot satisfy their summary judgment burden through expert testimony alone, and have pointed to no facts in the record which would support their proposed definition of geographic market. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them."). *See also Matsushita*, 475 U.S. 581 n.5. There is nothing in this record to illustrate that Professor Froeb has based his opinions on evidence in the record; in fact, he appears to admit that he did not do so, relying instead on a theoretical model be constructed for the purpose of his analysis.

The Supreme Court has defined the relevant antitrust geographic market as the "area in which

---

so recognized. Dean sees this change in plaintiffs' position as an improper effort to amend their complaint and argue that there is no authority which permits a party to withstand summary judgment by fundamentally geographic market alleged in its complaint.

While it appears that the two district court cases cited by plaintiffs do not fully support the proposition asserted by the plaintiffs, the Court need not decide this issue since plaintiffs have failed to establish that any genuine issue of material fact exists on the issue of the relevant geographic market. The Court does note, however, that market definition is a fact intensive inquiry.

the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961). In deposition, Professor Froeb admitted that he did not consider the relevant market in that context but rather that he used a "different approach" in arriving at his conclusions. Professor Froeb also admits that he did not assess the "commercial realities," *Id.*, but rather relied solely on his theoretical model. Such an approach may be academically acceptable; it does not, however, comply with the Supreme Court's dictates with respect to construction of the relevant geographic market. Furthermore, Professor Froeb's construction of his model with reference to a single customer, Food Lion, also does not comply with the relevant legal requirements. Professor Froeb admitted that he constructed his model with reference solely to "the regions where Dean and Food Lion engage in the sale and purchase of milk."[21] As defendants point out, a geographic market cannot ordinarily be defined by reference to a single customer. *See Apani Southwest, Inc. v. Coca Cola Enters., Inc.*, 300 F.3d 620, 632-33 (6th Cir. 2002).

Plaintiffs, in their supplemental brief[22] filed on July 15, 2010, [Doc. 809], argue that it would be improper for the Court to discount Professor Froeb's opinions without full briefing on the *Daubert* issues raised by defendants' attacks. The deficiencies in Professor Froeb's methodology may well

---

[21]     In addition, although not argued by defendants, such an approach ignores the class action allegation of the amended complaint.

[22]     Plaintiffs filed their July 10 supplemental brief without leave of court long after the time for response had passed, making the dubious argument that such filing was "consistent with Magistrate Judge Inman's April 6, 2010 Order" granting leave to supplement the summary judgment record with the full expert report of Professor Froeb. Defendants have not moved to strike the brief and the Court will not do so on its own motion. Attached to the brief is a "rebuttal report" from Professor Froeb dated June 28, 2010, in the form of a declaration. In the declaration, Professor Froeb states that he "remain[s] convinced" that his earlier conclusions "are true and sound." He also defends his methodology, as noted in the body of this memorandum opinion, as the same methodology he "would have employed and would have directed [his] staff to undertake had this issue come before [him] during [his] employment at the Department of Justice or at the Federal Trade Commission."

be subject to a *Daubert* attack; that, however, is not the issue before the Court. The issue before the Court, assuming the admissibility at this point of Professor Froeb's opinions, is whether they comply with the methodology mandated by Supreme Court precedent. They do not.

Plaintiffs defend Professor Froeb's methodology by suggesting that defendants have not shown how his analysis would have differed had he done what case law requires[23] and that the methodology he employed is the same as he would have undertaken had the issues in this case been presented to him "during [his] employment at the Department of Justice or at the Federal Trade Commission."[24] These arguments miss the point, however. This Court is bound by existing precedent and the defendants are under no burden to show whether Professor Froeb's opinions would have been the same had he relied on applicable legal definitions rather than his theoretical ones. Moreover, that he would have instructed staff to employ the same methodology during his employment at the Department of Justice or at the Federal Trade Commission proves only that, not that such methodology is legally acceptable based upon existing precedent.

Plaintiffs have failed to establish that there is a genuine issue of material fact with respect to their definition of the relevant geographic market and defendants are entitled to summary judgment as to Counts III and IV on this basis alone.

### b. Market power

---

[23] Plaintiffs, throughout their pleadings, suggest that somehow their cause is advanced because Dean and its experts have not defined an alternative geographic market. In fact, Professor Froeb expressed "disappointment" that Professors Kolt and Elzinga "[do] not present an alternative to [his] defined markets." These arguments represent a fundamental misunderstanding of the burden of proof and the burden of opposition to a motion for summary judgment.

[24] Professor Froeb was Director of the Bureau of Economics at the Federal Trade Commission from 2003 to 2005. He was an economist at the Antitrust Division at the Department of Justice prior to his employment at Vanderbilt University.

Although it is not necessary for the Court to do so, the Court will also address the other issue raised by the defendants, *i.e.*, that plaintiffs cannot establish that Dean possessed or had dangerous probability of achieving monopoly power in the relevant geographic market. As noted above, monopoly power is defined as the power to raise prices or exclude competition. *Eastman Kodak*, 504 U.S. at 464. For the reasons noted above, the two pieces of evidence pointed to by plaintiffs in support of their argument that they have established that Dean has direct control over prices and competition within the relevant market, that is, that Dean's profits are above what Food Lion's consultant believes they should be and the statement of Dean's Eastern Region CEO, do not create a genuine issue of material fact as to Dean's market power.

