**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE: SOUTHEASTERN MILK** | ) | |
| **ANTITRUST LITIGATION** | ) | |
| | ) | **Master File No. 2:08-MD-1000** |
| | ) | |
| **THIS DOCUMENT RELATES TO:** | ) | **Judge J. Ronnie Greer** |
| *Food Lion, LLC, et al.* | ) | **Inman** |
| *v. Dean Foods Company, et al.,* | ) | |
| *No. 2:07-CV-188* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are retail sellers of processed milk who purchase directly from defendants Dean

Foods Company ("Dean") and/or Dairy Farmers of America, Inc. ("DFA") who bring this purported

class action under Sections 1 and 2 of the Sherman Act, 15 U.S.C. § § 1-2 and Section 3 of the

Clayton Act, 15 U.S.C. § 14.[1] Plaintiffs' complaint alleges causes of action for violation of Section

1 of the Sherman Act against Dean, DFA, and National Dairy Holdings, LP ("NDH") (agreement not

to compete) (Count I); violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act

against Dean, DFA, NDH, Southern Marketing Agency, Inc. ("SMA") and Dairy Marketing Services,

LLC ("DMS") (conspiracy to unreasonably restrain trade) (Count II); violation of Section 2 of the

Sherman Act against Dean (unlawful monopolization) (Count III); violation of Section 2 of the

Sherman Act against Dean (attempt to monopolize) (Count IV); and violation of Section 2 of the

Sherman Act against Dean, DFA, and NDH (conspiracy to monopolize) (Count V).

On August 4, 2010, the Court granted Defendant's motion for summary judgment on Counts

II, III and IV and denied the motion as to Counts I and V, [Doc. 863]. Currently pending before the

---

[1]  Although there is a pending class certification motion, no class has been certified in this case.

Court are two related motions which this order will address: (1) Defendants' motion for reconsideration of the Court's August 4, 2010 order denying summary judgment as to Counts I and V, [Doc. 952], and (2) Defendants' supplemental motion for summary judgment as to Counts I and V, [Doc. 1026]. The parties have now exhaustively briefed the pending motions, the Court has heard oral argument and the motions are ripe for disposition. For the reasons which follow, defendants' motion for reconsideration will be GRANTED IN PART (as to Count V) and DENIED IN PART (as to Count I) and the supplemental motion for summary judgment will be GRANTED, Counts I and V of plaintiffs' complaint will be DISMISSED, and judgment will be entered on the Court's orders in favor of defendants.

## I.     The Motion For Reconsideration, [Doc. 952]

### A.     Count I

Defendants argue that the Court erroneously held that disputed issues of material fact require trial of the conspiracy count (Count I) of the plaintiffs' complaint under § 1 of the Sherman Act. Defendants acknowledge that the Court recognized the correct standards but they say that the Court failed to properly apply them. They specifically argue that the Court clearly erred when it found that the parties' competing views of the evidence and the inferences to be drawn from that evidence create material issues of fact for trial without requiring plaintiffs to produce "evidence that tends to exclude the possibility" that the challenged conduct was the result of independent action. *See Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). Plaintiffs, of course, disagree.

Although the Court will grant Defendants' pending supplemental motion for summary judgment as to Count I, the Court believes that it both correctly stated and correctly applied the proper standards in its prior memorandum opinion. The motion for reconsideration as to Count I,

2

therefore, will be DENIED. Because the Court may not have articulated its views as clearly as it could have in the prior order, the Court will briefly discuss two of the issues raised by the motion and response.

The first deals with the proper application of the summary judgment standard in antitrust cases. Although the parties appear to agree on the definition of the standard, they disagree strenuously on the manner in which it is applied. Defendants seem to argue that the standard is met when they respond to Plaintiffs' ambiguous evidence with evidence of their own unilateral, independent business decisions related to the conduct. In other words, they seem to argue that they meet the standard whenever they offer any argument from which the jury could draw from their conduct an inference of independent business decision, as well as an inference of action in furtherance of an antitrust conspiracy. They then appear to argue, not that Plaintiffs must show a jury question, but that Plaintiffs must prove that the action was not taken unilaterally, but in concert with others in an illegal conspiracy. Plaintiffs describe Defendants' efforts as an "upside down view" of the standard because Defendants urge the Court to require Plaintiffs to produce "overwhelming evidence" of joint illegal conduct. The Court agrees with Plaintiffs on this point and an example will illustrate the point.