Once again, plaintiffs point to the declaration of Professor Froeb in an effort to create a genuine issue of material fact. Plaintiffs argue that "Professor Froeb has concluded that Dean has market power over the market for fresh white fluid milk in the relevant market . . . ." A review of Professor Froeb's declaration reveals that he has concluded, based upon his "analytical model," that Dean has market power because it has the ability to raise prices, not that Dean has actually exercised that power. The plaintiffs correctly argue, however, that it is the ability to raise prices, not the actual exercise of that power, that is key in determining whether a defendant possesses monopoly power. *Conwood Co.,* LP., 290 F.3d at 783 n.2.

Plaintiffs also point out that Professor Froeb has noted and relied upon Professor Cotterill's calculation of Dean's market share "in Federal Milk Market Order 5."[25] Professor Froeb concludes that Dean's concentration of plant ownership within the market as he defines it is greater than it is

---

[25] As noted above, plaintiffs have abandoned their argument that the relevant geographic market can be defined using the boundaries of Federal Milk Marketing Orders 5 and 7.

within Order 5 itself, based upon his "extrapolation" from Professor Cotterill's calculations. Plaintiffs further argue that Professor Froeb's findings are consistent with the "anecdotal evidence in the record that Food Lion was forced to pay a price that it considered to be higher than a competitive price."

Once again, Professor Froeb's opinion cannot be relied upon by plaintiffs to create a genuine issue of material fact.[26] This is so primarily because Professor Froeb admits that he never analyzed what was actually happening and he points to no "facts" in the record upon which he relies. The plaintiffs cite a footnote in the *Conwood* case for their assertion that the Sixth Circuit has "repeatedly" held that it is the ability to raise prices, not the actual exercise of that power which is key. While the plaintiffs have correctly stated the language of the footnote in *Conwood*, it does not stand for the proposition they advance. Indeed, the very case cited in the *Conwood* footnote, *Byars v. Bluff City News Co., Inc.*, 609 F.2d 843 (1979), makes it clear that when a plaintiff is attempting to show monopoly power other than through market share, it is "the exercise of ***actual*** control over prices or the ***actual*** exclusion of competitors" which is relevant. *Byers*, 609 F.2d at 850.

There are two ways established in the case law for showing monopoly power. The first is by presenting direct evidence "showing the exercise of actual control over prices or the actual exclusion of competitors." *Id.* The second is by presenting circumstantial evidence of monopoly power by showing a high market share within a defined market. *Id.*; *Re/Max Int'l.*, 173 F.3d at 1016. Professor Froeb admits that he made no analysis of whether or not Dean exercises actual control over prices

---

[26] Plaintiffs claim that "Professor Froeb's ***opinion*** presents direct evidence of Dean's market power . . ." [Doc. 765, p. 7]. It is doubtful if "opinions" can ever create a genuine issue of material ***fact***. Plaintiffs further claim that this direct evidence of market power is corroborated by indirect evidence of Dean's market power based on Dean's market share. As noted elsewhere in the opinion, the "corroborating evidence that Dean possess a market share in excess of 67%" is based on Dr. Froeb's "extrapolation."

or has engaged in actual exclusion of competitors. As a result, his opinion that Dean has the ability to do so within the relevant geographic market as described by him is largely irrelevant.

That leaves the plaintiffs with the "shortcut" formula which involves measuring the market share possessed by the alleged monopolist. *Byers*, 609 F.2d at 850; *Re/Max Int'l.*, 173 F.3d 995. Professor Froeb does estimate Dean's market share in the different, smaller geographic market defined by him at 67%, a figure he extrapolates from Professor Cotterill's computation that Dean has an 80% market share in Order 5. Professor Froeb's extrapolation is doubtful at best. In any event, the Sixth Circuit has warned about an approach involving a more narrow definition of a geographic market in order to allow a calculation of a higher percentage share of the market. *See Byers*, 609 F.2d 843 at 850, n.17 (citing *United States v. DuPont & Co.*, 351 U.S. 377 (1956)).

Plaintiffs have failed to establish that there is a genuine issue of material fact with respect to Dean's market power and Counts III and IV of the complaint are subject to summary judgment on this basis as well.

### D. Count V (violation of § 2 of the Sherman Act/conspiracy to monopolize against Dean, DFA and NDH)

In Count V, plaintiffs allege that Dean, DFA and NDH have conspired to monopolize the market for processed milk in violation of § 2 of the Sherman Act. The plaintiffs allege that Dean, DFA and NDH each specifically intend to obtain monopoly power in the market and have committed overt acts in furtherance of that conspiracy, which include an agreement among Dean, DFA and NDH not to compete for sales of processed milk to retail stores.