Plaintiffs have offered evidence which, if believed by the jury, establishes that Defendants have acted contrary to their independent economic interest, for instance, that DFA/NDH acquired spin-off plants from the Dean/Suiza merger which were doomed to failure from the outset. Defendants respond that acquisition of the plants satisfied a legitimate business purpose, *i.e.*, satisfaction of the government's concern about the merger, and that DFA had an interest in supplying raw milk to these plants. From this circumstantial evidence the jury could draw one of two inferences

3

- the one argued by plaintiffs or the one urged by defendants. Yet, one of these inferences, if accepted by the jury, "tends to exclude the possibility" that the conduct was the result of independent action. Defendants want the Court to decide this dispute in the summary judgment motion context, not at trial by a jury. That is not the proper standard. If it is, then no antitrust case would ever reach the jury as long as the defendant could merely suggest a plausible business reason for complained of conduct.

Secondly, Defendants argue that the Court erroneously considered the "cumulative effect" of the evidence, violating both Supreme Court and Sixth Circuit standards against aggregating such evidence. In the prior memorandum opinion, the Court observed:

> Defendants rather convincing respond to many of the individual allegations made by plaintiffs and the Court would be constrained to agree with defendants on many of the individual issues raised by the respective parties in their briefs, if the Court viewed each separate document or transcript of testimony in isolation. Defendants appear to invite the Court to do just that; however, the Court must view the record as a whole and, while testimony or documentary exhibits viewed in isolation might not create a genuine issue of material fact, the cumulative effect of such evidence does so. *See American Tobacco Co. v. United States*, 147 F.2d 93, 107 (6th Cir. 1945) ("Acts done to give effect to the conspiracy may be, in themselves, wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").

> That the parties have many disputes about the appropriate inferences which could be drawn by a reasonable jury with respect to such a large volume of evidence simply illustrates the existence of genuine issues of material fact with respect to the conspiracy claim. It is not the strength of the plaintiffs' case on the merits that is being tested by this motion; rather, the Court must determine only whether or not there are genuine issues of material fact without weighing the evidence, resolving issues of credibility of witnesses or resolving factual disputes. Simply put, that is a matter for a jury.

[Doc. 863, at 12-13]. The Court simply observed the established rule that separate acts legal in

4

themselves may be part of the sum of the acts relied upon to effectuate the conspiracy. None of the cases cited by Defendants change that rule.

**B.    Count V**

As noted above, the Court previously denied Defendants' motion for summary judgment as to Count V, the claim of conspiracy to monopolize against Dean, DFA and NDH. Relying on cases from other circuits, the Court held that "[i]t is doubtful that the contours of the geographic market must be as precisely defined, if at all, in a conspiracy to monopolize claim as opposed to a monopolization or attempt to monopolize claim." [Doc. 863, at 36]. Defendants suggest in this motion that the cases relied upon by the Court predated the United States Supreme Court decision in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) and are contrary to clear Sixth Circuit precedent. Plaintiffs respond that Defendants are "wrong about the law." First, they argue that the *Spectrum Sports* case did not hold, as Defendants argue, that a determination of the relevant geographic market is an element of a conspiracy to monopolize claim and, secondly, that none of the Sixth Circuit cases cited by Defendants so hold.

In *Spectrum Sports*, a jury verdict was returned finding that Spectrum Sports had, among other things, "monopolized, attempted to monopolize, and/or conspired to monopolize." *Id.* at 448. The Ninth Circuit, noting that the jury had found a violation of § 2 without specifying whether the basis of its verdict was monopolization, attempt to monopolize or conspiracy to monopolize, concluded that a case of attempted monopolization had been established and affirmed. *Id.* at 452. More specifically, the Ninth Circuit held that it was not necessary for a plaintiff to present evidence of a dangerous probability of monopolization in a relevant market, a holding in conflict with the holding of all other circuit courts of appeals. The Supreme Court reversed. *Id.* at 453. This Court

5

agrees with Plaintiffs that *Spectrum Sports* cannot clearly be interpreted to hold that plaintiffs must prove a relevant geographic market to succeed on its conspiracy to monopolize claim.

The Sixth Circuit, however, appears to have been relatively clear about the rule in this circuit. The Sixth Circuit most recently addressed the issue in *Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009). In that case, Kentucky Speedway sued NASCAR alleging a violation of § 1 of the Sherman Act and made claims for monopolization, attempt to monopolize and conspiracy to monopolize under § 2. The district court granted summary judgment on all claims and the Sixth Circuit affirmed, holding that a plaintiff alleging a violation of § 2 must define "the relevant market within which the alleged anti-competitive effects . . . occur," and that Kentucky Speedway's claim failed because it "lacks the ability to define the relevant markets." *Id.* at 916, 919.[2]

Likewise, in *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999), the Sixth Circuit affirmed the dismissal of a conspiracy to monopolize claim for failure to establish the relevant geographic market. Plaintiffs acknowledge this but argue that the Sixth Circuit "appears to have merely assumed the answer without explicitly considering" the issue. Nevertheless, the result in *Re/Max* is clear. Counter-plaintiff's claim of conspiracy to monopolize was dismissed because counter-plaintiff could not establish the relevant market.[3]

---

[2]  Plaintiffs acknowledge the holding of the *Kentucky Speedway* case, as they must. They claim, however, that the Sixth Circuit "did not explicitly consider the question of whether market definition is a necessary element of a conspiracy-to-monopolize claim." The record here establishes, however, that plaintiffs in the *Kentucky Speedway* case expressly argued in their brief that their conspiracy to monopolize claim did not require proof of a relevant market, a position the Sixth Circuit rejected.

[3]  Defendants also cite *Michigan Division-Monument Bldrs. of America v. Mich. Cemetery Ass'n.*, 524 F.3d 726 (6th Cir. 2008) as a Sixth Circuit case affirming dismissal of a claim of conspiracy to monopolize for failure to establish a relevant geographic market. The Court agrees with Plaintiffs that it is not entirely clear that the case involved such claim. It is clear, however, that the complaint alleged a "conspiracy to restrain trade and/or to monopolize" in violation of § 2 of the Sherman Act but the Sixth Circuit does not further expand upon the matter.

6

It thus appears that this Court erred in failing to apply these controlling Sixth Circuit precedents. It seems rather clear that definition of the relevant geographic market by plaintiffs for all their § 2 claims is required. Under these circumstances, justice requires that the Court reconsider its prior ruling and grant the motion for summary judgment as to the conspiracy to monopolize claim to avoid "a manifest error of law," unless defendants have waived their argument as claimed by plaintiffs.

Plaintiffs argue that defendants have waived any argument that market definition is required for plaintiffs' § 2 conspiracy claims by not making the claim in their opening brief, citing *Rich v. Gobble*, 2009 WL 801774 at *22 (E.D. Tenn. Mar. 24, 2009) ("parties generally waive issues in the district court when they are raised for the first time in motions for reconsideration or reply briefs."). Plaintiffs, however, overlook that defendants did in fact raise the argument in their opening brief in connection with all of plaintiffs' § 2 claims and the Court specifically considered those claims. Defendants have not waived their argument.

## II.     The Supplemental Motion For Summary Judgment, [Doc. 1026].

In addition to the reasons advanced by Defendants in the motion for reconsideration, they urge additional grounds on which the Court should grant summary judgment as to Counts I and V: (1) Counts I and V fail because Plaintiffs cannot establish antitrust injury; (2) Count I fails because Plaintiffs cannot establish the relevant geographic and product market; and (3) Count V fails because Plaintiffs cannot establish specific intent to monopolize. As necessary, the Court will address these grounds one at a time.

### A.     Antitrust Injury

The antitrust laws generally afford a private right of action to "any person who shall be

injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C § 15. The Sixth Circuit has established a two part test to determine whether a plaintiff has adequately alleged antitrust standing: (1) Whether the plaintiff has asserted a cognizable "antitrust injury," and (2) whether the plaintiff is a proper plaintiff to assert a violation of the antitrust laws. *Indeck Energy Servs. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000). Plaintiffs must establish both parts of this test; otherwise, they lack antitrust standing.

Here, Defendants argue that Plaintiffs have not established antitrust injury of the type antitrust laws were intended to prevent. "An antitrust claimant must show more than merely an 'injury casually linked' to a competitive practice; it 'must prove an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *NicSand, Inc. v. 3M Company*, 507 F.3d 442, 450 (6th Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). In other words, plaintiffs in antitrust cases must prove that the harm for which they seek recovery flows from that which makes defendants' conduct anti-competitive. *Brunswick*, 429 U.S. at 489.

Defendants focus primarily on the expert opinions of Professor Ronald Cotterill, upon whom plaintiffs rely for proof of injury and damages in this case. Professor Cotterill, they claim, "does not offer evidence of injury caused by the alleged anti-competitive conduct that is the focus of Plaintiffs' Complaint." Defendants argue that the damages model used by Professor Cotterill measures the impact of the Dean-Suiza merger rather than the alleged anti-competitive conduct. More specifically, they argue that Professor Cotterill's primary damages model compares actual prices during the relevant period to what he estimates prices would have been if the Dean-Suiza merger had not

8

occurred.[4]  Professor Cotterill's alternative damages models built on what defendants see as a flawed primary model and also estimates the impact of individual plant closings, which defendants argue are not anti-competitive.  Furthermore, Defendants argue that even if there were a conspiracy to lessen competition for sales of processed milk, Plaintiffs cannot show that such a conspiracy injured Food Lion because the prices Food Lion paid Dean for processed milk were determined pursuant to a negotiated formula, the components of which were based on objective factors having nothing to do with the alleged anti-competitive behavior.  Thus, they argue that any increased prices to Food Lion occurred "by reason of" the negotiated formula, not any alleged anti-competitive behavior.

Plaintiffs' response is predictable.  They generally argue that Professor Cotterill's opinions, using reliable and widely accepted methodology, properly establish both injury and damages.  In response to Defendants' specific claim that Professor Cotterill is measuring damages caused by the Dean-Suiza merger, Plaintiffs respond that Professor Cotterill "is comparing the before period with the conspiracy period," and they define the "before" period as the period of time immediately before the merger.  Plaintiffs spend a good part of their response on an argument that a methodology comparing the period before the alleged conspiracy with the conspiracy period is an accepted methodology.  As the Court understands it, Defendants do not quarrel with the methodology itself. While acknowledging that customers like Breto and Food Lion purchase through negotiated list prices, they argue that everyone who purchases milk, whether through negotiated prices or otherwise, suffers harm when parties succeed in conspiring to fix prices and they point to Professor Cotterill's opinion that formula pricing did not insulate Food Lion and Breto from overcharges.

_____

[4]  The Dean-Suiza merger closed in December 2001.  The instant lawsuit was filed in August, 2007. Plaintiffs have expressly disclaimed any legal challenge to the merger, clearly recognizing that such a challenge is time barred by the four year limitations period of 15 U.S.C. § 15b.

Case 2:07-cv-00188   Document 669   Filed 03/27/12   Page 9 of 21   PageID #: 16344

On the issue related to Professor Cotterill, this Court agrees with the Defendants. While Defendants insist that Professor Cotterill has not measured impact caused by the merger, Professor Cotterill himself acknowledged, as Defendants point out, that that is precisely what he did. Professor Cotterill testified in his deposition that his task was "to analyze whether in fact the creation of NDH [through the merger] and the assertion [to DOJ] that there would be economies of size and lower prices through efficiencies generated by that creation from January 1, 2002 going forward [*i.e.* from merger], whether that in fact was true or not . . ." [Doc. 1149, Ex. 12, Cotterill depo. April 12, 2010, p. 267 ll. 15-20]. Professor Cotterill's expert report is even clearer. He states in that report that "the model I estimate is similar to the approach employed by the Department of Justice in its analysis of potential anticompetitive effects from the 2001 Dean-Suiza ***merger***." [Cotterill report, March 5, 2010, ¶ 114] (emphasis added). Further, he stated that "the DOJ used this model to estimate the price impact of the proposed merger between Dean and Suiza, finding a predicted average price increase of six cents per gallon, or 2.5%, for affected Suiza customers in the sixteen state region analyzed. The application in this litigation is largely the same . . ." [*Id.*].

Thus, in this Court's view, it is largely beyond question that Professor Cotterill has measured the price impact of the merger itself and it is inescapable that the price increases he identifies as injury to the Plaintiffs in this case are related, if not totally, then at least in part, to the merger itself, conduct which is not challenged in this case. Further, it appears to the Court that Professor Cotterill cannot, and did not, measure how prices would have increased in the absence of a conspiracy. He simply compared pre-merger prices to post-merger prices. In short, Professor Cotterill's analysis does not create a material issue of fact on the question of whether the price increases were "by reason of" an illegal conspiracy in violation of the antitrust laws and Plaintiffs do not allege an injury of the

10

kind which the antitrust laws are designed to prevent.[5]

Because Plaintiffs cannot establish antitrust injury, i.e., there is not a genuine issue for trial on the issue, Counts I and V fail and defendants are entitled to summary judgment as to Counts I and V on this basis alone.[6]

## B.    Relevant Geographic Market

The Court has previously stated that "Plaintiffs allege a horizontal agreement among Dean, DFA and NDH to lessen competition for sales of processed milk to retailers in the southeast and, in fact, not to compete for such sales." [Doc. 863 at 8]. Plaintiffs describe the conspiracy as a *quid pro quo* agreement between Dean and DFA (they allege that NDH was a false competitor controlled by DFA) in which Dean agreed to buy raw milk only from DFA in exchange for DFA's agreement to lessen competition in the bottled milk market. They further claim that full supply agreements were the "means by which Dean paid off DFA for NDH's participation in the conspiracy." [Doc. 1128 at 2]. The Court has previously held that Plaintiffs lack standing to challenge these raw milk agreements and has dismissed Count II on that basis, [*see* Doc. 863], but plaintiffs continue to see these agreements as being at "the heart" of their Count I conspiracy claims. The Court has previously held and now reaffirms that the evidence as a whole creates genuine issues of material fact as to whether Defendants entered into the alleged agreement.

Defendants argue, however, in this motion that Plaintiffs' Count I claim, no matter how it is

---

[5]  Professor Cotterill himself appears to admit that the required causal connection is not present in his analysis. *See* [Doc. 1149, Ex. 12, at p. 66, ll. 13-14].

[6]  As a result of the Court's ruling with respect to Professor Cotterill's expert opinions and the absence of any genuine issue of fact related to antitrust injury, the Court will not consider the other argument made by defendants, that is, that the prices Food Lion paid Dean for processed milk were determined pursuant to a negotiated formula and thus Plaintiffs cannot show that a conspiracy, even if it existed, injured Plaintiffs.

characterized or labeled by Plaintiffs, is in reality, not a claim of a horizontal, *per se* illegal conspiracy, but rather a claim of an illegal conspiracy involving contracts between firms at different levels of the distribution chain – i.e. between a bottler of processed milk and a supplier of raw milk (Dean and DFA) which is essentially vertical in nature and subject to the rule of reason analysis. Because Plaintiffs cannot prove a relevant geographic market, Defendants argue that the conspiracy claim – Count I – fails. Plaintiffs respond that the conspiracy, if proven, is *per se* unlawful and no proof of a geographic market is required. They claim, alternatively, that even if the case were judged under the rule of reason standard, there is evidence of the appropriate geographic market.

Given this Court's ruling with respect to Professor Froeb's testimony, Plaintiffs cannot prove the relevant antitrust geographic market. If, therefore, the case is judged by the *per se* standard, the case must be submitted to the jury for resolution of the fact question of whether Defendants engaged in the alleged conspiracy. If, on the other hand, the case is judged by the rule of reason standard, Defendants are entitled to summary judgment because there is no genuine issue of fact as to the relevant geographic market. The question of whether the alleged conspiracy is horizontal and *per se* illegal or essentially vertical and judged under the rule of reason standard is, therefore, a critical one for Plaintiffs. Many of the issues related to this question have been considered and decided in relation to summary judgment motions in the coordinated case of the dairy farmer plaintiffs and the Court's analysis in that case, much of which is incorporated herein, is set out in Doc. 1639.

Section 1 of the Sherman Act provides in pertinent part:

> [e]very contract, combination . . . or conspiracy in restraint of trade or commerce among the several states . . . is declared to be illegal.

15 U.S.C. § 1. While § 1 appears to prohibit every restraint of trade, the Supreme Court has interpreted the statute as condemning only those combinations which constitute unreasonable

restraints of trade. *Standard Oil Company of New Jersey v. United States*, 221 U.S. 1 (1911). In order to establish their claim under § 1 of the Sherman Act, the Plaintiffs must prove that the Defendants "(1) participated in an agreement that (2) unreasonably unrestrained trade in the relevant market." *Nat'l Hockey League Players' Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d at 712, 718 (6th Cir. 2003).

Whether an agreement unreasonably restrains trade is determined under one of two approaches: the *per se* rule or the rule of reason. *Worldwide Basketball and Sport Tours, Inc. v. National Collegiate Athletic Association*, 388 F.3d 955, 959 (6th Cir. 2004). In *per se* cases, evidence of actual effect on competition is not required because these actions are conclusively presumed to be unreasonable. *Copperweld Corp. v Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *Northern Pacific Railway Company v. United States*, 356 U.S. 1, 5-6 (1958). A restraint on trade is *per se* illegal when "the practice facially appears to be one that would almost always tend to restrict competition and decrease output." *National Collegiate Athletic Association v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100 (1984) (citations omitted).

Examples of practices which are *per se* illegal are horizontal price fixing, market allocation, group boycotts or tying arrangements, activities which are considered inherently anti-competitive. *Copperweld Corp.*, 467 U.S. at 768; *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-20 (1979); *Northern Pacific Railway Company*, 356 U.S. at 5-6. "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 1522-23 (1988). There is often no bright line separating *per se* from rule of reason analysis. *NCAA*, 468 U.S. at 104, n.26.

A *per se* rule is inappropriate where the effects of a particular restraint are unclear, even where aspects of the restraint may appear to be facially anti-competitive. *Meijer, Inc. v Barr Pharmaceuticals, Inc.*, 572 F. Supp.2d 38, 47 (D.D.C. 2008). *Per se* analysis should not be extended "to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious . . . ." *Balmoral Cinema, Inc. v Allied Artists Pictures Corp.*, 885 F.2d 313, 316 (6th Cir. 1989) (quoting *FTC v Indiana Federation of Dentists*, 476 U.S. 477, 459 (1986)).

Furthermore, "there is a presumption in favor of a rule-of-reason standard," *Business Electronics*, 485 U.S. at 726. *See also Care Heating & Cooling, Inc. v. American Std., Inc.* 427 F.3d 1008, 1012 (6th Cir. 2005) ("There is an automatic presumption in favor of the rule of reason standard."). Under the rule of reason analysis, the plaintiff bears the burden of establishing that the conduct complained of "produces significant anticompetitive effects within the relevant product and geographic markets." *NHL Players' Assoc.*, 325 F.3d at 718; *Worldwide Basketball and Sport Tours*, 388 F.3d at 959 (quoting *Nat'l Hockey League Players*, 325 F.3d at 718)).

At the hearing on the supplemental motion for summary judgment on December 16, 2010, the Court posed a question to the parties – i.e., whether the question of whether the alleged conspiracy is one subject to *per se* analysis or one subject to rule of reason analysis is a question for a jury or the Court. By letter brief filed on December 30, 2010, [Doc. 1222], plaintiffs argue that the Court cannot, as a matter of law, determine whether *pro se* or rule of reason analysis applies to the case, relying almost exclusively on *In re Sulfuric Acid Antitrust Litigation*, 743 F.Supp.2d 827, (N.D. Ill. 2010), a case where defendants asked the court to hold that rule of reason analysis applied and the district court declined to do so, holding that "[it] is not the Court's task to determine whether

14

Defendants' conduct would be subjected to the rule of reason if the facts are as they claim." *Id.* at 866-67. The court found that the evidence presented an issue of fact as to whether a *per se* violation had occurred, *e.g.* whether certain defendants "stood in a horizontal, vertical, or hybrid relationship with co-defendants." *Id.* at 868.

Defendants responded to Plaintiffs' letter brief, [Doc. 1244], arguing that *Sulfuric Acid* has no application because here, unlike that case, there are no disputed issues of fact to be decided. They argue, on the contrary, that the case presents a "classic rule of reason case" based on "Plaintiffs own allegations." [*Id.* at 2]. In other words, Defendants argue that Plaintiffs' own view of the case establishes that the case is subject to rule of reason analysis. They also argue that whether Plaintiffs "*quid pro quo*" agreement should be evaluated under the rule of reason analysis is a question of law for the Court.

The question of the appropriate rule of law to be applied to the conspiracy alleged by the Plaintiffs in their complaint is to be determined by the Court or is a question of fact for the jury has not been precisely answered in the Sixth Circuit. This Court concludes, however, the *Sulfuric Acid* decision notwithstanding, that the weight of authority supports Defendants' argument that determination of the appropriate rule of law to be applied is a question of law to be decided by the Court and that approach also appears to be consistent with the Sixth Circuit's application of the legal rules involved.

A leading antitrust treatise recognizes that the selection of the mode of analysis is a question of law for the court:

> While applying any one of antitrust's modes of analysis might involve many fact questions, the selection of a mode is entirely a question of law. To be sure, the Supreme Court stated in *Maricopa* that "the rule of reason requires the factfinder to decide whether under all the

15

circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." But that statement was not meant to indicate that the fact finder should determine whether the *per se* rule or the rule of reason applied to a particular set of facts. Rather, it meant that once the court decided that the rule of reason should apply, disputed factual questions about reasonableness should be left to the jury. In a footnote the court made clear that determining the rule of decision was a question of law.

*XI Herbert Hovencamp, Antitrust Law* ¶ 1909b at 279 (2d Ed. 2005) (citing *Perceptron, Inc. v. Sensor Adaptive Mach.*, Inc., 221 F.3d 913 (6th Cir. 2000)). This statement is also consistent with decisions of the Sixth Circuit. For instance, in *Expert Masonry, Inc. v. Boone County, Kentucky*, 440 F.3d 336 (2006), the Sixth Circuit said: "In the first instance, **courts** must distinguish between some types of unlawful anticompetitive restraints that [are] . . . *per se* illegal under the antitrust laws, and the far-larger type of restraints that should be analyzed under the rule of reason approach . . . ."). *Id.* at 342 (emphasis added). Likewise, in *United States v. Cooperative Theaters of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988), although a criminal case, the district court held as a matter of law that the alleged conduct constituted a *per se* violation of the Sherman Act, a ruling affirmed by the Sixth Circuit. *See also Care Heating & Cooling, Inc.* 427 F.3d at 1012 ("if a court determines that a practice is illegal *per se*, further examination of the practice's impact on the market or the procompetitive justifications for the practice is unnecessary for finding a violation of antitrust law," suggesting that the decision as to whether a practice is illegal *per se* is one committed to the court).

The approach is likewise consistent with that taken by the United States Supreme Court and other circuit courts of appeals. The Supreme Court has repeatedly noted that the *per se* rule should be applied to conduct only after **courts** have had "considerable experience with certain business relationships." *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608 (1972). Since it seems quite clear that the *per se* rule should be applied to conduct only after it has been examined carefully

by the courts, not juries, it also seems rather clear that the question of whether allegedly unlawful conduct is subject to *per se* analysis or rule of reason analysis is a legal question for the court, not a question for the jury. *See also Northern Pacific Railway Company*, 356 U.S. at 5 (suggesting that the court must first determine whether the conduct alleged to be unlawful is the type of conduct that has a "pernicious effect on competition and lacks any redeeming virtue . . .," to be considered illegal *per se*); *Copy-Data Systems, Inc. v. Toshiba America, Inc.*, 663 F.2d 405 (2d Cir. 1981) (where the district judge had held, after hearing argument from both sides, that Toshiba had imposed a horizontal, illegal *per se* territorial restriction on Copy-Data, a holding reversed by the Second Circuit on appeal as a matter of law).

It is beyond question that Plaintiffs present their claim as a horizontal, *per se* illegal conspiracy to restrain trade and fix prices on the part of the Defendants, [*see* Complaint, Doc. 87, ¶ 162], arguing only alternatively that the agreements at issue violate § 1 of the Sherman Act under rule of reason analysis. In addition, Plaintiffs have repeatedly referred to their claim as a horizontal, *per se* claim in their pleadings and at oral argument. The labels attached to the conduct by the Plaintiffs are not determinative, however, i.e. that Plaintiffs repeatedly state that the conspiracy they allege is a horizontal, *per se* illegal conspiracy to fix prices and allocate markets does not make it so. In fact, the Supreme Court has recognized just that. *See California Dental Ass'n. v. Federal Trade Commission*, 526 U.S. 756 (1999).

The Sixth Circuit has succinctly defined the two major types of antitrust conspiracies as follows:

> Courts have identified two major types of antitrust conspiracies to restrain trade: horizontal and vertical. *Crane & Shovel Sales Corp. v Bucyrus-Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988). Horizontal conspiracies involve agreements among competitors at the same level

> of market structure to stifle trade, such as agreements among
> manufacturers or among distributors to fix prices for a given product,
> and therefore may constitute *per se* violations of antitrust law. *Id.*; *see
> also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 131 (2d Cir.
> 1978). Vertical conspiracies, on the other hand, involve agreements
> among actors at different levels of market structure to restrain trade,
> "such as agreements between a manufacturer and its distributors to
> exclude another distributor from a given product and geographic
> market." *Crane & Shovel Sales Corp.*, 854 F.2d at 805.

*Care Heating & Cooling*, 427 F.3d at 1013. Vertical restraints are analyzed under the rule of reason.

*Id.* (citing *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 57-58 (1977)). To the extent

there was any lingering doubt about whether vertical restraints are subject to *per se* or rule of reason

analysis, that suggestion was quashed by the United States Supreme Court in *Leegin Creative Leather

Products, Inc. v. PSKS, Inc.,* 551 U.S. 877 (2007) (vertical restraints to be judged according to the

rule of reason). *See also Total Benefit Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield*,

552 F.3d 430 (6th Cir. 2008).

   As an initial matter then, the Court must determine whether or not the agreement alleged by

the plaintiffs is horizontal in nature, which may constitute a *per se* violation of antitrust law, or

vertical in nature, which must be analyzed under the rule of reason. In making this determination,

as set forth above , the labels used by the plaintiffs are largely irrelevant and the decision will be

made against a backdrop of several well established principles. First of all, "[t]here is an automatic

presumption in favor of the rule of reason standard." *Care Heating & Cooling*, 427 F.3d at 1012

(citing *Business Electronics Corp.*, 485 U.S. at 726; *Continental T.V., Inc.*, 433 U.S. at 49).

Secondly, the category of agreements to be analyzed under a *per se* analysis has been shrinking over

the last few years. *See Leegin*. Finally, the *per se* rule should be applied only in "clear cut cases"

of trade restraints that are so unreasonably anticompetitive that they present straightforward questions

for reviewing courts. *NHL Players Assoc.*, 325 F.3d at 718 (citing *Sylvana*, 433 U.S. at 49-50). *See also Balmoral Cinema*, 885 F.2d at 316 ("*per se* analysis should not be extended 'to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious . . . .'").

As noted above, the essence of Plaintiffs' conspiracy claim is a *quid pro quo* agreement between competitors at the same level of the distribution chain (Dean and NDH) almost totally carried out through the use of agreements involving the supply of raw milk among a group of firms at other levels of the distribution chain (Dean and DFA, NDH and DFA). At oral argument, Plaintiffs presented the Court with a chart illustrating their claim which showed a triangular relationship with Dean and NDH as horizontal competitors and DFA in a vertical relationship to both Dean and NDH. Plaintiffs suggest that two horizontal competitors, Dean and NDH, "are central to the argument" while at the same time arguing that it is the full supply agreements for raw milk between vertical actors that are "at the heart" of their claims.

Plaintiffs equate the arrangement among the firms sued here with those in *In re Pressure Sensitive Label Stock Antitrust Litigation*, 2007 WL 4150666 (M.D. Pa. 2007) (not reported in F.Supp.2d) and argue that the court there rejected the "exact same arguments" Defendants make in this case. In a footnote in that opinion, deciding a class certification motion, the district judge noted that Defendants had argued at oral argument that the agreement in question was not a horizontal agreement. As the Court understands the parties in that case, the plaintiffs, in the business of processing and converting pressure sensitive label stock ("PSL"), sued defendants, PSL producers, for conspiring "to fix, raise, maintain or stabilize prices for self-adhesive label stock . . . and to allocate and restrict output in the market for self-adhesive label stock sold in the United States." *Id.*

19

at *1.

One of the defendants ("UPM") was a paper supplier as well as the owner of another defendant ("Raflatac"), a PSL producer. Avery, another PSL producer, competed with Raflatac, and also had a contract with Raflatac's parent, UPM, to supply paper to Avery. The gist of the alleged illegal agreement challenged was that Avery would purchase large quantities of paper stock from UPM in consideration of UPM agreeing to refrain from competing with Avery in the PSL market through Raflatac. Thus, the paper supply agreement was a critical element of plaintiffs' antitrust claims. Defendants claimed that the antitrust arrangement was a dual distribution arrangement, not a horizontal agreement. The district court rejected that position, finding that "the agreement was between competitors and, therefore, horizontal," *Id*. at *12, FN7. The instant case, Plaintiffs argue, "mirrors *Pressure Sensitive*," and they characterize the arrangement as "3-way agreement trading vertical supply for horizontal non-competition."

Defendants here do not claim the arrangement among Dean, NDH and DFA is a dual distribution arrangement. They claim rather that the substantial vertical elements of the agreement challenged here make the case analogous to cases decided under the rule of reason. It is for this reason that the Court does not find *Pressure Sensitive* to be particularly helpful in resolving this question. The district judge in *Pressure Sensitive*, while noting that the paper supply agreement between UPM and Avery was a critical element of the alleged conspiracy, apparently never considered the nature of the agreement in the terms posed by Defendants here.

The issue presented here is a difficult one. On the one hand, Plaintiffs' argue that the essence of the agreement here is that two horizontal competitors, Dean and NDH, are central and that the agreement should therefore be subjected to *per se* analysis. On the other hand, Plaintiffs also allege

that NDH is a false competitor, completely controlled by DFA, and that the full supply agreements for raw milk are at the heart of their claims. In reality, it appears to the Court that the essence of the agreement alleged by the Plaintiffs is one between Dean in its role as a processor of bottled milk and DFA in its role as a supplier of raw milk and that the milk supply agreements for raw milk are central to the completion of the alleged conspiracy. Under these circumstances, the Court agrees with Defendants that the agreement has substantial vertical elements such that the alleged agreements challenged by Plaintiffs ought to be subject to the rule of reason analysis, requiring that Plaintiffs establish the relevant geographic antitrust market, something they cannot do. For this reason, Defendants are entitled to summary judgment as to Count I of Plaintiffs' complaint.

So ordered:

ENTER:


<u>s/J. RONNIE GREER</u>
UNITED STATES DISTRICT JUDGE