#### 1. Defendants' Argument

Defendants raise the same argument in support of their claim that they are entitled to summary judgment on the conspiracy to monopolize claim as well, that is, that plaintiffs do not define

the relevant geographic market. In a footnote in their memorandum, they assert additionally that Count V fails because there is no evidence proving a conspiracy.

### 2. Plaintiffs' Argument

Plaintiffs assert that defendants erroneously argue that all § 2 cases require a finding with respect to the relevant geographic market and that it is not necessary for plaintiffs to establish the relevant product and geographic markets in which they compete for their conspiracy claim to succeed and that defendants' summary judgment motion does not claim that retailer plaintiffs lack intent to monopolize.

### 3. Applicable Legal Principles

To prove a conspiracy to monopolize, it [is] not necessary to show power and intent to exclude all competitors, or to show a conspiracy to exclude all competitors," because § 2 prohibits efforts to "monopolize any part of the trade or commerce among the several states . . . ." *American Tobacco Co.*, 328 U.S. at 789. Nor, in a conspiracy claim, does an antitrust plaintiff need to show defendants' dangerous probability of success as would be the case if an attempted monopolization claim were brought. *International Distribution Ctrs., Inc. v. Walsh Trucking Co., Inc.*, 812 F.2d 786, 795-96n.8 (2d Cir. 1987). Although market power need not be shown for a conspiracy claim, such power is relevant to whether a particular defendant possessed a specific intent to monopolize. *See Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 926-27 (9th Cir. 1980), *cert. denied*, 450 U.S. 921 (1981). "[T[he mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize" because "[a]ll lawful competition aims to defeat and drive out competitors." *Great Escape, Inc. v. Union City Body Co., Inc.*, 791 F.2d 532, 541 (7th Cir. 1986) (citing *Pacific Eng'g & Prod. Co. v. Kerr-McGee Corp.*, 551 F.2d 790, 795 (10th

Cir.), *cert. denied* 434 U.S. 879 (1997)).

Some courts have held that since "[s]pecific intent to monopolize is the heart of a conspiracy charge, . . . a plaintiff is not required to prove what is the 'relevant market.'" *Salco Corp. v. General Motors Corp.*, 517 F.2d 567, 576 (10th Cir. 1975). Other courts have held that a minimal showing must nonetheless be made as to the "product and geographic context" of the alleged conspiracy. *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1181-82, (8th Cir. 1982), *cert. denied*, 461 U.S. 937 (1983). Another view is "that relevant market should be considered a necessary element of § 2 conspiracy claims, at least in civil cases." *Alexander*, 687 F.2d at 1182 (citing 3 Vaughn Kalinowski, *Antitrust Laws And Trade Regulation* § 9.02[4] (1982)).

In this respect, the Supreme Court's 1947 decision in *United States v. Yellow Cab Co.*, 332 U.S. 218 (1947), *overruled* on other grounds by *Copperweld*, is instructive. In that case, the Supreme Court addressed the sufficiency of a complaint alleging a conspiracy to monopolize and held that a failure by a plaintiff to allege defendants' monopoly power or to allege "[i]ts relative position in the field of taxicab production [had] no necessary relation to the ability of the [defendants] to conspire to monopolize or restrain . . . an appreciable segment of interstate cab sales. An allegation that such a segment has been or may be monopolized or restrained is sufficient," 332 U.S. at 226. Indeed, one circuit court of appeals has, relying upon this language in *Yellow Cab*, found that proof of a relevant market is unnecessary to a § 2 conspiracy. *See United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961). Although the precedents are somewhat unclear, it would seem to this Court that at least some showing of a relevant geographic market is necessary in a conspiracy case; otherwise, the allegations of conspiracy to monopolize in a given market would make little sense.

### 4. Discussion

The Court is constrained to agree with plaintiffs that the only argument properly raised by defendants for summary judgment on the conspiracy to monopolize claim relates to the relevant geographic market. As set forth above, it is doubtful that the contours of the geographic market must be as precisely defined, if at all, in a conspiracy to monopolize claim as opposed to a monopolization or attempt to monopolize claim. Defendants seem to acknowledge as much, arguing however that lack of market or monopoly power is probative of a lack of such intent. While defendants' position is likely correct, in that it does appear that some level of market power and some definition of the contours of the geographic market is necessary for a conspiracy claim to succeed, it also appears that the primary focus in a conspiracy claim has to do with the defendants' specific intent to monopolize.

Given the lack of development of the argument in defendants' filings, and since defendants' summary judgment motion does not specifically claim that there is no genuine issue of material fact as to a specific intent to monopolize, the Court will not grant the motion for summary judgment at this time, but will deny the motion, subject to its refiling on this ground as to Count V by the defendants with a more thorough examination of the record evidence in the case. For these reasons, motion for summary judgment as to Count V will be DENIED.

### V. Conclusion

For the reasons set forth above, defendants' motion for summary judgment, [Doc. 461], is **GRANTED IN PART** and **DENIED IN PART**, and Counts II, III and IV of plaintiffs' amended complaint are **DISMISSED**.

So ordered.

ENTER

<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE